UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re: | ) | |
| DAVID RAIFFE CH: 7 | ) | 2:18-BK-15086-DPC |
| UNITED MIDWEST SAVINGS BANK DBA MIDWEST vs DAVID RAIFFE | ) | ADV: 2-19-00098 |
| TRIAL | ) | |

U.S. Bankruptcy Court
230 N. First Avenue, Suite 101
Phoenix, AZ 85003-1706

January 27, 2020
9:00 a.m.

BEFORE THE HONORABLE DANIEL P. COLLINS, Judge

APPEARANCES:

| | |
|---|---|
| For United Midwest Savings Bank dba Midwest Business Capital: | Anthony W. Austin<br>Philip L. Brailsford<br>Craig Street<br>FENNEMORE CRAIG<br>2394 East Camelback Road<br>Suite 600<br>Phoenix, AZ 85016-3429 |
| For David Raiffe: | Adam E. Hauf<br>HAUF LAW, PLC.<br>8102 N. 23rd Avenue Suite E<br>Phoenix, AZ 85021 |

Proceedings recorded by electronic sound technician, Renee Bryant; transcript produced by eScribers, LLC.

INDEX

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **WITNESSES:** | | | | |
| Spencer Twyford | | | | |
| (By Mr. Brailsford) | 12 | | | |
| (By Mr. Hauf) | | 64 | | |
| (By Mr. Brailsford) | | | 88 | |
| (By Mr. Hauf) | | | | 98 |
| (By Mr. Brailsford) | | | 124 | |
| (By Mr. Hauf) | | | | 125 |
| Craig Street | | | | |
| (By Mr. Brailsford) | 135 | | | |
| Dr. David Raiffe | | | | |
| (By Mr. Brailsford) | 157 | | | |
| (By Mr. Hauf) | | 216 | | |

| EXHIBITS: | Offered | Received |
|---|---|---|
| 3 | 9 | 10 |
| 4 | 9 | 10 |
| 18 | 9 | 10 |
| 19 | 9 | 10 |
| 20 | 9 | 10 |
| 25 | 9 | 10 |
| 28 | 9 | 10 |
| 46 | 9 | 10 |
| C | 9 | 10 |
| D | 9 | 10 |
| E | 9 | 10 |
| F | 9 | 10 |
| J | 9 | 10 |
| 1 | 48 | 49 |
| 47 | 93 | 93 |
| 14 | 142 | 142 |
| 15 | 143 | 143 |
| 16 | 145 | 145 |
| 17 | 146 | 146 |
| 11 | 152 | 154 |

THE CLERK: In the case 18-15086, David Raiffe, with Adversary 19-98.

THE COURT: Appearances on the Raiffe matter, please.

MR. HAUF: Good morning, Your Honor. Adam Hauf on behalf of the Debtor and Defendant, the Defendant is in the room.

MR. BRAILSFORD: Good morning, Your Honor. Phil Brailsford on behalf of Plaintiff. I also have Mr. Anthony Austin, and Mr. Craig Street, who will be representing the bank.

THE COURT: All right. Thank you.

I understand we had some computer problems to begin with. Mr. Hauf, did you come in in advance to make sure that this was all going to work?

MR. HAUF: I did, Your Honor. I left the adaptor on my computer at home, and then apparently we don't have the other adaptors here, so --

THE COURT: Okay. So what eventually happened here, or --

MR. HAUF: They gave me, since I had brought my exhibits on USB, just as a precautionary measure, they've given me a laptop to use, to at least present my side of the exhibits.

THE COURT: Meaning opposing counsel or the court?

MR. HAUF: The court technical department did.

THE COURT: Okay. All right. Well, let's go ahead and get started. Any preliminary comments, thoughts or issues we need to cover first, Mr. Brailsford?

MR. BRAILSFORD: Your Honor, I believe we have reached an agreement to dismiss (a)(4) and (a)(6). There was one kind of hang-up on that. We insisted that the stipulation include each party to bear own side and cost based off of 523(d). Defense counsel wasn't sure if he wanted to agree to that at this point, but we will not be pursuing (a)(4) and (a)(6) today.

THE COURT: Okay. So is this an oral motion to dismiss those?

MR. BRAILSFORD: Yes, Your Honor.

THE COURT: Okay. And Mr. Hauf, what's your response to that?

MR. HAUF: I have no objection to the dismissal. It was simply that in the stipulation we had -- the stipulation stated that each side would bear their attorney's fees and costs, and so at this point I said I had not fully researched whether or not that was a -- whether we were completely barred from seeking attorney's fees, and I said if we were, then we wouldn't seek attorney's fees.

The stipulation was that we agree with the dismissal, and we just weren't going to specifically stipulate to disallow attorney's fees.

THE COURT: So what I am hearing you say is no opposition to the dismissal. The attorney's fees issue is another issue for another day.

MR. HAUF: Correct, Your Honor.

THE COURT: Good with that, Mr. Brailsford?

MR. BRAILSFORD: Yes, Your Honor.

THE COURT: Okay. All right. So the 523(a)(4) and (6) causes of action will be dismissed. In looking at the complaint, that looks like it's Count I and Count II, leaving only Count III, correct?

MR. BRAILSFORD: Yes, Your Honor.

THE COURT: And then with respect to Count III, we had a discussion about this last time we were together, it's my understanding that it is a 523(a)(2)(B) cause of action, not (A).

MR. BRAILSFORD: That is correct, Your Honor.

THE COURT: Okay. All right. Very good. I'll just sign the minute entry indicating that Counts I and II have been dismissed, with prejudice, but the question of the attorney's fees issue is another issue for another day.

MR. HAUF: Thank you, Your Honor.

THE COURT: Okay. All right.

Mr. Brailsford, how about anything else?

MR. BRAILSFORD: Your Honor, our position we don't believe that opening arguments or even closing arguments are

necessary, but we would like to do a closing brief, if that's okay.

THE COURT: What kind of time period after the conclusion of evidence are you looking at?

MR. BRAILSFORD: Two weeks, Your Honor.

THE COURT: Two weeks? Mr. Hauf? Are you talking about simultaneous briefs, or are you talking about --

MR. BRAILSFORD: I think simultaneous briefs would be fine.

THE COURT: Followed by responses or not?

MR. BRAILSFORD: No, I don't think responses are necessary, Your Honor.

THE COURT: Okay. So Mr. Hauf, the proposal is two weeks after the conclusion of evidence, there would be briefs, and they would be simultaneous, and there would be no responses.

MR. HAUF: Your Honor, I -- so two things, I don't have a problem with briefing, just because of the nature of this. If they didn't prepare opening and closing, I'd like to at least do a summation, oral close, if we can.

THE COURT: Well, I'm only talking about briefs right now.

MR. HAUF: Okay, so briefs. Yeah, I don't have a problem with simultaneous submittal. I do always like to be able to respond but given the nature -- I don't have a problem

with response if we allow it. I would prefer a response, simply because we have a relatively small number of issues that we're dealing with, so I don't think response is going to be overly burdensome.

THE COURT: Do you want to file a brief though because I'm thinking it ought not to be mandated, rather permissive, and it sounds like Mr. Brailsford wants to file one. Do you want to file one?

MR. HAUF: I don’t think it would be necessary, but I'd rather have it be --

THE COURT: If he files one, you want to have the opportunity to respond.

MR. HAUF: To respond, correct, Your Honor.

THE COURT: Okay. So let's put it this way, two weeks after the close of the trial, any briefs that want to be filed, can be filed. It's not mandated by the Court. If there is a brief that somebody wants to respond to, that too needs to happen, but let's call that a week after that. Okay?

MR. BRAILSFORD: Understood, Your Honor.

THE COURT: Now let's talk about opening statements. It sounds like Mr. Brailsford, you would rather just get right to the evidence.

MR. BRAILSFORD: Yes, Your Honor. If we had a jury here, I would certainly want to make an opening, but given that the Court is the fact finder, I don't think it's necessary.

THE COURT: And you think at the closing of the trial, there's no need for closing arguments. You're going to have a brief, and that will be your closing argument?

MR. BRAILSFORD: Yes, Your Honor. That's our position.

THE COURT: Okay, understood.

Mr. Hauf?

MR. HAUF: And Your Honor, I did prepare -- it's not an extensive opening, just really a summation. On matters like this, I always like to summarize what the basic issues are, and then I would prefer to do a closing, as well.

THE COURT: Okay.

MR. HAUF: I had not intended openings or closing that were going to be more than possibly five minutes in length, so --

THE COURT: Okay. So Mr. Hauf is still wanting to do an opening and a closing. Let's say this, to the extent there are briefs filed, and responses filed, I don't see a need for additional argument after that, unless there's something about the briefing that strikes me as needing to bring parties back in. But for right now, I am not going to set such a hearing, okay?

So with that, Mr. Brailsford, tell me about exhibits. Have the parties identified certain exhibits that simply can be admitted without necessarily having to address each exhibit

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

during the course of the trial?

MR. BRAILSFORD: Very few, Your Honor. My hope is that with regard to plaintiff's exhibits, the testimony will alleviate a lot of the concerns that Defendant had listed with these exhibits.

The ones that there are no complaints on are 18 -- I'm sorry, 3, 4, 18, 19, 25, 28 --

THE COURT: What about 20?

MR. BRAILSFORD: 20 as well, yes, Your Honor.

THE COURT: And then 20- --

MR. BRAILSFORD: 23, there is no exhibit. That's a number we skipped.

THE COURT: Okay. So then the next one is 25, no opposition to admitting that.

MR. BRAILSFORD: Correct, Your Honor.

THE COURT: And then it looks like 28. 28, correct?

MR. BRAILSFORD: 28, yes, Your Honor. And then 46, that is Plaintiff's exhibits.

THE COURT: And then when we get to Debtor's exhibits, it looks like C, D, E, are all okay to be -- and F are okay to admit?

MR. BRAILSFORD: And J, as well, Your Honor.

THE COURT: And J. Okay.

Mr. Hauf, any opposition to the admission of each of the identified exhibits?

MR. HAUF: No, Your Honor.

THE COURT: Valerie, did you get all those?

THE CLERK: I did.

THE COURT: So let the record reflect that those are all admitted exhibits.

(Exhibits 3, 4, 18, 19, 20, 25, 28, 46 Received)

(Exhibits C, D, E, F, J Received)

THE COURT: To the extent there are other exhibits listed in the joint pretrial that have not been admitted at this point, we'll deal with those as we come up.

Let me say this to the parties though, the fact that the parties have stipulated to the admission of certain documents doesn't mean I'm necessarily going to read those documents. If the parties don't see fit to talk about them during trial, I'll assume that while they're admitted, nobody wants me to bother reading them. If you want me to read them, make sure you talk about them during trial. Okay?

MR. BRAILSFORD: Yes, Your Honor.

THE COURT: All right. Any other preliminaries, Mr. Brailsford?

MR. BRAILSFORD: I don't believe so.

THE COURT: So let's let -- Mr. Hauf, you're going to do your opening at the opening of your case, right, not right now?

MR. HAUF: Correct, Your Honor.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Okay. And Mr. Brailsford, if you could call your first witness, please.

MR. BRAILSFORD: I guess one more question, Your Honor, is there any way you want to divide the time for this, as far as -- we have two days for the trial. We have --

THE COURT: Is this really going to take two days?

MR. BRAILSFORD: I don't think it will take two full days, but I would not be surprised if it takes at least a day-and-a-half.

THE COURT: Okay. Let me say this, you've got witnesses from out of town, right?

MR. BRAILSFORD: Yes, Your Honor.

THE COURT: First and foremost, let's accommodate them, so that if they can back home tonight, that would be nice. We don't have a jury here, so the order doesn't, I think, matter so much.

MR. BRAILSFORD: Correct, Your Honor. Yes, and they would appreciate that.

THE COURT: Okay. Is that essentially what you're asking, can we get them out of here?

MR. BRAILSFORD: That is my goal is to get them out today. Yes, Your Honor.

THE COURT: Okay. Mr. Hauf, any comments?

MR. HAUF: I have no opposition to that, given the nature of the claim, and the number of witnesses. I think --

and that we don't have a jury, I think we can do what we need to, to accommodate the out-of-state witnesses.

THE COURT: Okay. Very good. Then I'll understand this is not necessarily the order you would ordinarily do with a jury, but I will factor that in as I am weighing the evidence.

MR. BRAILSFORD: Thank you, Your Honor.

THE COURT: Okay? So with that, Mr. Brailsford, are you ready to call your first witness?

MR. BRAILSFORD: We are. Yes, Your Honor.

THE COURT: All right.

MR. BRAILSFORD: Plaintiff calls Spencer Twyford.

THE COURT: All right. Mr. Twyford, would you please forward and be sworn in?

THE CLERK: Raise your right hand.

SPENCER TWYFORD, PLAINTIFF'S WITNESS, SWORN

THE COURT: Mr. Twyford, if you would have a seat in the witness box.

Go ahead, Mr. Brailsford.

MR. BRAILSFORD: Thank you, Your Honor.

THE COURT: Good morning.

THE WITNESS: Good morning.

DIRECT EXAMINATION

BY MR. BRAILSFORD:

Q Would you state your name, and spell your last name for

the record, please?
A Spencer Twyford, T-W-Y-F-O-R-D.
Q And Mr. Twyford, where do you work?
A United Midwest Savings Bank.
Q Now I may refer to it as Midwest Bank, or the bank, but you'll understand that I'm speaking about United Midwest Savings Bank.
A Correct.
Q And what do you do for Midwest Bank?
A I'm a business development officer.
Q And what is a business development officer?
A My job is to go out and develop SBA commercial loans for medical practice professionals. I do that through a network of what's known as "practice brokers."
Q Okay. And when did you start working at Midwest Bank?
A In January of 2016.
Q Now my understanding is you're not just an employee of Midwest Bank; is that correct?
A That is correct.
Q What other interest do you have in Midwest Bank?
A When I joined the bank, it was a recapitalization, so I am an investor in the bank. I put my own personal liquidity into the bank, as well as I have what's known as SARs or stock options.
Q So as I understand it, you have a personal interest in the

success of the bank?
A    Very much so.
Q    And if there's any -- if you're aware of any potential harm or risk to the bank, would you act on that?
A    Absolutely, as a lot of my net worth is tied up into the bank.
Q    Okay.  Now you said you started at Midwest Bank in January 2016, where did you work prior to that?
A    I worked for approximately two years at Lorain National Bank.
Q    And what did you do for Lorain National Bank?
A    The exact same thing, I was a business development officer to develop SBA loans for medical practice transitions.
Q    And prior to Lorain National Bank, where did you work?
A    Huntington National Bank.
Q    And do you remember what years, approximately, you were there?
A    I was there, basically 11 years, so that would've been probably from 2002 to 2012, '13.
Q    And what type of work did you do for Huntington National Bank?
A    Exact same thing, business development officer.
Q    So how many years in total have you been a business development officer?
A    Approximately 22 years.

Q Now do you focus your business development on any particular field?
A I do. My area of expertise and what I do is only to medical professionals. 98 percent of what I do, and make loans to, are only dentists for practice acquisitions. I do some other set codes, as well, veterinarians, but primarily to dentists.
Q And how do you find your customers?
A I find my motto, our bank's business motto is we're not really what's called B to C, it's not business to customer, it's B to B. My job is to go out throughout the country, and basically call on practice brokers. There's a whole network of people, kind of like a realtor sells commercial property. There's brokers who sell dental practices, and I call on those brokers to get them to refer me, and our bank business.
Q So as I understand, you primarily help dentists get loans for practices through a broker; is that correct?
A That is correct.
Q Now I've heard the term "lender" before. Is a business development officer the same as a lender?
A Yeah, I guess I consider myself a commercial lender, same thing, if --
Q Now --
A Okay.
Q Okay. I've also heard the term relationship lender. How

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

is a commercial lender different than a relationship letter?
A Completely different. When I first started my career in banking, I was a relationship lender, and that was almost straight out of school. What a relationship lender does is they build a relationship with the client, and they want you to get what's called "share of wallet." They want you to make them a mortgage loan, get their checking accounts, sell investments, build a whole relationship with that client. What I do is very transactional, so that's why it's a commercial lending, rather than a relationship lender.
Q So your primary relationship then is not with the borrower itself, but with the broker; is that correct?
A Absolutely. All -- a lot of my activities to generate business is to like, for instance, my expense reports, I'm always flying or going or traveling to meet with brokers, not doctors.
Q Okay. And as I understand your testimony, you first started out as a relationship lender, but you've been primarily a commercial lender --
A For the last 22 years.
Q Okay.
A Yeah. I would never describe myself as a relationship lender.
Q Approximately how many clients do you speak with on an average day?

A    Oh, I -- that's a great question.  Some days it's 30, 40, some days it might be 20, but I'm always on the phone.  That's how I make my living, is talking on the phone with brokers, or doctors, clients.

THE COURT:  Mr. Brailsford asked how many clients are you on the phone with in a day, are you talking about brokers or are you talking about borrowers?

THE WITNESS:  Probably brokers.  I'm on the phone probably with at least, I don't know, 20 -- you see, when you call a broker and they send you a referral, that might lead to a call with a doctor.  So I don't know, I would say mostly my calls are with brokers.  I'd say maybe 60 percent, 70 percent, and then the rest of it's to call a doctor to follow-up on a lead.  Does that make sense?

THE COURT:  Yes.

BY MR. BRAILSFORD:

Q    Is a function of your business to wine and dine customers?

A    Brokers, yes.

Q    Okay.  So have you taken a broker out to dinner?

A    All the time.

Q    Taken a broker out to a game?

A    Absolutely.

Q    Basketball games, and like that?

A    Absolutely.

Q    What about a doctor or a borrower, have you ever taken a

borrower out to dinner?

A Rarely. The only time I've ever ate a lunch or a breakfast with a doctor was in correspondence with maybe a loan closing or like that. Rarely do I go to entertain with a doctor.

Q Understood. I want to ask you about Dr. Raiffe. When did you first meet Dr. Raiffe?

A I first met Dr. Raiffe, he was a seller on a transaction I was doing in Cleveland. I remember the doctor's name was Nikki, or Nichole Cochrane (phonetic), and he was the seller, and I was financing the buyer, which was Nichole Cochrane.

Q Do you remember approximately when that was?

A Oh, gosh that probably would've been maybe -- I'm sorry, I -- 15 years, 16 years.

Q Not a problem.

A Yeah. It's been back in time.

Q What do you recall about the sale?

A This might -- I remember that deal for two particular reasons. This might sound bad but I remember that Dr. Cochrane was very attractive, and I remember her. And then I remember when we were trying to get the deal completed, I had to ask a lot of questions because the seller, Dr. Raiffe, had some license problems with his dental license, and had to work through that under the credit, and find out exactly what was going on there before we approve the transaction.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Q Did you find out what was going on with those license issues?
A As my memory serves me, he was having problems with the OD -- Ohio Dental Board because he was doing procedures he was not supposed to be doing, or he wasn't licensed or permitted to do.
Q Okay. So did you have -- would you consider your -- okay, that was the first time you met Dr. Raiffe.
A Right, very first time, yeah.
Q It's my understanding you've helped Dr. Raiffe with loans since that time?
A I have.
Q Do you know approximately how many?
A I think approximately seven.
Q And with those seven loans, was your contact with Dr. Raiffe, would you consider that to be consistent?
A During the process, yeah.
Q When he was not seeking a loan, did you have contact with Dr. Raiffe?
A I -- I did not.
Q Now did Dr. Raiffe, would he approach you directly or would that go through a broker?
A Dr. Raiffe never contacted me directly for a loan. Every transaction I ever did for him, it was referred to me through that network of broker, practice brokers.
Q And those loans you helped Dr. Raiffe with, were those all

SBA loans?
A Every one of them, that's all. That's all for the past 20-some years, that's all I've done is SBA financing.
Q In your contact with Dr. Raiffe, did he seem to understand the loan process?
A Yes.
Q Was it your understanding that Dr. Raiffe understood that he needed to submit a personal financial statement as part of the loan application process?
A Absolutely.
MR. HAUF: Objection. Speculation. Foundation.
THE COURT: Mr. Brailsford?
MR. BRAILSFORD: I'm asking for his impression, Your Honor.
THE COURT: Restate the question, would you please.
MR. BRAILSFORD: Was it your impression that Dr. Raiffe understood that he needed to submit a personal financial statement as part of the loan application process?
THE COURT: Mr. Hauf?
MR. HAUF: I think it's still foundation objection, Your Honor.
THE COURT: Build a little foundation, and then go from there.
MR. BRAILSFORD: Certainly.
///

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BY MR. BRAILSFORD:
Q Personal financial statement, is that something that's part of every SBA loan?
A Absolutely, it has to be completed with every application.
Q Is that a government requirement or the bank's requirement?
A Both.
Q How would a potential borrower get a copy of a personal financial statement?
A During the loan application process, I have like a -- a package that every deal we would request which would include the SBA, we call it a PFS, or a personal financial statement, and then we would also request other pertinent financials. So that process never changes. We need that information for every application.
Q So is that something you would send to the borrower?
A That is correct.
Q And typically, when you would send that to the borrower, would you explain to the borrower that they need to fill out the document?
A Absolutely, we would send the documents, and request, and tell them that they would need to complete the PFS, the personal financial statements. Sorry.
Q Is that your practice with every SBA loan to do that?
An Absolutely. Every -- the process really doesn't deviate.

Q And how many SBA loans do you do on average per month?
A Gosh, it varies per month. I probably close anywhere from three to maybe seven a month.
Q Do you believe that you would have sent this packet of documents including the personal financial statement to Dr. Raiffe?
A Absolutely.

MR. HAUF: Speculation, Your Honor. Objection.

THE COURT: Mr. Brailsford?

MR. BRAILSFORD: Your Honor, it's based off of every SBA loan he's ever done. It's his common practice to do that.

THE COURT: It's overruled.

BY MR. BRAILSFORD:
Q So based on your practice -- let me ask you this, do you remember -- do you recall specifically sending the personal financial statement to Dr. Raiffe for this loan?
A I can't remember sending it directly to him. I can't recall like oh, yes, I definitely, I remember the date and time I sent it to him. I can't recall that.
Q That's because you do numerous loans every month?
A I -- I am a high volume SBA lender. I do a lot of loans, so -- but yes, I would have sent him the -- the package. Anytime a broker would send me a lead that hey, this doctor wants to acquire this practice, here's the information, I would send correspondence to the doctor to get the information. And

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

in that correspondence, see that -- the personal financial statement, a lot of times it's updated. The government -- the -- because the personal financial statement is an SBA form, and sometimes that is updated, and they -- they update the form, so a lot of times we always have to send the most current version of that form out because if we don't have the most current form of that form, it will get -- it will get kicked basically.

Q So as I understand your testimony, it's the normal course of business for you to send a personal financial statement to a potential borrower?

A Absolutely.

Q And it is the normal course of business, or it's your normal practice or is it the normal course of business, or is it your normal practice to ask the borrower to fill out the personal financial statement?

A Absolutely.

Q If a borrower asked you questions about the personal financial statement, how would you handle that?

A I -- I get questions all the time from borrowers that have questions like hey, I have -- I don't know where to put such and such. You know, I got a question about this or that. So I do -- I do get questions from the borrower about the form from time to time.

Q And you explain it to them?

A Absolutely.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Q Okay. Would you have gone forward with the loan if Dr. Raiffe had expressed concern about not knowing that he had to fill out the personal financial statement?

MR. HAUF: Objection. Speculation.

THE COURT: Mr. Brailsford?

MR. BRAILSFORD: Withdraw the question.

BY MR. BRAILSFORD:

Q You previously testified that you helped Dr. Raiffe with seven SBA loans, approximately seven, correct?

A Correct.

Q Were all of those loans in Ohio?

A They were.

Q During your work with Dr. Raiffe, did you come to know his business model?

A I did.

Q What is your understanding of how Dr. Raiffe ran his practice?

A My understanding is during the course of him acquiring a practice, during practice -- dental practice acquisition financing, Dr. Raiffe would acquire the practice, and then there'd be a transitional period where Dr. Raiffe would work in the practice, a lot of times the seller would stay on and work with the doctor, and they call it a transition because what they're trying to do is transition the patient goodwill to the new doctor. So Dr. Raiffe would work in there a couple of days

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

a week, and -- to get the patients through what's called "recall," like hygiene recall, if you're familiar with the dentist -- dental practice, they'll call again for hygiene recall, and it's important that the doctor meet all the patients and be introduced as the new owner, so it was his business model to do that, to transition that goodwill. Does that explain it to you?

Q It does. So my understanding is his -- Dr. Raiffe's business model was that he would work the practice?

A Correct.

Q Would he work it every day?

A He would not. Most doctors don't work every day. He would work in the practice during the transitional period, and then he might reduce his doctor days, and -- and he might work another practice for a couple of doctor days, but it was my understanding during that transitional period, he would definitely work the practice, and tell the practice was solidified in that goodwill, was transfer to him, and he felt like the practice was in good shape.

Q When considering an SBA loan, is it important to know the doctor's business model?

A Absolutely.

Q Why?

A Because it can have a whole lot of bearing on the demographics of the practice, the cash flow, because in a

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

transition, the biggest concern would be that goodwill not being conveyed to the new doctor because you're not talking about a tangible asset, you're talking about the goodwill of the patients, is what you're trying to transfer to the new doctor. So it's important for us to understand how that is going to be handled, at least in that transitional period.

Q Understood. Did Dr. Raiffe ever tell you that he was moving to Arizona?

A No.

Q Did Dr. Raiffe ever tell you he purchased a house in Arizona?

A No.

Q Would a move to Arizona be a substantial deviation from Dr. Raiffe's business model as you understood it to be?

MR. HAUF: Objection. Speculation.

THE COURT: Mr. Brailsford?

MR. BRAILSFORD: I don't know how that's speculation. I'm asking him if it's a substantial deviation, if a move would be, as he understood it, a substantial deviation. So it's his understanding.

THE COURT: It was what did he understand, Mr. Twyford.

MR. BRAILSFORD: Correct.

THE COURT: Objection overruled.

///

BY MR. BRAILSFORD:
Q Do you need me to repeat the question?
A Yeah, if you could, if you don't mind.
Q Would moving -- would a move to Arizona be a substantial deviation from Dr. Raiffe's business model, as you understood it to be?
A It would have.
Q And why is that?
A Well, I would have had to ask a whole battery of questions of how he was going to handle a transitional period, and how he was going to handle any existing practice exposure we had with the doctor. It -- it would just be a deviation that would have to be addressed.
Q And as I understand it, well did you ask any of those questions?
A I did not.
Q So is that an indication to you that you did not know that he was moving to Arizona?
A I did not.
Q Okay. I want to ask you about the loan that Dr. Raiffe obtained on July 20th, of 2016, from United Midwest Savings Bank. I will refer to that as the "Hamilton" loan.
A Okay.
Q Are you aware that Dr. Raiffe applied for a loan from the bank in about May of 2016?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

A For that Hamilton loan?
Q Yes.
A Yes.
Q Did you assist Dr. Raiffe with that loan?
A I did.
Q Do you recall what the purpose of the loan was?
A I recall it was for a practice acquisition on Hamilton Road in Columbus.
Q Was it your understanding that Dr. Raiffe was growing his business in Ohio?
A Yes, all the acquisitions we had done were all based in Ohio.
Q Was it your understanding that Dr. Raiffe would work at the practice he was purchasing with the loan for Midwest Bank?
A It was.
Q Do you recall the amount of the loan?
A I knew it was small, by around 400-and-some thousand, I believe.
Q Are you able to see that Exhibit 1?
A I am.
Q What is that?
A That's a personal financial statement.
Q Now normally when you provide a personal financial statement to a borrower, is it blank?
A It's always blank.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Q So it must be filled out by someone, correct?
A Yes.
Q Do you see the name on the first page?
A I do.
Q And what's the name?
A David M. Raiffe.
Q Is that person in the courtroom here today?
A He is.
Q Seated at the defense table?
A He is.
Q Okay. And you see a date on that --

MR. HAUF: Your Honor, I object to the testimony regarding this exhibit unless it's admitted into evidence.

THE COURT: Mr. Brailsford?

MR. BRAILSFORD: I'll build a foundation to it, Your Honor. I'm happy to do that. If I need to do it now, I'll do it now or I can do it later, but I haven't moved to exhibit -- move it into evidence yet, so -- how about if we just build the foundation for it? How about that?

THE COURT: Okay.

BY MR. BRAILSFORD:

Q So you testified this is a personal financial statement, and David M. Raiffe on there, correct?
A Correct.
Q Do you want to look at the second page? Let me know when

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

you have a chance to look at the second page.

A I have.

Q Is this the personal financial statement that was in the bank's file for Dr. Raiffe's loan?

A It is.

MR. HAUF: Objection. Speculation, and foundation, Your Honor.

THE COURT: Mr. Brailsford, the objection is speculation but he's really looking for you to build a foundation as how he would know about this in the first place.

MR. BRAILSFORD: Understood. I'll clarify.

BY MR. BRAILSFORD:

Q How would know that this is the document that was in -- that this is the personal financial statement that was in the bank's file?

A I guess it would be in the file for the bank, that I would know that -- because we have to get a new personal financial statement for every application that this looks like this would be the personal financial statement for the application in question.

Q Have you seen the bank's file on this loan for Dr. Raiffe?

A Yes.

Q Have you provided documents for this loan -- I'm sorry, have you provided documents for the bank's file on Dr. Raiffe's loan?

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

A Yes.
Q Does this appear to be a copy of the personal financial statement that was in Dr. Raiffe's -- the file for Dr. Raiffe at Midwest Bank?
A It does.

MR. HAUF: Once again, Your Honor, foundation. I think we have an issue here with regard to -- if Your Honor allows, I can specify my objection. My objection is how do we know that this is the document in the file?

THE COURT: So Mr. Brailsford, there's a challenge to how Mr. Twyford would know that this is a document in Dr. Raiffe's file at the bank.

MR. BRAILSFORD: Well, Your Honor, he's testified that he's seen the file. He's testified that this is a document that would be in that file. I can build further foundation if the Court believe it's necessary.

THE COURT: Mr. Hauf?

MR. HAUF: Your Honor, in this case, we have this document. I don't know if there's any unique identifying items on it. I think we're really asking -- I mean he said several items that indicated an unsure element as to whether or not this was the actual document in the file. That's what we're really looking for here.

THE COURT: That's the question you want Mr. Brailsford to ask.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MR. HAUF: What was that, Your Honor?

THE COURT: That is the question you want Mr. Brailsford to ask.

MR. HAUF: Is yes, how would he know that this document is the document in the file?

THE COURT: Mr. Brailsford.

MR. BRAILSFORD: Yes, Your Honor, I will ask him more questions.

BY MR. BRAILSFORD:

Q Is this a document that you would have sent to Dr. Raiffe?

A I would have sent him a blank PFS, yes.

Q Do you see the top of page 2 of Exhibit 1 where it says "Warren Dental Group"?

A Yes.

Q What is that?

A Warren Dental Group was one of Dr. Raiffe's practices in Warren, Ohio.

Q Does that indicate that this document was sent from a fax from Warren Dental Group?

A Sent from Warren Dental Group, yes.

MR. HAUF: Your Honor, once again we object based on the fact that he doesn't have personal knowledge of the Warren Dental Group fax.

THE COURT: Sorry, he doesn't have personal knowledge of what?

MR. HAUF: The Warren Dental Group fax. He said it's a -- this was received as a fax, so he assumes that it must be from Warren Dental Group that Dr. Raiffe owned.

THE COURT: Mr. Brailsford?

MR. BRAILSFORD: I guess I am -- are you asking if he knows, personal knowledge, if the -- if Dr. Raiffe had some kind of a tie to Warren Dental Group, is that the question you're asking?

MR. HAUF: What I am asking is there's a lot of Warren Dental Groups, I am guessing. How -- there's no fax number. There's no indication that this document came from the Warren Dental Group that Dr. Raiffe owns or a Warren Dental Group associated with the file.

BY MR. BRAILSFORD:

Q Go to page 6. What's the name on that document?

A Personal financial statement.

Q Yes, and do see right below that, there's a name? It says David M. Raiffe, does it not?

A It does.

Q And there's a residential address. Do you see that address?

A I do.

Q What is the address?

A 7601 Royal Portrush Drive, Solon -- Solon, Ohio.

Q Now this -- you said this typically a document that you

would send as part of your loan application process to a borrower, correct?

A Correct.

Q And typically that borrower would send it back to you, correct?

A Correct.

Q Do you know if that address, 7601 Royal Portrush Drive is Dr. Raiffe's home address or at the time?

A I do.

Q You do know that? Okay. So given that you know the names, Dr. M. Raiffe and the address is Dr. Raiffe's address in Solon, Ohio, and that the fax line came from Warren Dental Group that you know is a dental practice that warren or that Dr. Raiffe owned, do you have any other personal knowledge on this document?

A I'm sorry, can you ask the question again? I --

Q Yeah. Would you have submitted this document to the bank after you received it?

A Yeah, typically what will happen in these cases is I send the blank form to the document -- of the document to the doctor. The doctor, a lot of times will complete the document and send it back to me, but the document is required to have a signature on it. So when they electronically submit it, I have to tell them, hey, you have to sign it. It needs to be signed. Then a lot of times in most instances, the doctor will sign,

and send the second page via fax, or they'll sign it and scan it back to me.

MR. BRAILSFORD: Could you show page 2 again, please.

BY MR. BRAILSFORD:

Q There's a signature at the bottom. Do you see that?

A I do.

Q Does that signature -- do you recognize that signature?

A I do.

Q What do you recognize that signature as?

A Dr. Raiffe's signature.

Q Is there anything peculiar about that signature --

A Sure.

Q -- that makes -- that helps you identify it as Dr. Raiffe's signature?

A There is.

Q What is it?

A Obviously, I've seen a lot of doctor's signatures.

MR. HAUF: Well, I'm going to object on speculation. He's not a signature expert.

MR. BRAILSFORD: I'm not asking him to be a signature expert. I'm asking him if he recognizes Dr. Raiffe's signature, and if there's anything peculiar about Dr. Raiffe's signature that he recognizes that makes it stand out.

THE COURT: Objection overruled.

A What -- his signature, I recognize it as Dr. Raiffe's

signature, but the reason it's so recognizable, I've always found it peculiar or odd because I -- I've looked at lot of the signatures from doctors, it's not odd that doctors would sign things like John Doe, DDS, that's normally how they would sign it. His signature was always odd, I found it odd, because he would put MBA after it. So it was always very noticeable to me when it was his signature because when he would sign something, I would always find it frankly strange that he would put MBA after his signature.

BY MR. BRAILSFORD:

Q Looking at Exhibit 1, is this the form that you sent to Dr. Raiffe for the Hamilton loan?

A Yes.

Q Did Dr. Raiffe, to your knowledge, send it back to you?

A He did.

Q Did you review this document when it was sent back to you?

A I did.

Q Did you send this document to the -- to Midwest Bank for their file?

A I did.

MR. BRAILSFORD: Your Honor, I will move to admit Exhibit 1.

MR. HAUF: Objection, Your Honor. We still have foundational issues in that there's been no testimony as to why the second page, which has a fax receipt on it, and the first

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

page, which does not, how they were -- one, whether he has personal knowledge that these were sent in tandem, and whether or not he made the claim again that normally these are sent secondarily, so they'd be received, and then rejected or a signature requested. There's no specific knowledge that that occurred or that these two documents were held together that way, and transmitted that way.

THE COURT: So Mr. Brailsford, the objection is the fax line appears on page 2 but not on page 1. Were these documents separately submitted or in tandem, and Mr. Hauf is looking for foundation in this regard.

MR. BRAILSFORD: I can ask those questions but I think they're certainly questions he can ask on cross, but he's testified that this is the document he's sent. This is the document he received. He personally reviewed it, and it's the document he sent to the bank, but I'm happy to ask those questions.

THE COURT: It's the in tandem, or simultaneous transmission that I think Mr. Hauf is focused on, and I think that would be useful if you could ask some questions in that regard.

MR. BRAILSFORD: Yes, Your Honor.

BY MR. BRAILSFORD:

Q So we have what appears to be a fax line at the top of page 2. Do you see that?

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

A I do.
Q Now if we look at page 1 --
MR. BRAILSFORD: Can you show page 1?
BY MR. BRAILSFORD:
Q -- there does not appear to be a fax line on that top page there; do you see that?
A I do.
Q Do you -- can you explain why that would be?
A As previously stated, a lot of times doctors will send the personal financial statement, in this case, he has typed in -- a lot of times, they'll handwrite them in -- he has typed in the personal financial statement, and then they'll electronically email them back to me, and then I have to contact them, and say I need a signature on the personal financial statement, and then they'll sign it, and fax it back to me.
Q Did that happen here?
A Yes.
Q Does the bank allow --
MR. HAUF: Objection, Your Honor. Foundation. We have no way to know what happened here. The date on the first page is May 29th. The date on the second page is May 17th. How do we know the first page was rejected with a later date than the signature page?
THE COURT: So while the witnesses confirm that pages

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1 and 2 came in together, Mr. Hauf is now focused on the May 17 fax line, but the May 29 personal financial statement line.

Mr. Brailsford?

MR. BRAILSFORD: Yes, Your Honor.

BY MR. BRAILSFORD:

Q Do doctor -- the borrower, sometimes do they put a date of an anticipated closing date on these personal financial statements?

A Sometimes they do. Doctors that have been through the process know that the government, the SBA requires us to have the signature within a certain time period, and the documents have to be within a time period of the closing. So a lot of times they'll understand they don't want to redo the documents.

Q So they'll pre-date the document?

A In some cases, yes.

Q Do you know if that happened here?

A For certain no, but could have.

MR. BRAILSFORD: Just one moment, Your Honor.

BY MR. BRAILSFORD:

Q Okay. So it appears that with this document being pre-dated, that there was an anticipation that this loan might close at the end of the month; is that your understanding?

MR. HAUF: Objection. Foundation. I mean, we already -- he already testified he didn't know.

THE COURT: Mr. Brailsford?

MR. BRAILSFORD: One moment, Your Honor.

BY MR. BRAILSFORD:

Q Okay. So let's back up through a typical loan closing process. If it's expected that a loan is going to close on a certain date, obviously you're going to need those documents prior to that close date, correct?

A Correct.

Q And you would need the document signed by -- prior to that closing date, correct?

A We would.

Q Was it your -- do you recall when this loan was supposed to close?

A A lot of times our -- our loans do close at the end of the month because of insurance billing, and transition. So like the last week of the month is busy. Because of month-end, they want to close out of the books, so we normally will schedule a lot of closings at the end of the month, so that transition can period (sic) -- so I believe this loan would be consistent with that.

Q So if you're anticipating the loan will close at the end of the month, and you obviously need the documents by that date, correct?

A Correct.

Q And it's common that these documents are pre-dated, correct?

A Yes.
Q So it would be dated into the future, correct?
A In some cases.
Q And so if there was a problem, for example, if Dr. Raiffe forgot to sign it, and you had to reach back out to him to have it sign it, and he actually signed it, and sent it back to you, it might -- that would be the actual date, correct?
A Correct.
MR. HAUF: Objection. Speculation.
THE COURT: He didn't say it happened here. He is saying that could be the possibility. Objection overruled.
BY MR. BRAILSFORD:
Q Do you recall if that was -- do you recall in this instance if you had to ask Dr. Raiffe to send back the signature?
A I -- I do in the fact that he would submit them, and we would have to ask for signatures on documents.
Q Is it your understanding --
MR. HAUF: Objection. Foundation. I don't know if he asked if this specific case or in general.
THE COURT: Mr. Hauf, it's going to be a lot more helpful if you can make the objection right after the question, and before the answer comes out.
MR. HAUF: Okay. Thank you, Your Honor, I apologize.
THE COURT: Okay, Mr. Brailsford?

MR. BRAILSFORD: Yeah, I don't know where we currently stand with the objection. I don't know --

THE COURT: Just re-ask the question, and try it again here.

MR. BRAILSFORD: I don't even remember what my question was. Could the reporter read back my last question, please?

ECR: "-- recall in this instance if you had to ask Dr. Raiffe to send back the signature?"

BY MR. BRAILSFORD:

Q In this instance, do you recall if Dr. -- if you had to ask Dr. Raiffe to send back the signature page of the personal financial statement?

A Yes, I -- I recall needing him to fax back a signature. It was without a signature.

Q Is Exhibit 1 one of the documents you would've reviewed in Dr. Raiffe's application for the Hamilton loan?

A Absolutely.

Q And you previously testified in a personal financial statement is required on every SBA loan, correct?

A Correct.

Q And you stated that's a government requirement and a bank requirement?

A Absolutely, yes.

Q Does the personal financial statement require a signature

under the penalty of perjury?
A It does.
Q Do you consider the personal financial statement an important document?
A Extremely important.
Q Why is that?
A Personal financial statement because it's signed under the penalty of perjury, and especially in a small business administration loan application, we rely on that to be, or to find things that other courses of our credit process wouldn't find. So for instance, personal financial statement would have things on them that the credit bureau wouldn't have on them.

To use an example, like a big one is always alimony, or child support. When we would pull a personal financial statement, we look at that, but we also look at the credit bureau, but you have to look at the personal financial statement because there could be contingent liabilities that we might not know of when we pull the credit bureau.

It also gives us an idea of assets that if the doctor would have assets, we're also looking at assets as well as liabilities, i.e., a personal financial statement.
Q You mentioned there might be things -- there should be things on a personal financial statement that would not necessarily show up on a credit bureau check.
A Correct.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Q Why is that?
A There's some things that just don't show up, like I alluded to, alimony, child support, if you have a large, private loan. There's a lot of seller financing that happens with these acquisitions. So we rely on the personal financial statement.

And then another reason we rely on the personal financial statement, some creditors not -- might not report to the credit bureau or someone might have just recently gotten a loan, or applied for a loan where the personal financial statement should reflect that.
Q Do you know how long it can take before debts can show up on a credit bureau report?
A It depends on the creditor but it could take 60 to 90 days for that to happen, on -- on average.
Q So is it your testimony that it is important that a personal financial statement contains accurate information?
A Absolutely.
Q Is Exhibit 1 a copy of the personal financial statement that was provided to you at Midwest Bank in connection with Dr. Raiffe's loan application for the Hamilton practice?
A It is.

MR. HAUF: Objection. Foundation. Speculation.

THE COURT: Mr. Brailsford?

MR. BRAILSFORD: Your Honor, his testimony has been

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

that he has personally reviewed this document, that he sent it to Dr. Raiffe, he received it back from Dr. Raiffe's dental practice, that he's reviewed the file, and that this is the document that's in the file.

THE COURT:  And the question again is?

MR. BRAILSFORD:  Is Exhibit 1 a copy of the personal financial statement that was provided to Midwest Bank in connection with Dr. Raiffe's loan application for the Hamilton practice?

THE COURT:  Well, if the objection was foundation, has Mr. Brailsford satisfied your concerns?

MR. HAUF:  I think the issue here, Your Honor, is that -- excuse me -- we don't have a foundation as to why this document was -- as I said, there were discrepancies, and we don't have a foundation how this document was specifically received by the witness, and how this document was specifically -- because my understanding is this would've been a bounce back.  So the witness testified that --

THE COURT:  This would have been a what back?

MR. HAUF:  A bounce back, or essentially a second request.  The witness testified they needed new signatures, and so they have a split document, one clearly with a fax stamp, one clearly without.  And so there's been no foundation as to how that document was received, compiled, transmitted, nothing with regard to that.

MR. BRAILSFORD: Your Honor, there has been --

THE COURT: I'm not following the discussion you just had about stamp. Are you saying that page 1 of this document has a stamp at the bottom right-hand corner, or are you talking about the fax line stamp?

MR. HAUF: The fax line stamp, Your Honor. Page 1 does not have it, so my understanding of the testimony is that page must've been received at a different time, and then page 2 does have a fax line. But there's been no testimony about how that was received, how that was transmitted, and how that was sent to the bank, or received from the defendant, given the voluminous nature of these loans.

THE COURT: The way I understood the testimony to be, Mr. Twyford, is that you would have received a PDF emailed document that had pages 1 and 2, page 2 not being signed; am I right so far?

THE WITNESS: Correct.

THE COURT: Then the request of Dr. Raiffe would have been I need you to sign page 2.

THE WITNESS: Exactly.

THE COURT: And then page 2 is signed --

THE WITNESS: And sent back to me.

THE COURT: -- by Dr. Raiffe.

THE WITNESS: Correct, Judge.

THE COURT: A signature you recognize.

THE WITNESS: Correct.

THE COURT: And then it is -- that page 2, and only page 2 is transmitted back to you in a fax.

THE WITNESS: Correct.

THE COURT: Am I understanding it correctly?

THE WITNESS: Absolutely, you got it. And that -- that happens a lot. You know, doctors -- it's easier for them to fill this out and email it because they're busy with patients, and stuff, and then I have to go back and say I need the second page signed and sent to me, and it's kind of -- happens quite often.

THE COURT: Mr. Brailsford, follow-up questions?

MR. BRAILSFORD: One other question I think that would help.

BY MR. BRAILSFORD:

Q Are electronic signatures permitted for the SBA loan process?

A No.

Q So it has to be an actual signature?

A Yeah, our -- our policy is you need signatures. You can't sign anything electronically.

MR. BRAILSFORD: I think that satisfies any objections, Your Honor.

THE COURT: Okay, so then please ask the question again.

MR. BRAILSFORD: Okay.

BY MR. BRAILSFORD:

Q Is Exhibit 1 a copy of the personal financial statement that was provided to Midwest Bank in connection with Dr. Raiffe's loan application for the Hamilton Practice?

A It is.

MR. BRAILSFORD: Move to admit Exhibit 1 into evidence, Your Honor.

THE COURT: Questions or opposition, Mr. Hauf?

MR. HAUF: It's the same opposition I've had before, Your Honor. There's been no establishment as to transmission. We don't have -- and why I say this specifically is we don't have an identification as far as an email string showing the transmission, we don't have an incoming fax number. We don't have any documents showing that -- that should at this day in age be easily available to allow the witness to testify that this is indeed the document. I've seen no identifying marks on the document that would allow such identification.

THE COURT: But the testimony was pages 1 and 2 were part of a unified package that came in at separate times, but it's all the same information, as I'm understanding it.

MR. HAUF: Correct, but I -- my issue with the document specifically is there seems to be a level of speculation as to whether or not that happened. No tracking, no evidence showing the emails or any of the other likely

notable information related to these documents -- this document showing that oh, the document transmission without the signature, and then the document request for the signature, and then the email or the fax receipt, and then the transmission to the bank. Those items are simply not available.

So once again, I think that there's not been enough foundation to admit this into evidence.

THE COURT: Okay. I am going to overrule the objection but it certainly seems to me that this is all fair game for cross-examination, Mr. Hauf.

MR. HAUF: Thank you, Your Honor.

THE COURT: Exhibit 1 will be admitted.

(Exhibit 1 Received)

BY MR. BRAILSFORD:

Q Mr. Twyford, did you help Dr. Raiffe with a loan to purchase the Warren Group dental practice?

A I did.

Q Is it your understanding that if you received a fax from the Warren Dental Group for a loan that Dr. Raiffe was applying for, that it could only be coming from Dr. Raiffe?

A Yes.

MR. HAUF: Objection. Speculation.

THE COURT: Objection to speculation, Mr. Brailsford?

MR. BRAILSFORD: I asked -- the question was if it was his understanding.

THE COURT: Based on what?

MR. BRAILSFORD: Based on the fact that he had helped Dr. Raiffe purchase the Warren Dental Group, that he was -- that he previously testified that he was familiar with Dr. Raiffe's signature, and that based on those understandings and that knowledge, that it was his understanding that any fax for a loan that Dr. Raiffe was applying for, that came from the Warren Dental Group would have come from Dr. Raiffe.

THE COURT: I understand your explanation, but I am asking you to ask him those questions --

MR. BRAILSFORD: Oh, understood. Yes, Your Honor.

THE COURT: -- to supply that foundation.

BY MR. BRAILSFORD:

Q Did you help Dr. Raiffe purchase the Warren Dental Group?

A I did.

Q Was it our understanding that he was -- he owned and operated the Warren Dental Group as of May 2016?

A Yes.

Q Is it your understanding that if you received a fax for the Warren Dental Group for this loan application, that it was coming from Dr. Raiffe?

A Yes.

Q When a person applies for an SBA loan, and they submit a personal financial statement, I believe you testified that you also do a credit check on the borrower.

A Correct.
Q And was that done here?
A Yes.
Q Did you do it?
A I typically pull bureau myself, and then during the process, a bureau will be pulled if I haven't, but it's my protocol to -- to pull a credit bureau.
Q Did the credit bureau that you pulled on Dr. Raiffe for this loan, did it show $1.5 million in debt for a home that he purchased in Arizona?

THE COURT: Which loan are we speaking now? We've been talking about Hamilton. We've been talking about Warren, and we're talking about this one particular loan that's at issue today.

MR. BRAILSFORD: Yes, so the Hamilton loan is the loan that is at issue today. So I'm asking him about the credit check -- doing the credit check for that loan, but if it showed debt for another loan. Does that make sense?

THE COURT: Okay. So let's ask that question, please.

MR. BRAILSFORD: Okay.

BY MR. BRAILSFORD:
Q Did the credit report that you did for this loan, the Hamilton loan, did it show $1.5 million in debt for a home that was purchased in Arizona?

A It did not.
Q And is it one of the reasons that a personal financial statement is required is because sometimes debt does not show up on the credit bureau report?
A Yes.
Q After you reviewed Dr. Raiffe's application in the credit bureau check, did you make a recommendation to Midwest Bank as to whether it should approve Dr. Raiffe's loan application for the Hamilton practice?
A I did.
Q And what was that recommendation?
A I recommended that the loan should be approved.
Q And in making your recommendation to approve the loan, did you rely on the information provided to you on Exhibit 1?
A I did.
Q Is the personal financial statement the only way that you know about a borrower's assets?
A Yeah, I mean we -- we rely on the borrower to give us truthful information. So we rely on the borrower, compounded or combined with third-party reports we pull.
Q And with regard to the signature, you testified that the personal financial statement electronic signatures are not proper; is that correct?
A That is correct.
Q Are signature stamps, so a stamp of a person's signature,

is that allowed?

A Absolutely not.

Q Is that an SBA requirement, or a bank requirement, or both?

A Kind of both, yeah.

Q Was it your understanding that Dr. Raiffe signed Exhibit 1?

A Yes.

Q And how did you come to that understanding?

A Because I would've asked for his signature, and received a fax back with his signature, and as I testified earlier, because of the MBA on his signature --

Q Was it your understanding that Dr. Raiffe filled out Exhibit 1?

A Yes.

MR. HAUF: Objection. Speculation.

THE COURT: It was asking for his understanding, not the actual fact of the matter.

MR. BRAILSFORD: Understood, Your Honor.

THE COURT: Objection overruled.

BY MR. BRAILSFORD:

Q Did Dr. Raiffe ever tell you that he did not fill out Exhibit 1?

A He did not.

Q Did Dr. Raiffe ever tell you that someone else filled out

Exhibit 1?
A He did not.
Q Had Dr. Raiffe told you -- well, let me ask you this. If you were to find out that a person other than the borrower filled out a personal financial statement, how would handle that?
A I would've asked them to politely redo it with their own signature or with them attesting to the information in it. That -- can I -- that -- that rarely happens because doctors have a lot of personal -- I mean it's a personal financial statement, so there's personal information on there that doctors always complete it themselves.
MR. BRAILSFORD: Can you go to page 1, please?
BY MR. BRAILSFORD:
Q So the personal information that doctors would know themselves, can you -- looking at page 1 over there, are any of those types of information there that you can point out that would be examples of that?
A It -- it would have all kinds of stuff like, I -- I -- I would say, you know, how much cash they have, you know, their debt. Yes, it would have a lot of personal information.
Q Does it ask for how much money they have in a retirement account or an IRA?
A It -- it does.
Q Does it ask how much other assets they have?

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

A Amount in other assets, it does.
Q Does it ask them, the borrower, what their salary is?
A Yes.
Q Does it -- does this require them to list other loans that they have?
A It does.
Q If you look at the bottom of Exhibit 1, do you see a series of loans there?
A I do.
Q Did you help Dr. Raiffe with those loans?
A Some of them, I did. Some of them, I did not.
Q It looks like the -- it's collateral on the right. Do you know which ones, which particular ones you did help him with?
A At the time, these Northwest banks, those -- when I was at that bank, it was Lorain National Bank, and it was -- has since been acquired by Northwest Bank. So it's my understanding those would have been the loans that I originated at Lorain National Bank, but they were acquired by another bank. The Bank of America I would not have done that.
Q Okay.

MR. BRAILSFORD: Can you show page 2, please?

BY MR. BRAILSFORD:
Q Okay. Is the Arizona home listed -- is Dr. Raiffe's Arizona home listed on Exhibit 1 anywhere?
A It is not.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Q Where would it be listed on Exhibit 1, if it were to be?
A Under property A, type of property, residence, and it would have them listed in there.
Q And this, of course, shows Dr. Raiffe's residence as 7601 Royal Portrush Drive, Solon, Ohio?
A That is correct.
Q If there was $1.5 million in debt for the Arizona home, where would that be listed on this exhibit?
MR. BRAILSFORD: Can you show him that document?
A Well, you would have seen it listed under assets, and then you would have seen it listed under liabilities on the front page. Then sometimes they would've listed it under other -- other debts. It would have been under mortgages on real estate, it would've been listed there, and on the asset side, it would be listed as real estate assets.
And then we ask for additional information throughout the document. Notes payable to bank, or others. And then on the second page, we ask about assets.
MR. BRAILSFORD: Can you go -- pull up the second page, please?
A There in the middle.
BY MR. BRAILSFORD:
Q Where it says Warren Dental Group, Bucyrus Family Dental Group.
A Yeah.

Q Mentor Dental Group. Okay.
A And then, you know, if you look at other liabilities, that -- that's where it would also could be listed.
Q Where is that?
A It's section 7.
Q Okay.
A So the way the SBA document is, if there's -- as you can see, there's only so many places, so if there's additional debt, it would be listed in -- in here.
Q And this is showing that for a mortgage for a home in Ohio?
A Correct.
Q You testified that Dr. Raiffe's -- had you know Dr. Raiffe had moved to Arizona, that would show a deviation from the business model as you understood it, correct?
A Correct.
Q Absent further information from Dr. Raiffe about his move to Arizona, would you have been able to recommend the loan?

THE COURT: I didn't understand the question. Could you please repeat it?

BY MR. BRAILSFORD:
Q Given that there was a change, as you understood it, to Dr. Raiffe's business model that he's living in Arizona, would you have been able to recommend the loan be approved without further information from Dr. Raiffe?

MR. HAUF: Objection. Speculation. Foundation.

THE COURT: Mr. Brailsford?

MR. BRAILSFORD: I don't -- I guess I don't understand the foundation part of it.

MR. HAUF: What we're asking here, Your Honor, is specifically him to speculate on a business model, their issues with timing specifics of that model, and when the move would've taken place and what constitutes a move.

THE COURT: Does that help, Mr. Brailsford?

MR. BRAILSFORD: Yeah, I'll withdraw the question. Let me just check.

(Counsel Confer)

BY MR. BRAILSFORD:

Q Okay. In May of 2016, when Dr. Raiffe was applying for this loan, it was your understanding that he was living in Ohio, correct?

A Correct.

Q And you had an understanding of his business model, correct?

A Correct.

Q And we -- you testified to that earlier that it was your understanding that Dr. Raiffe's business model was to purchase a practice, maybe an under-performing practice, he would work it to pass on the goodwill, correct?

A Yep.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Q And after a while, he might transition back, and maybe work a day a week, or a day every two weeks. Is that your prior testimony?
A Yes, he would transition the practice, and then after the practice would go through active recall, and things looked to be stable, he would take a step back from the practice.
Q So if Dr. Raiffe was no longer living in Ohio, he was living now in Arizona, as you understood it, would that be a change to his ability to run the business?
MR. HAUF: Objection. Speculation.
THE COURT: The question was as to his understanding.
MR. HAUF: Withdrawn.
THE COURT: Overruled.
A It would have -- it would've needed to be addressed on several fronts.
BY MR. BRAILSFORD:
Q And so you would want more information from Dr. Raiffe, correct?
A Correct.
Q And those questions were never asked, correct?
A They were not. Like I said, something like that would've opened up a whole another batter of questions that we would have asked.
Q So absent further -- excuse me, so absent further information from Dr. Raiffe, would you have been able to

recommend the loan?

MR. HAUF: Objection. Speculation. There's many issue at play here that constitute review, such as the Solon, Ohio house, whether that would've been sold, whether there was an experienced associate.

THE COURT: So are you asking Mr. Brailsford to isolate specifically as to this issue, and whether that in itself drove a decision one way or the other?

MR. HAUF: Correct, Your Honor.

THE COURT: Mr. Brailsford?

BY MR. BRAILSFORD:

Q So it was your understanding that Dr. Raiffe was living in Ohio?

MR. BRAILSFORD: Right, I guess I'm not following the objection, Your Honor, if you could --

THE COURT: What I'm essentially understanding is, and this goes back to something we talked about at our last hearing, paragraph 18 of the complaints said had Debtor informed Midwest of the home, referring to the Arizona home --

MR. BRAILSFORD: Yes.

THE COURT: -- the indebtedness, referring to the Arizona indebtedness, or his intent to move to Arizona, the loan would not have been made. That's what you're talking about, right, Mr. Hoff?

MR. HAUF: Correct, Your Honor, the third prong on

that.

THE COURT: And so are these conjunctive or disjunctive? It sounds like that's what you're driving at here, right?

MR. HAUF: Correct, Your Honor.

THE COURT: Could it be one, and one alone, or does it have to be all three in conjunction with each other for the decision to have been different on the loan made. That's what you're focused on, right?

MR. HAUF: Yes, Your Honor.

THE COURT: Does that help, Mr. Brailsford?

MR. BRAILSFORD: Yes, and I'm trying to get through that, Your Honor.

BY MR. BRAILSFORD:

Q Was the move to Arizona material, or let me finish that. In your consideration whether or not to recommend the loan, to approve the loan, was it material to you that Dr. Raiffe had moved in Arizona?

A If I would've known he was moving to Arizona, I might not have, or probably wouldn't have recommended the loan for approval.

Q If you were aware -- let me ask you this, do you consider the $1.5 million in debt for the Arizona home purchase, do you consider that to be material in your decision to recommend that Midwest Bank approve the Hamilton loan?

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

A Had I have been aware of the $1.5 million mortgage, and a move, it would've drastically changed my opinion on the application in entirety.

Q So is there no guarantee that you would've recommended a loan approved -- be approved, had you known about the $1.5 million in debt?

A Had I known about the $1.5 million worth of debt, most likely would not have recommended for approval.

Q Okay.

MR. BRAILSFORD: No further questions, Your Honor.

THE COURT: All right. Mr. Hauf, is this an appropriate time to take say a five-minute break?

MR. HAUF: Yes, Your Honor.

THE COURT: Just in terms of scheduling, I need to be available for a meeting at noon, so I would like to break just a little bit before then. I'm thinking we ought to take an hour, unless the parties want an hour-and-a-half break at lunch. We will stop at 5 today, pick up again tomorrow at 9 o'clock, and continue on the same path. If we take five now, that works everybody, right?

MR. HAUF: Yes, Your Honor.

MR. BRAILSFORD: Yes, Your Honor.

THE COURT: Okay. Lunch, hour, hour-and-a-half, what's the preference?

MR. BRAILSFORD: I think we'd defer to you, Your

Honor, however long you need for your meeting, your call. However long your staff needs to get lunch, and work through whatever orders may be --

MR. HAUF: We have a second day, so I don't care if Your Honor needs an hour-and-a-half, we can kick it to -- we'll have enough time to make that up on the second day.

THE COURT: Okay. We'll call an hour-and-a-half lunch break, and just a tad before noon, but for right now, let's take five minutes.

MR. HAUF: Thank you, Your Honor.

MR. BRAILSFORD: Thank you.

(Recess)

THE CLERK: All rise.

THE COURT: Mr. Hauf, before we get started, back to the scheduling today, I just learned that Mr. Austin, and Mr. Brailsford's partner, Gerald Shelley, has a discovery issue that they need resolved today at 3:45. So we will take a break at that time. Hopefully, that's a fairly short deal.

MR. AUSTIN: Your Honor, first of all, we apologize for Mr. Shelley. I know we're on the record, and jokes don't normally follow, so just to be clear, that was a jest but we'll apologize for Mr. Shelley ahead of time. And just for the record, Mr. Street, just slipped into the courtroom. He came in after you taking the bench, I just wanted to make the record clear. He was here.

THE COURT: Okay. Thank you.

Mr. Hauf, are you ready to proceed?

MR. HAUF: I am, Your Honor.

CROSS-EXAMINATION

BY MR. HAUF:

Q Mr. Twyford, now you testified under oath at your deposition on September 5th, 2019; is that true?

A I did.

Q Thank you. And you swore to tell the truth; is that correct?

A I did.

Q And you did tell the truth?

A To my best of my ability.

Q Now, I am going to -- this was already admitted as an exhibit. I'm going to open -- well, actually I'm sorry, I'll wait on that. I'm going to refer to your deposition. On page 24 --

THE COURT: Mr. Hauf, let's do it this way.

MR. HAUF: Yes.

THE COURT: Just ask him the question, and if the deposition --

MR. HAUF: Okay.

THE COURT: -- is in conflict with what his testimony is today, then we can start talking about the transcript.

MR. HAUF: Understood, Your Honor. Thank you.

BY MR. HAUF:
Q So my question is now, were there any specific conditions required of Dr. Raiffe individually with relation to the Hamilton loan?
A A lot of times there's various conditions related to approval. I don't know them all of off the top of my head.
Q Understood. And then if we go to -- now I will open Exhibit C, which as I said was already admitted, and we will make this full screen, so that it's easier to see. Okay. The Midwest loan commitment letter, and I'll refer to the bank as Midwest loan --
A Okay.
Q -- or Midwest. The Midwest loan commitment letter, would it have conditions if there were any, would it be in the commitment letter, the conditions?
A Most conditions make it in, but there's some conditions that are standard that wouldn't make it into a commitment letter, like I mean there's certain requirements of an applicant that wouldn't necessarily be spelled out in a commitment letter.
Q Understood. And I am going to show you this. This is Exhibit C. Is this the Midwest -- is this the commitment letter that Midwest would've issued in the Hamilton practice?
A It appears to be so.
Q And is this the type of letter Midwest typically uses when

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

they issue loans under SBA that you're familiar with?
A Yeah, I don't prepare this document but it's consistent with a commitment letter that we would send.
Q Okay. And on page 3 of this document -- let me get that here, I apologize -- okay. On page 3, they have the conditions of approval. Now do you see that on the document?
A I do.
Q And does it state the commitment as subject to MBC receiving a 75 percent guarantee on the subject loan amount?
MR. BRAILSFORD: Your Honor, this is not relevant. He's asking questions about insurance. That has absolutely no bearing on 523.
THE COURT: Mr. Hauf?
MR. HAUF: Your Honor, I am trying to establish what conditions of approval that were. I'm not asking the relevance of the approval as it relates to this case, just whether or not there were conditions in this document related to the loan.
THE COURT: Objection overruled.
BY MR. HAUF:
Q And this commitment is void if the SBA guarantee cannot be obtained; is that correct?
A That is correct.
Q And in your experience and your knowledge, typically if there would be a restriction such as the doctor is unable to leave the state or must remain in the state, would that

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

normally be put in this condition -- as a condition of the loan?
A Yeah, but I -- I have never seen a condition like that. I mean, there are certain --
Q So you've never seen a condition that the doctor is not allowed to leave the state in any loan that you've personally engaged in?
A I've never seen a condition other than the conditions of approval that are subject -- our conditions of approval just states 75 percent guarantee, and normally a biz val (phonetic) or an appraisal needs to come back.
Q Okay. And with relation to the requirement -- I know I asked this before, let me be more clear. In any of the loans that you've ever closed or engaged in, has a requirement that the dentist remain in the state in which the loan is being received been in the conditions, to your knowledge?
A To my knowledge, no.
Q Okay. And did this particular loan go through?
A If this was the Hamilton loan, yes.
Q And -- I've already addressed that --

MR. HAUF: I will move to -- you'll have to bear with me, we're using a different laptop. I'm going to move to Exhibit J, which once again was already admitted without objection.

///

BY MR. HAUF:

Q And can you see the exhibit okay? Let me bring that up --

A I can.

Q -- to full screen here. Okay. And these are the -- this is the loan committee minutes on Monday, June 6th, 2016. Do you see your name there?

A I do.

Q And were you an attendee at this loan committee meeting?

A I either would've been there in person, or phoned -- well, it says by phone, I would've been in person at this one.

Q So you would've been aware of all of the proceedings within this committee meeting?

A Only as it pertains to my individual loan.

Q Okay. And then do you see the committee -- I have to make sure that it's in -- yes -- now the loan committee conditions, do you see the condition that required a capital of $40,000 for controlled funds for equipment?

A I do.

Q And then once again, are there any conditions mentioned in this document, or to your recollection that required that Mr. -- that Dr. Raiffe remain in Ohio?

A There are -- I do not see any.

Q And then -- now with regard to -- we'll go back to your testimony and per Your Honor's request, I'm going to ask the question if it differs from your testimony at deposition, I'll

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

read that.

Now you testified, did you know that the doctor -- Dr. Raiffe bought a house in Arizona?

A I'm sorry, was that a question?

Q Yes, I'm sorry. Did you know that Dr. Raiffe bought a house in Arizona?

A I --

THE COURT: What time frame are we speaking of, Mr. Hauf?

MR. HAUF: What was that? I'm sorry.

THE COURT: What time frame are we speaking of?

MR. HAUF: In the foundational context, this was in his deposition that we took 9/15/19, and so this would've been prior to the purchase of what we've referred to as the Hamilton practice, the loan that Midwest gave, that --

THE COURT: So are you asking did you, Mr. Twyford, understand in May of 2016, that there was a purchase in an Arizona home; is that what you're asking?

MR. HAUF: Right, so prior to the purchase or the Hamilton practice, and this is the context of the deposition --

THE COURT: Prior to making the loan?

MR. HAUF: Correct.

BY MR. HAUF:

Q Prior to the completion of the loan, were you aware that -- did you know that Dr. Raiffe bought a house in Arizona?

A No.
Q And then if we look at the depositions on page 28, line 21, through page 29, line 1, the deposition -- and that's once again, 28, line 21, okay:
"Q And then the same time period on or before May 2016, did you know that Dr. Raiffe had purchased a home in Arizona?"
Your response:
"A I did not."
Follow-up question:
"Q You didn't know," and then it was quite some time, I believe it was due to the -- or I'm sorry, 28 to 29.
"A I don't believe so."
And then we say:
"Q Okay."
And --
THE COURT: What's the question, Mr. Hauf?
MR. HAUF: The question was, did you know that Dr. Raiffe purchased a house, as we said in the time line, May of 2016. The answer was no, and then it was I don't know.
BY MR. HAUF:
Q And then going back to that, do you get commission from every loan that closes?
A Typically, yes.

Q Okay. And so I wanted to clarify some of the testimony we had, Dr. Raiffe had eight loans for dental practice purchases. Did you obtain all of those loans for him?
A Well, when I reviewed his PFS there was a Bank of America loan that I wouldn't have had there. I -- I think I helped him with seven, approximately. I don't --
Q So of the eight loans he had, you would've helped him with seven of those loans, except for the B of A loan. So you didn't work with B of A; is that correct?
A Correct.
Q And so with regard to Dr. Raiffe's process, you testified that you're familiar with how he transitioned practices. How long does the transition typically take in your view, for a practice to be transitioned?
A Well, it's not one size fit all. It depends on how big the practice is, their demographics for their patient base, and so forth. So -- but as I testified earlier, in a typical fashion, you want all those patients through active recall, at least once.
Q Okay. And so does that transition -- once again, based upon your experience, that transition time, does that differ depending on the size of the clientele that each practice has, and whether or not they have well-known, or well-liked associates also at the practice?
A Yeah, I mean to -- to answer your question, it depends on

-- we call them active patient count, so it kind of depends on the number of active patients, that determines how quickly you could get them through recall, so there's various factors. You know, you would have a large active patient count, and not a lot of doctors, it's going to take longer.

Q And in cases where a doctor is geographically further away from several practices, let's say, typically if they have to fly in or they have to drive to those practices, does that typically create an issue with that transition period?

A If -- if they have to travel pretty far, we -- we ask questions as how -- how they're going to transition the practice. There are questions that we would ask.

Q Okay. Do you have a minimum location or a minimum time range, meaning I have two practices an hour away, versus I have two practices eight hours away, does that change your inquiry?

A Yeah, it does, but what you've got to realize is it also matters how quickly those acquisitions were done in between each other, so for instance, if someone bought a practice a year ago, and they've transitioned that practice, then given like Dr. Raiffe's model, that practice is stable, he's transitioned, he's got them through active recall, he can devote more of what they call doctor days in the new practice.

Q Okay. So in a typical structure like this, it wouldn't be expected that once a practice is established, that the doctor spends much time in that established practice.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

A We expect him to, and the SBA expects them to manage daily operations. If there's someone else who is managing daily operations, and not overseeing the practice, they're required to sign as a personal guarantor. So they don't necessarily have to do what we call production in the dental practice, but we're -- they're expected to manage that practice.

Q All right. So management doesn't necessarily go hand in hand with production. They're not expected to actually be at the chair doing the work on the patients.

A And not in all instances. It depends on how the loan was approved.

Q Okay. And then as far as the Exhibit 1 that was admitted into evidence, I'll bring that back up on the screen. Can you see that okay, and that I can? Okay.

So on you already identified some of the items there. I'll go to the first page, and we're looking at the -- on the right side, the liabilities, the 906 street loans. Do you see that?

A Yeah, yeah.

Q Okay. And then I am going to -- I think to clarify this a little bit, I'm going to go to the second page, and that lists the -- really what I am looking at is where on this page would the residence to be located for Dr. Raiffe that was listed on this PFS?

A Well, on the first page, the residence is listed at the

top.
Q That's under real estate?
A Well, at the very top, if you can go up there. You see name, and then it says resident's address, and then it asks for resident's phone number. And then it asks for business. So the residence would be listed there.
Q And I'm really referring to the property that's listed here as an ownership interest. Where would that be listed, if it was a real personal property. So like a house.
A Oh, okay. The house would be listed under real estate on section 4, and then the want you to describe it in section 4.
Q Okay. In section 4, and that's what's down on page 2 under residents, correct?
A Correct.
Q Okay. And on -- I'm going to quickly move to another exhibit, which is Exhibit D, now that we've identified the 7061 Royal Portrush Drive, or actually let me hold on just a second. So that residence, if this residence was sold, would that impact your estimation of whether or not the loan would be granted?
MR. BRAILSFORD: Your Honor, objection. It calls for speculation.
MR. HAUF: So, I'll reword.
BY MR. HAUF:
Q Previously in your testimony you said that if you had

known about Dr. Raiffe's loan in Arizona, it would have given you pause when calculating the loan. In this case, this house listed here, did you believe that this was Dr. Raiffe's house?

A Yes, I -- I would've had no other reason to believe otherwise.

Q Okay. And then on section 7, where we list second and third mortgage obligations --

A Yes.

Q -- there's an obligation of 97,000 and an obligation of 788,000. Do you see those two?

A I do.

Q If those obligations were not held, or if those second and third mortgages were on a property not owned by Dr. Raiffe, would that impact your calculation, i.e., if this property wasn't owned by Dr. Raiffe, would that be more beneficial or less beneficial for him?

MR. BRAILSFORD: Objection. Speculation.

THE COURT: Mr. Hauf?

MR. HAUF: We're trying to establish here based upon specifically the issue here is that this property was not owned by Dr. Raiffe.

BY MR. HAUF:

Q So if these liabilities were removed from the PFS, would that have had a negative or positive impact on your speculative decision whether or not to grant him a loan?

MR. BRAILSFORD: Same objection, Your Honor, speculation.

BY MR. HAUF:

Q In your opinion, would you have granted him the loan if we had to change that?

MR. BRAILSFORD: Objection to speculation.

MR. HAUF: So let me withdraw the question.

BY MR. HAUF:

Q So if on this -- so on this personal financial statement, what is typically your response if there is information that is not accurate that you've become aware of?

A We asked them to redo it.

Q The whole financial statement?

A Well, we -- sometimes there would be some inaccuracies, and we might ask them to change it, and complete it, or initial, and this -- you know, like if something's off, like you might get them where they're like handwritten. I don't -- yeah.

Q Okay. And what type of inaccuracy would require an amendment, typically in your view?

A If they didn't give truthful and honest information that -- yeah.

Q So we'll go to Exhibit D then.

A Yeah.

Q Exhibit D, which I was talking about before is the

Plaintiff's response to admissions, and so we ask whether or not the Plaintiff in this case, Northwestern, was aware that dental had a practice located -- that the Debtor had a practice located in North Royalton at the time of this application, and they said that they were aware.

Were you aware that there was a practice that was not listed on this PFS?

A I guess I -- at the time, I don't know if I was aware of that or not. I -- if I would've made the North Royalton loan, maybe I would've been aware of it, I don't know.

Q And would you say that was a material exclusion from the PFS?

A If he -- if he had additional debt out there, that we would want to know about it obviously.

Q Okay. And if in the circumstance where you had helped with the North Royalton loan, and there was an amount of debt on that, would you have required him to amend it, the PFS, or because you already knew about the loan, and you helped with the loan, would you not have required a PFS amendment?

MR. BRAILSFORD: Objection. Speculation.

THE COURT: Mr. Hauf?

MR. HAUF: So what I am going to is in his opinion whether or not the fact that he had helped with this North Royalton loan that was acknowledged as excluded would have mattered with regard to the amendment of the PFS.

THE COURT: Well, let's back up and take this sequentially. Have we established that the North Royalton loan is not there?

MR. HAUF: We can, Your Honor.

BY MR. HAUF:

Q In -- I'll go to page 1 of the personal financial statement. It lists all the practices owned by Dr. Raiffe. Now if you take a look at that, do you see the North Royalton loan listed there?

A See it's -- it's hard for me, I am just -- you know, there are several loans, many years ago, like when they put the B -- it's called a DBA, like My Family Dental, I don't know if that's North Royalton or not. I'm sorry. I lost you there. Do you see where it says that?

Q Yes.

A Or DOC, Raiffe --

Q Well, that's --

A I don't know what corresponds with the location, does that make sense?

Q That does.

A Yeah.

Q So let's back up. So let's say you helped Dr. Raiffe acquire how many loans in your testimony?

A I believe seven.

Q Okay. And so this North or Hamilton, would've been the

seventh loan; is that correct?
A I think so.
Q Okay. And you've already testified that B of A was not a loan that you helped him acquire.
A I did not.
Q So that means that based upon the number of loans you closed, plus the B of A, he should own a total of eight practices.
MR. BRAILSFORD: Objection. Calls for facts not in evidence.
THE COURT: Just ask him directly, Mr. Hauf.
BY MR. HAUF:
Q Yeah, how many loans did you -- or is based upon the number of loans listed here from Northwest Bank, do you see all seven of the loans that you helped close listed here?
A I don't, but that wouldn't be odd to me because sometimes they sell practices, and -- and buy practices, plus there's a business indebtedness form that we also ask the doctor to sign to list business indebtedness.
Q The -- okay, so the business indebtedness form, is that a form that is also -- is that part of the personal financial statement?
A It is not.
Q Okay. And so is it possible then that the North Royalton practice could've been listed on the personal -- and what did

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

you call it, I'm sorry, the personal indebtedness form?
A    Business -- like for instances, like we required to get balance sheets, and things like that on the practice.  It could've been there.
Q    Okay.
A    I don't know if I am answering your question here, but --
Q    Well, the reason I ask that is if there was a practice that was listed on that form, but then was not listed on the PFS, would you go back and amend the PFS to include that practice?
A    Not necessarily because this is a personal financial statement, so some doctors fill it out, and they keep separation of state and church, like they don't put anything related to their business on their personal financial statement, and then the financials for the practices or the businesses list all the business debt.
          The real -- the real thing would be is if did we account for the payments in that.
Q    Okay.  I just -- I'm trying to clarify because the issue here is that I see one, one, two -- well, how many Northwest bank loans do you see on this PFS?
A    I see four.
Q    And you're not completely sure which loan corresponds to what based upon their name?
A    The only ones that I could -- I guess I could speculate

would be the Mentor would be for Mentor, and the New Carlisle, because it's listed in the name is for New Carlisle.

The other thing I wouldn't know is doctors buy and sell practices all the time and I don't know if that Bank of America refinanced a bunch of those previous practices because that's a big thing. Sometimes during what we do, people use the SBA to acquire practices, and then they'll refinance.

So if you're asking me would I be aware that something was missing, no, I -- I might not unless that's why we do all this exhaustive underwriting on the -- on the loan.

Q Okay. And really the question goes towards if you knew this practice was missing, would you have had him amend his PFS?

MR. BRAILSFORD: Objection. Speculation.

BY MR. HAUF:

Q So as a matter of policy, we already talked about the importance of the PFS --

A Right.

Q -- and the importance of its accuracy, and so if you found that a practice that you helped acquire was not listed on the PFS, but because of your aid in helping to acquire that practice, you knew about it, would you have required that the Debtor or that Dr. Raiffe amend the PFS to include that practice later on?

MR. BRAILSFORD: Objection. Calls for speculation.

THE COURT: Mr. Hauf?

BY MR. HAUF:

Q So when you do these loans, and in your personal view, and that's what we're talking about is your expertise, when you have a PFS like this, and if you had a practice with a liability that you helped acquire, would you then in your view, want the PFS amended?

MR. BRAILSFORD: Objection. Calls for speculation.

MR. HAUF: I'm asking about what he would want done if he knew that the practice was not excluded, as we said.

THE COURT: You're not talking about bank policy. You're not talking about this deal. You're talking just in a generic sense.

MR. HAUF: Correct.

THE COURT: Objection overruled.

A If it was me, I would want the debt documented somehow or some fashion.

BY MR. HAUF:

Q But not necessarily on the PFS?

A Well, once again, PFS stands for personal financial statement, so typically some doctors exclude some of their personal debt and it's picked upon the business financials. So what's most important to me, and my recommendation, is that it's accounted for.

Q Okay.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

A Does that make sense, so --
Q He -- and let me interrupt then, even if it's a personal debt that would've normally been required to be on the PFS like the other practices we see listed here --
A Yep.
Q -- as long as it was listed somewhere else, you'd be okay with the PFS being as it is?
A Not -- not if it's a personal --
MR. BRAILSFORD: Objection. Misstates testimony.
BY MR. HAUF:
Q So once again, in the general sense, if you testified that if it was a business liability, it would be documented somewhere else. My question specifically is if it's a liability held in the kind that we see in this PFS, would you want the PFS generally amended to include a personal liability?
A If a personal liability was not documented on the personal financial statement, I would want it amended to be reflected.
Q Okay. And then with regard to the real property, and we talked about that briefly, on these PFS, do you normally take the income of the spouse in account when you're doing these?
A Yes and no. It depends on if the spouse is going to sign. I can't count her income if she's not going to sign on the loan.
Q Okay. And then what about spousal assets, if there's a asset that is owned by a spouse, but not by the applicant,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

would that normally be listed on the PFS?
A    Well, it depends on what state, if there's Dower rights, and things like that. So Ohio is a Dower rights state, so typically an asset that is owned by the spouse is owned by the other spouse.
Q    Okay.  So in a lot of instances, it would be listed.
A    Okay.
Q    And then what about liabilities held by a third party or a spouse, are those normally accounted for in the PFS, as well?
A    It wouldn't be incorrect if the party -- the person filling out the personal financial statement isn't a guarantor on that.  So for instance, say the spouse has a credit card, and the husband or the vice versa isn't on that credit card, no, it would not need to be on the PFS.
Q    Okay.
MR. HAUF:  Excuse me for one second.
BY MR. HAUF:
Q    And then a few quick questions, I'm almost done.  With regard to this PFS, what is your standard process when you email out -- it's from your previous testimony, you said that it's quite common for doctors to send you the PFS filled out electronically, and then to transmit the signature in some other way.
A    Correct.
Q    Okay.  And how do you normally receive those documents?

A Sometimes, they're emailed, scanned or faxed.
Q Okay. And so with regard to the electronic copy, so we'll separate these into two halves, essentially the half with all the numbers, and then the half with the signature. Is that a fair classification?
A Well, both halves have numbers on them.
Q So one would just be an original signature, and one would be digital? Do you normally get an original signature on both pages, i.e., they send you a copy of the signatures on both pages?
A The front page doesn't have a line for a signature on it.
Q Okay. So it's not uncommon for you to receive the first page electronically and then the second page in some other form?
A Correct.
Q Okay. And then how do you normally track those pages? Do you transmit the first half before you get the second half? How -- what's your process there?
A Typically when we receive it, if it is unsigned, we ask for the signature page to come in, and then they'll combine the two.
Q Okay. And what's your verification process for the signature? You're waiting for it, you get it, and then?
A I mean it's -- it's not that hard when you make a phone call to a doctor and you say hey, I need you to sign the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

signature page, and then the doctor faxes it. That's my confirmation that that's him, I guess. I don't -- I -- to me that doesn't seem complicated, I don't know.

Q Okay.

A You know.

Q And -- and you said in your testimony that typically the doctors fill these out directly?

A Always.

Q Okay, so they don't employ professionals like accountants or managers to help them fill these documents out?

MR. BRAILSFORD: Objection. Speculation.

THE COURT: Mr. Hauf?

BY MR. HAUF:

Q You testified with regard to your knowledge, as to whether or not doctors fill them out directly. So the question would be in your experience, have you had doctors who employ professionals to fill out these documents.

A In my whole 22-year career, I'm not aware of someone else completing a personal financial statement for someone, this particular form. Now, a CPA might have a personal statement of assets and liabilities, but it looks totally different. And we don't accept that form. We require the doctor to complete this. And in my experience, the -- every loan I made, the doctor has completed this on their own.

Q And then you -- when you need the signature, you will

contact the doctor directly or a party affiliated with the doctor? What's your process there?

A Well, because, you know, I'm the point person for the doctor, i.e. sales, I like to tell them, hey, here's the -- we got you approved, here it is. So I'm in that process, so I typically talk directly to the doctor. With this type of business, you have to talk to the doctor. You can't -- like, some people that do my job -- and I was trained early on -- they don't talk to the doctor. They talk other people's word for it. And in my training, you must talk to the doctor to find out things that you otherwise might not know.

Like, for instance, a practice broker might say, hey, I can tell -- I always talk to the doctor. If that --

Q Understood.

A -- answers your question.

Q And then when you get a fax, do you do a confirmation afterwards to verify that the fax was sent by the doctor?

A Do I call the doctor and say, was this you who sent the fax?

Q Correct.

A No.

Q No? Okay. And then what do you do with the page after you receive it?

A Typically, put it in the file that moves on with the package.

Q And how -- what form is that normally done in?
A You should see our files. They're pretty big, so the paper's put into the file.
Q So it's a physical file?
A We build a physical file, because if the -- we have to have a physical -- we go through an audit process, so there's a thick file with all the documentation in it. So there is a physical file.
Q Okay.

MR. HAUF: That's all the questions I have for now, Your Honor.

THE COURT: Thank you. Mr. Brailsford, redirect.

MR. BRAILSFORD: Yes, Your Honor.

(Counsel Confer)

MR. BRAILSFORD: Can you pull up Exhibit C?

THE COURT: Which exhibit?

MR. BRAILSFORD: Exhibit C -- Defendant's Exhibit C.

REDIRECT EXAMINATION

BY MR. BRAILSFORD:

Q Mr. Twyford, you were asked about conditions on your cross by Mr. Hauf. And you testified that there was not a condition that he live in Arizona, correct?
A Correct.
Q But there was a condition that he be truthful in his application, correct?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

A Absolutely.

Q Okay. Would you --

MR. HAUF: Objection. Outside scope of cross.

THE COURT: Mr. Brailsford.

MR. BRAILSFORD: I'll withdraw the question, Your Honor.

BY MR. BRAILSFORD:

Q This is the commitment letter, correct?

A Correct.

Q And this is the material adverse change clause?

A Correct.

Q And this is in that approval letter, right?

A It is.

MR. HAUF: Once again, objection. Outside scope of cross.

MR. BRAILSFORD: Your Honor, he asked about this document, and I'm just asking some more questions about the same.

THE COURT: Objection overruled.

BY MR. BRAILSFORD:

Q So based on this material adverse change clause that's been highlighted in yellow, is it your understanding that Midwest Bank made the commitment subject to the accuracy of the information, representations, and materials that were submitted with or in support of the borrower's request for the loan?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

A Yes.
Q And if it was inaccurate or there were omissions in any of those representations or materials that were submitted to the loan, then the borrower was to correct those; is that your understanding?
A It is.
Q Okay.
MR. BRAILSFORD: Can you pull up Exhibit 1, please? And go to the first page, please. Thank you.
BY MR. BRAILSFORD:
Q You were asked about whether or not the North Royalton practice was listed on this personal financial statement. You remember that testimony?
A I do.
Q And your testimony was you couldn't tell based on the way the loans were marked?
A Correct.
Q Okay.
MR. BRAILSFORD: Can you pull up Exhibit 47, please? And it might help to go to the first page so I can --
THE COURT: This is Exhibit 47?
MR. BRAILSFORD: Yes, Your Honor, Exhibit 47.
BY MR. BRAILSFORD:
Q Do you recognize Exhibit 47?
A I do.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Q What is it?
A It's our internal approval document credit analysis?
A So this document -- is it your understanding that this document would contain the analysis -- the credit analysis and whether to approve Dr. Raiffe's loan?
A Yes, this is what all the approvers -- it's -- it's 29 pages. That's what the people who would approve the loan would review to grant approval.
Q Okay.

MR. BRAILSFORD: Can you go to the page that's Bates marked 133 -- mid-133?

Can you pull up -- highlight that section where it says, "Doctor's existing practices are as follows."

MR. HAUF: Objection, Your Honor. Hearsay, foundation. This document hasn't been admitted into evidence.

THE COURT: Mr. Brailsford?

MR. BRAILSFORD: I didn't realize I had to have a document admitted into evidence to show a witness and ask them questions about it. If you need me to lay the foundation to have it admitted, or I can ask questions about the document, I will.

THE COURT: Just lay the foundation, please.

MR. BRAILSFORD: Okay.

BY MR. BRAILSFORD:
Q Okay. You testified that this is the credit analysis that

the bank does when it performs a loan --
A Correct.
Q -- approval? And you said it's 29 pages?
A Correct.
Q And do you -- are you -- do you participate in providing information for this credit analysis?
A I do.
Q And how do you do that?
A I gather the financials and things from the doctor, and I send it to my credit analyst, who then works on the document.
Q And is there dialogue between you and the -- I'm sorry, who's a colleague?
A Yeah. In this case, it was Adam Weesie (phonetic).
Q And who's Adam Weesie?
A He's one of our underwriters.
Q So were you the originator for this loan?
A I was.
Q And Adam Weesie was the underwriter for this loan?
A He was.
Q And did you and Adam have conversations to provide information so that this document, Exhibit 47, could be created?
A We did.
Q And is this -- Exhibit 47, the credit analysis, is it part of Dr. Raiffe's file?

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

A It is.
Q And how do you know that?
A Because it's the approval document. It would have to be in the file.
Q Do you have personal knowledge that it is?
A Yes.

MR. BRAILSFORD: Your Honor, move to admit Exhibit 47.

MR. HAUF: Objection. Foundation. He said it would have to be in the file. I didn't hear any acknowledgement that it was personally viewed by or seen by the witness.

MR. BRAILSFORD: I asked him if it -- if he had personal knowledge; his answer was yes. And then he said it would have to be.

THE COURT: Yeah, objection overruled.

So Mr. Hauf, now, the request is for Exhibit 47 to be admitted.

MR. HAUF: The big issue we have is an objection on foundation. There's several blank pages in the document, and so we don't know if this is the complete document or not. So --

THE COURT: So Mr. Hauf, even though this is redirect, I'm going to give you an opportunity -- since this is the first time we're seeing this document, I'm going to give you an opportunity for recross on this.

MR. HAUF: Thank you, Your Honor.

MR. AUSTIN: Your Honor, sorry to -- just for our notes, just to be cleared, 47 is admitted subject to redirect, or is it admitted now?

THE COURT: 47 is admitted.

(Exhibit 47 Received)

THE COURT: Thank you, Mr. Austin.

MR. BRAILSFORD: Can you go to page 143? And then if you could pull up, side-by-side, Exhibit 1?

BY MR. BRAILSFORD:

Q So the top there, you see Dr. Raiffe's existing practices are as follows. Do you see that?

A I do.

Q And do you see the very last one there listed?

A Yes.

Q Doc Raiffe Management Group, North Royalton, Ohio; do you see that?

A I do.

Q Okay. Now, if we look at the pullout from Exhibit 1, which is the bottom half, do you see the second one from the bottom?

A I do.

Q $445,000 loan; do you see the far right highlighted in yellow, Doc Raiffe Management?

A I do.

Q Okay. Is it your understanding that the North Royalton practice was accounted in the loan application process?
A It is.
Q Okay. You were asked about the process for loan approvals. I believe your prior testimony was that you do a large volume of SBA loans; is that accurate?
A I --
Q I'm sorry, yeah?
A Yes.
Q Okay. And do borrowers communicate directly with you if they have concerns about the loan process?
A They do.
Q Do you invite potential borrowers to ask questions if they have concerns about the loan approval process?
A Absolutely.
Q And is it your understanding that Dr. Raiffe filled out seven different personal financial statements to purchase -- to -- let me start over.
Is it your understanding that Dr. Raiffe had seven different personal financial statements in connection with the seven different SBA loans that you assisted him with?
A Yes.
Q Did Dr. Raiffe ever express confusion to you in any of those seven small business loans that you helped him with?
A No.

Q Did he ever -- did Dr. Raiffe ever express confusion with the personal financial statements in the seven SBA loans that you helped him with?
A Not that I recall, no.
Q Did Dr. Raiffe ever ask any questions about the personal financial statement in those seven loan applications that you helped him with?
A Not that I recall.
Q Did he ever -- did Dr. Raiffe ever tell you that he did not understand the personal financial statement?
A Not that I recall.
Q Based on the lack of communication that you had from Dr. Raiffe and the lack of questions that you had from Dr. Raiffe with regard to the personal financial statement --
MR. HAUF: Objection. Foundation.
BY MR. BRAILSFORD:
Q -- is it your understanding Dr. Raiffe understood the form?
THE COURT: So the objection was?
MR. HAUF: Foundation. I didn't think that he testified to a lack of -- or the -- foundation with regard to the wording of the question.
THE COURT: Say it again, Mr. Hauf.
MR. HAUF: So it seemed as if there was a double negative in saying that there was not -- that there was a lack

of understanding -- a lack of nonunderstanding in the previous questions.

THE COURT: There may or may not have been a double negative there, but Mr. Brailsford, do you want to give it another try?

MR. BRAILSFORD: Thank you, Your Honor. I guess if I knew where the double negative was, I would know where to avoid it. So --

THE COURT: Try the question again, and --

MR. BRAILSFORD: All right.

THE COURT: -- let's see if we hit that double negative.

BY MR. BRAILSFORD:

Q Based on the lack of communication with Dr. Raiffe that you had in the loan approval and the lack of questions that you received from Dr. Raiffe with regard to the personal financial statement and the loan approval process, was it your understanding that Dr. Raiffe understood the personal financial statement?

A It is.

MR. BRAILSFORD: I have no further questions, Your Honor.

THE COURT: Thank you.

Mr. Hauf, you get a shot at the very narrow issue, which is this Exhibit 47, in particular the reference to the

D-O-C Raiffe Management Group.

MR. HAUF: Just a second, Your Honor.

RECROSS-EXAMINATION

BY MR. HAUF:

Q So Mr. Twyford, with regard to the document which is labeled as 47 by the Plaintiffs (sic) and those lists of -- let me bring it up here for your review. It would have been page 133.

Bear with me just a second here. This is not -- there we go.

On the document itself, it's labeled as a Bates stamp 133 right there. They list the practices: Bucyrus, Warren, New Carlisle (phonetic). Do you see that list there?

A I do see it.

Q Okay. And so which of these practices, to your knowledge, did you help acquire loans for?

A Oh. Bucyrus, I remember; Warren; New Carlisle. I think those -- those are -- I think I -- all of them, I think. North Royalton doesn't ring a bell to me, but the rest of them -- I think the Reynoldsburg (phonetic) would be the loan in question, which now would be a different loan. I don't -- yes, I think I -- I closed all those.

Q Okay. And then with regard to -- I'll bring back up Exhibit 1 so we can look at the disclosures. The -- there are a few practices based upon the two comparisons here that are

missing. It looks like, most notably, it's Bucyrus -- you can see there -- and Warren Dental Group; do you see that?
A Yes.
Q Okay. Do you know whether or not the B of A loan encompassed those practices?
A I don't. It could have, and it could not have. I -- I'm not privy to what the Bof loan -- B of A loan might have, might not have done.
Q Okay. Where would those -- where would that disclosure have been made?
A Pardon me?
Q Well, my question is really this. We have -- in 47, it lists all these practices, individually?
A Correct.
Q And then the B of A loan, it doesn't list the -- two practices that we see in 47?
A It's -- in the B of A, it says "Dental Practices" and "O-O-R-E."
Q Do you know what O-O-R-E stands for?
A I don't, unless it -- I would imagine it's like real estate of some sort, or it'd be occupied real estate.
Q Okay. So we're still -- so once again, this personal financial statement and the 47 don't necessarily match up, specifically?
A I can't talk --

MR. BRAILSFORD: Your Honor, object. Misstates testimony. He says it -- that that line states "practices," plural.

THE COURT: Okay. Mr. Hauf.

MR. HAUF: Your Honor, I'm simply eliciting testimony that says that the 47 disclosure does not match the PFS. And ostensibly, I will ask the question then --

THE COURT: Is there any way you could do a split screen so he can compare these two?

MR. HAUF: I will --

THE COURT: Not just him, but me as well.

MR. AUSTIN: Your Honor --

MR. HAUF: I'll see if I can, Your Honor.

MR. AUSTIN: Your Honor, for convenience, we can do split screen if that would help, Your Honor. I'm happy to make that accommodation.

THE COURT: That helps move it along. And you're okay with that, aren't you, Mr. Hauf?

MR. HAUF: I am, yeah.

MR. AUSTIN: Give me one second.

THE COURT: Thank you. Is there a way to split screen Exhibit 1 and 47, page 6?

MR. HAUF: Okay. Can both of you see those exhibits?

THE WITNESS: Yes.

///

BY MR. HAUF:
Q    If you look on the left-hand side, as I see it, it lists the practices you've already testified that you helped acquire loans for?
A    Yeah.
Q    And those practices are not clarified on the right side; is that correct?
A    Well, as I said earlier -- yeah, I mean -- yeah, it looks like he's listed four practice -- I -- maybe I'm not answering your question -- that match, and then there's the Bank of America that lists "Dental Practices."
Q    Okay.  So essentially, the PFS is not clear as to what practices the B of A refer to.  And so if there was an exclusion, that was never clarified in the PFS; is that correct?
A    I'm sorry; restate the question.
Q    Fair.  If we look at page 40- -- so on the left-hand side, this would be their Exhibit 47 that lists his dental practices?
A    Right.
Q    There was no requirement that the PFS be amended to be more specifically itemize the liabilities associated with each practice?
A    No.  One of the things -- all these practices were required to get affiliate tax returns, so we would have had tax returns or financial information on all those practices.  So we

would have looked at what he had listed and make sure we had things accounted for, which -- just looking at it and not being able to go back in time, it looks like he listed four practices, and then the B of A may or may not have -- I can't remember my recollection -- be the other two practices.

Q Right. So it wouldn't have mattered what was listed on the PFS because you're going to have backup document requirements --

MR. BRAILSFORD: Objection. Calls for speculation.

THE COURT: What's the objection?

MR. BRAILSFORD: Calls for speculation, Your Honor.

THE COURT: Well, first of all, we've established, I think, that, between Exhibit 1 and Exhibit 47, 47 identifies six matters, four of which are listed in one. Is that fair to say?

THE WITNESS: Correct, yes.

THE COURT: And the two that are missing are Bucyrus and Warren?

THE WITNESS: Correct.

THE COURT: Right? And so Mr. Hauf, what is your question related to the absence of Bucyrus and Warren on Exhibit 1?

MR. HAUF: Yeah, my question is this. If Bucyrus and Warren, if they weren't properly accounted for in the B of A loan -- we don't necessarily know --

THE COURT: Well, let's establish that first. Is --

MR. HAUF: Right.

THE COURT: Because I haven't heard that, specifically.

MR. HAUF: Okay.

BY MR. HAUF:

Q So to your knowledge, are those two practices encompasses -- encompassed by the B of A loan?

THE COURT: Bucyrus and Warren?

MR. HAUF: Correct.

A I didn't make that loan, so truthful testimony would be, I don't know for sure what that encompassed. Now, I'm sure during our credit analysis and our underwriting, we would have figured that out.

BY MR. HAUF:

Q Okay. So it would not be necessary to rely on the PFS to make that determination?

A Well, like I stated earlier, the PFS is -- we need to know -- anything that we're not accounting for that we're not aware of, we need it on the PFS, is really what we're after on that document.

Q Well, the question is this. If Bucyrus and Warren, if one of those is not listed there, but you received their tax returns, you were obviously were aware of them, and the information was available -- since this was not altered,

clearly, there was no --
A Okay. So I understand your question. My response to that would be, because it's business debt and it's not personal debt, it -- other avenues may or -- may have listed that debt, so it's not as important to have on the personal financial statement if it's listed in --
Q And what do you define as "business debt"; I'm sorry?
A Debt that's related to the business.
Q So does that mean it has a guarantee or not a guarantee? Does that matter?
A No, it means it's debts associated to his business, his dental practices.
THE COURT: So I'm a little confused now. Aren't all six of these Exhibit 47 practices owned by an entity, some of which are guaranteed and perhaps some of which are not guaranteed by Dr. Raiffe?
THE WITNESS: Correct. They're all guaranteed by Dr. Raiffe.
THE COURT: So are you telling us that the Bucyrus and Warren corporate obligations or entity obligations are not guaranteed by Dr. Raiffe?
THE WITNESS: I don't know for sure because of B of A doing the loan. I guess what I'm saying is, I can't testify that those are those other two loans. That's what I'm -- I guess I'm getting confused on what the question is.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: So you're wondering whether B of A encompasses Bucyrus and Warren?

THE WITNESS: Correct.

THE COURT: I thought you said earlier you made the Warren loan?

THE WITNESS: I did, but I believe B of A refinanced those.

THE COURT: And you think that perhaps B of A also refinanced Bucyrus?

THE WITNESS: Correct.

THE COURT: And you mad the Bucyrus loan --

THE WITNESS: Correct.

THE COURT: -- yourself?

THE WITNESS: Yeah.

THE COURT: Okay.

THE WITNESS: I don't know. Maybe I'm not -- I'm getting confused now. You've got me -- my head's spinning. I'm confused.

BY MR. HAUF:

Q No, I understand. Do you recall offhand how much the Bucyrus and Warren loans were?

A I can't remember.

Q Okay. And do you recall spec -- well, generally speaking, you said that this loan -- I think in your earlier testimony -- was one of the smaller loans you had done?

A    Me, personally, I do a lot of large loans, yeah.  It's a --
Q    Okay.  With regard to Dr. Raiffe, do you recall what his average loan size were?
A    I don't -- I don't --
          MR. BRAILSFORD:  Your Honor, we're getting way outside the redirect or, I should say, the recross.
          THE COURT:  I think he's right, Mr. Hauf.
          MR. HAUF:  Understood, Your Honor.  I think that's all I have for now.
          THE COURT:  Okay.
          UNIDENTIFIED SPEAKER:  Mr. Hauf.
          MR. HAUF:  Oh, hold on just a second, Your Honor.
     (Counsel Confer)
          MR. HAUF:  With regard to this document, Your Honor, I isolated the --
          THE COURT:  which document?
          MR. HAUF:  The Exhibit Number 47.  The entire exhibit was submitted on -- as evidence.  I have limited my redirect (sic) to the pages requested.  Would I be able to question on pages outside of the pages that have already been discussed in the exhibit?
          THE COURT:  Let's give it a try and see, and we'll see what Mr. Brailsford says to that.
          MR. HAUF:  Okay.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BY MR. HAUF:

Q I'd like to go to page -- what is Bates Stamp M-I-D-00139.

MR. AUSTIN: Are you going to take over since it's not side-by-side, or do you want me just to --

MR. HAUF: Yeah, I can -- if you want to let me do --

MR. AUSTIN: Whatever's easier to get us to the Court's lunch-hour, I'm happy to do it.

MR. HAUF: Yeah, I'm worried we're --

MR. AUSTIN: So Adam, what did you need? Mr. Hauf, I apologize for the informality.

MR. HAUF: 00139. And then I'll start this back up.

THE COURT: I think it's everybody's objective that we allow Mr. Twyford to leave after this series of questions, right?

MR. BRAILSFORD: Correct, Your Honor.

THE COURT: In other words, that Mr. Hauf wouldn't be required to recall him as a witness in his case.

MR. BRAILSFORD: Correct.

THE COURT: Do we all agree to that one?

MR. HAUF: Yes, Your Honor.

THE COURT: Okay.

THE WITNESS: Thank you.

MR. HAUF: Okay.

BY MR. HAUF:

Q Can you see that exhibit?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

A I can.
Q Mr. Twyford. You can or cannot?
A Can.
Q Okay. And under the current assets or cash, current liabilities or credit card balances, do you see those two items there?

MR. BRAILSFORD: Your Honor, I'm going to object. This is going into testimony about the ratios -- the debt ratios, and the motion in limine was specifically directing the parties, we are not to discuss that type of testimony -- that type of evidence.

THE COURT: Mr. Hauf, you had a great deal of concerns about these kinds of ratios. What's your response?

MR. HAUF: What -- really, what I'm looking at is not the ratios but what it says it listed -- lists on his credit report and the PFS.

THE COURT: Let me make sure I'm understanding. You're focused on the -- essentially the top two lines: assets and liabilities?

MR. HAUF: No. Actually, please ignore -- I'm actually interested in the text.

THE COURT: Okay. Starting at current assets and cash and current liabilities or credit card bill -- or credit card balances?

MR. HAUF: Correct, Your Honor.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MR. AUSTIN: Your Honor, as an accommodation, our technology allows us to redact that top part to comply with the Court's order, if you'd like us to --

THE COURT: So Mr. Hauf, Mr. Austin is suggesting that the top --

MR. HAUF: I have no objection to that. They can isolate the text; that's fine.

THE COURT: So show him, if you would, Mr. Austin, what it is you're going to isolate.

Okay. He just wiped it clean. Is that now what you want to focus on?

MR. HAUF: Yeah. Can you -- there were text lines above that that didn't deal with the ratio. The one -- the --

THE COURT: The above numbers?

MR. HAUF: Yeah, the above numbers. That just gives us a date for reference in this document.

THE COURT: Okay. So what's your question, Mr. Hauf?

MR. HAUF: Sure.

BY MR. HAUF:

Q Can you read, under the current assets, cash, and current liabilities or credit card balances, that -- what is the second line or second dot there? Do you see that paragraph that begins, "The majority of liabilities"?

A I do.

Q And what does it list there with regard to his bureaus?

A Pardon me? What's the question?
Q So --
A The majority of the liabilities --
Q So this list specifically -- that the -- the house is not owned by Dr. Raiffe; do you see that?
A I do.
Q It also says that it's placed as collateral on existing debt; do you see that?
A Yes.
Q And so my question is, would that typically be required to be included in the PFS, including the pledged debt?
A Would it be required that the house be listed if he's not on the house?
Q Correct.
A Under assets, as I alluded to earlier, because of the fact that Ohio's a dower rights state, then he would have an interest in that house. Therefore, it would be an asset that should be listed.
Q Okay. And what about the liabilities, if he's not listed on the liabilities on the house as well?
A Would not need to be listed if he's -- if he's not a party to it.
Q Okay. And if those liabilities were listed, would that have an effect on the calculation of whether or not he would receive the loan?

MR. BRAILSFORD: Objection. Calls for speculation.

THE COURT: Mr. Hauf.

BY MR. HAUF:

Q So in a general context, where someone is in this -- well, let's say in this particular case, we've acknowledged, based on this exhibit, that he is not listed -- that he doesn't own the property. And there seems to be collateralized debt on Exhibit 1. Exhibit 1 listed --

A Right.

Q -- a second and third mortgage.

A Correct.

Q So given that those two mortgages were listed on Exhibit 1, if he was not personally liable on those mortgages, would that make a difference with regard to his qualifications?

A It would be factored in. Does that answer your question?

Q Yeah, so the two obligations -- and we read it previously -- were 300- and 700,000, so about a million dollars?

A Well, to -- well, to answer your question, if -- if he's not listed as a guarantor on those loans, it would not be, but we would still be required -- or in my analysis for recommendation, if you're getting at this, I would have to account for some sort of liability for housing needs.

Q Right.

THE COURT: What? Liability for what?

THE WITNESS: Housing needs.
A So, like, if he's not on the house, rarely do we say, he's living rent-free with his girlfriend so we're not going to account any liabilities for housing expenses. We're going to factor that in, because it's just not logical that someone would be living rent-free. So some analysis would be done on that case. Does that make sense?
BY MR. HAUF:
Q That does. And so if -- so you always factor in some sort of mortgage expense or, in absence of a mortgage, a liability for rent?
A Right, because if we don't see any housing expense, one of the questions that we would ask is, where are you living, and what's the -- and then for instance, some doctors rent, and we expect the rent payment to be on the PFS. And if it's not, we address that, because we have to build in that housing expense in our analysis.
Q Okay. And when you're looking at those expenses for housing, is that weighted also in conjunction with the loan? So what I mean by that is, if I have a home loan and I have a payment for that home loan, and the home loan is -- and this is -- could be speculation, so let me re-ask.
So if I have a home loan and a mortgage payment, those are both factored into the PFS; is that correct?
A Correct.

Q And so if I don't have a home loan that I'm paying for, you still require me -- you still give me credit for a home or living expenses?

A If you want me to get real technical, we take out what's known as a owner's draw, and we take that owner's draw out to debt service the doctor's personal liabilities to make sure that they can account for a lifestyle and living.

Q Okay. And so really, all I'm looking at is, regardless of whether they have a mortgage payment or not, a doctor's always going to be given -- or expected that he pays for some sort of living expense?

A Yeah, unless -- I mean, there's some instances that they can document a home's free and clear, then in those instances we would not.

Q Okay. And what is weighted more: the -- a large mortgage payment or the large mortgage payment itself, or does that matter in this calculation?

A Well, they kind of go hand-in-hand, so a large mortgage --

Q Is that the --

A -- equals a large payment in most instances.

Q Okay. And so the concern with a large mortgage is that the payment you have to make could be too big, essentially, to support a new debt. Is that --

A Absolutely.

Q Okay.

MR. HAUF: That's all I have, Your Honor.

THE COURT: Let me make sure I'm understanding what I think is being suggested here and whether the parties are both in agreement on this.

Number one: it looks like this Exhibit 47 suggests that the bank understands that Dr. Raiffe does not own the Solon property; and second, that he is not personally liable on the obligations because they don't show up on a credit report. There would be three obligations on the loan: the original mortgage, the second loan, the third loan.

Is everybody in agreement that, A, he in fact did not own the Solon property? And secondly, that there were three loans on it, none of which he was liable for?

Let me ask you first, Mr. Hauf.

MR. HAUF: That's our understanding of the circumstances, Your Honor.

THE COURT: Mr. Brailsford, or should I be asking your client that question?

MR. BRAILSFORD: Your Honor, our understanding was that he was living at the Ohio house. Whether or not he had liability on those various mortgages, we don't know that.

THE WITNESS: And --

THE COURT: You --

MR. BRAILSFORD: So we're not --

THE COURT: -- as counsel don't know that, but let's

see if Mr. Twyford does.

THE WITNESS: I'm trying to clarify any of the confusion., and I don't know if it's in this document that we would have required the spouse to sign what's called a limited guarantee in the interest of the property, which would have made those mortgages good on the property. Does that make sense?

THE COURT: So not a guarantee of your loan to the doctor, but rather her assurance to you that --

THE WITNESS: We had the lien --

THE COURT: -- she owned the property --

THE WITNESS: -- on the --

THE COURT: -- and she owned the debt?

THE WITNESS: Yeah, so we wouldn't have been able to take that lien on the property without his spouse's limited guarantee. So she would have had --

THE COURT: So you wanted a lien on this house even though he didn't own it?

THE WITNESS: Correct. I believe that's what we did.

THE COURT: Okay. We haven't gotten there yet.

THE WITNESS: Yeah.

THE COURT: But that's something I'm going to be interested in.

So bottom line question for you, sir, is, am I right in assuming that because of what I see in Exhibit 47 here that

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

the bank understood, at the time of the loan in May of 2016, that Dr. Raiffe did not own the Solon property?

THE WITNESS: From this, it appears that way, yes.

THE COURT: And am I to take it that the bank also understood that the first mortgage, together with the second and third, all of which appear in the Exhibit 1 financial statement, that none of these were actually the personal obligations of Dr. Raiffe? Did the bank understand that --

THE WITNESS: No, because --

THE COURT: -- at the time of the loan?

THE WITNESS: Can I see the second and third mortgages? Because one of those mortgages would have been related to the business loan. That's what I'm getting at. So Dr. Raiffe would have been liable for those.

THE COURT: Do you know that, or are you presuming that?

THE WITNESS: Well, I saw it earlier. Can I go back to the PFS?

MR. BRAILSFORD: I -- that would be the -- yeah, I'll bring up Exhibit 1, page 2.

THE WITNESS: I'm sorry; I'm trying to alleviate any confusion.

THE COURT: So I'm looking at --

THE WITNESS: So do you see --

THE COURT: -- Section 7.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE WITNESS: -- the third mortgage with Lorain National Bank?

THE COURT: Yes.

THE WITNESS: That would have been taken in conjunction with the business loans.

THE COURT: Which one?

THE WITNESS: That there.

THE COURT: Yeah, but which business loan?

THE WITNESS: I can't -- I wouldn't know at this point. This is so long ago.

THE COURT: So is it -- are you telling me now that, in May of 2016, the bank knew that Dr. Raiffe had liability for this third mortgage on the Lorain debt?

THE WITNESS: Yeah, what I'm telling you that -- is that same liability is the same liability as the business loan. So we'll take a property as additional collateral. And it's --

THE COURT: And the only way you can take that is for the spouse who is the sole owner agreeing that you can take it?

THE WITNESS: Exactly. That's my whole point is that she would have signed as a limited guarantor to the interest in the houses. I guess -- maybe you didn't need me to make that point. I thought that's where the confusion arose. Maybe that wasn't the confusion.

THE COURT: Is it the bank's understanding that the second mortgage is something that Dr. Raiffe had liability for?

THE WITNESS: Yeah, I don't -- I don't know. I don't know.

THE COURT: What about the first mortgage?

THE WITNESS: We would have thought it was his liability if it's listed, so --

THE COURT: And where is that listed?

THE WITNESS: It would have been up here under "Residence," the first --

THE COURT: The GMAC? And you would have assumed that that was his, or you knew that was his?

THE WITNESS: I think we would have put that in his debt-to-income ratio.

THE COURT: Did you?

THE WITNESS: I'd have to look at the approval document.

THE COURT: Okay. Mr. Hauf?

BY MR. HAUF:

Q If -- I hate to keep -- you know exactly what loan the $778,000 liability was for?

A I do not.

Q Can -- without --

MR. HAUF: Sorry, I hate to --

MR. AUSTIN: You're buying me dinner, Adam.

MR. HAUF: -- ask this. I know; I'll have to.

Can we go to -- I believe it's -- 153? In the

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Exhibit 47, Bate marked 153.
BY MR. HAUF:
Q So do you -- can you see that exhibit?
A Yeah. I mean, barely. I don't know if it can be enlarged.
Q So this is from Exhibit 47. I believe this is the personal cash flow of David M. Raiffe.
A Okay.
Q And then if you look down on -- about midway through, there's "Residential Mortgage"?
A Okay.
Q And then there is a second mortgage home equity loan. So when I'm looking at this, did the bank factor in his second and third mortgage payments if he was liable for them?
A Well, if you see historical core, annual debt-to-income ratio, it's 0000.
Q Well, my question is on this -- I believe this is his cash flow analysis, correct?
A It says, "Personal cash flow analysis."
Q Right. And so under "Residential Mortgage," it lists the same amount for every year and then a partial amount for 2016. Do you see that line? It's in the middle of the page.
A I do.
Q And what would that typically be a payment for?
A It'd typically be a mortgage payment.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Q Okay. And was that put in assuming that that was his mortgage on the first -- on the Solon, Ohio house?
A I would assume. I don't -- I don't know for -- because I don't do this analysis, so I don't know how Adam would have factored that in.
Q Okay.
A Let me look at it. Go down a little bit so I can see more of the document. Okay. What's your question?
Q So is this -- when you testified earlier, you said that you always impute some sort of living expense. Was this specifically the mortgage cost on that Solon, Ohio property?
A It appears it -- it is.
Q And then --
A I don't --
Q Oh, sorry. Go ahead.
A I don't know for sure. I didn't do this --
Q Okay. And then with this regard to the second mortgage and the third mortgage listed in that PFS, I don't see a payment for those listed here.
A That's my point, is those -- that's -- if you'll let me explain this. That's listed at 788-. What has happened is we've taken a mortgage and associated with the commercial loan, so you're not going to double dip him on the payments. So he listed that commercial loan, and he said, I got a mortgage -- third mortgage for X, Y, Z in this amount. Well, that mortgage

is associated with the commercial loan. So it's not a new payment. Does that make sense?
Q Right. So --
A Yeah.
Q So it doesn't go on as cash flow analysis, but you still -- when you look at it, you still said he had a second, a third, and then credited him with a liability for the first; is that correct?
A That's what it looks like here.
Q Okay. So from a personal perspective, that's about, what, a million dollars in liability that may or may not have been his?
A You're mis -- you're not following me here, and maybe I'm not doing a great job of explaining it. That 788,000, if you go back to the PFS, is a mortgage, but that mortgage is related to commercial loans, where those payments are figured under the business loans.
So though he has a mortgage for 788-, he doesn't have a second payment for that mortgage. Those payments are factored into the business loans.
Q Okay. So presumably --
A Does that -- you following me here? And maybe I'm not -- I'm getting confused. You're saying 788-, that he has this million-dollars' worth of mortgages. He might have a million dollars' worth of mortgages on the property, but he doesn't

have a million dollars' worth of payments.
Q Right. So when you factor in these loans, you're imputing -- at least on the residential P&I, you're imputing the first mortgage to him, whether or not that was his liability?
A It looks like, yeah, we're -- we've included 23,856 as some sort of residential debt.
Q And in this, do you typically include -- I don't see it here. Do you include a spouse's wages on this PF -- or on this cash flow analysis?
A No. If they're not guarantor -- if they're not a guarantor, we can't include their wages.
Q Okay. But they were -- she was a limited guarantor on the second third. In that context, would she be included?
A Limited guarantee for the subject of the property -- or I'd have to look at the approval. But we get a limited guarantee that limits the guarantee to just the property in question.
Q Okay. Does that normally carry a personal guarantee with it?
A That's -- a limited guarantee is -- is a guarantee that's --
Q Right, against --
A -- only in the --
Q -- the property.

A -- interest of the property.
Q Right. But in addition to that, do you also require the personal guarantee, typically?
A Of every doctor, we require a personal guarantee. I'm not -- by law, I can't require, as a actor, to always include the spousal guarantor. It's actually against the law to say your spouse has to sign unless there's another credit need for it.
Q Okay.

MR. HAUF: I think that's all I have on this particular matter --

THE COURT: Okay.

MR. HAUF: -- with this particular witness.

THE COURT: So are we now at the point where Mr. Twyford can be excused from this trial?

MR. AUSTIN: I think so. Oh. Well, hold just a second. Let me make sure --

(Counsel Confer)

MR. BRAILSFORD: Judge, I just want to clarify one thing on this Exhibit 47 that is up here.

(Counsel Confer)

THE COURT: If we're going to have any meaningful discussion about anything further with Mr. Twyford, I'm going to just take a break and bring him back after lunch, unless you can get this done very quickly.

MR. BRAILSFORD: It will be like 30 seconds.

THE COURT: Okay.

FURTHER REDIRECT EXAMINATION

BY MR. BRAILSFORD:

Q If you look at the top of Exhibit 47, it looks like the years are there; do you see that? The 12, the 12, the 12 for 2013, 2014, and 2015, and then the 3 for 2016. What do you understand that to be?

A The 3?

Q Yes.

A That is months -- three months.

Q So the first three months of 2016?

A Correct.

Q And then the other numbers that are pulled up, they're considering 12 full months for '13, '14, and the year '15?

A Correct, because you analyze it for the -- only the three months in '16, which we would have been through.

MR. BRAILSFORD: I have no more questions for him. He can be excused as far as we're concerned.

THE COURT: Is that right, Mr. Hauf? Can he be excused now?

MR. HAUF: I believe so, Your Honor. I had one more question, and then --

THE COURT: Let's ask it, and let's be done.

MR. HAUF: Yeah, since -- so we can make sure you can

leave.

FURTHER RECROSS-EXAMINATION

BY MR. HAUF:

Q With regard to the credit report, this does say 3. The loan did close in July, is that correct, It closed around about there? Do you run the reports again, or do you run any credit checks again before closure, or is it at application?

A We run it at application. And if it's within the time period allowed, we don't run another -- we don't pull another bureau right before closing.

Q Okay. And so that's the same thing with this. This is prepared at application?

A Right. Right.

MR. HAUF: I have no further questions, Your Honor.

THE COURT: Okay. Thank you, Mr. Twyford. You're --

THE WITNESS: Thank you.

THE COURT: -- released and welcome to leave if you wish. Thank you.

We'll be back at 1:30.

(Recess)

THE CLERK: All rise.

THE COURT: Please be seated.

Okay. Hopefully, everyone had a good lunchbreak.

Mr. Brailsford, are you ready to call your next witness?

MR. BRAILSFORD: Yes, Your Honor. I'd like to call Craig Street.

THE COURT: Mr. Street, if you come forward, please, and be sworn in.

MR. HAUF: Your Honor, just a matter of the record, we object to the witness simply because of the late disclosure. We put that in our joint pre-trial statement. So I'm putting my objection on the record for that purpose.

THE COURT: Tell me a little bit more about how that came to be and -- but first, let's have him sworn in, and then he can grab a seat.

MR. HAUF: Sure. So the disclosure deadline was --

THE COURT: Mr. Hauf --

MR. HAUF: Oh.

THE COURT: -- let's have him sworn in.

MR. HAUF: Oh, okay, sorry.

THE COURT: He'll grab a seat, and then we'll talk.

CRAIG STREET, PLAINTIFF'S WITNESS, SWORN

THE CLERK: Thank you.

THE COURT: All right, sir, if you could have a seat in the witness box, please.

Mr. Hauf.

MR. HAUF: Okay. Sorry about that, Your Honor.

So originally, the discovery deadline was October 30th, 2019. There was originally a witness who was disclosed

by the bank as a representative; however, we had asked for the representative's specific name so we could depose that particular representative. And it wasn't until close of discovery on December 17th, after discovery deadlines had lapsed, that we even received the representative's name.

And so we basically object on the fact that the disclosure wasn't made until after the close of discovery.

THE COURT: And when that disclosure was made, did you depose Mr. Street?

MR. HAUF: We did not, no, Your Honor. There was attempts to schedule that, but we couldn't essentially get it -- a scheduled deposition in place before the trial. But there wasn't disclosure of the actual witness, even their name, until after December.

THE COURT: All right. Mr. Brailsford.

MR. BRAILSFORD: I disagree with a lot -- with what Counsel just told you. We disclosed a 30(b)(6) back in -- it was before the discovery deadline. I believe it was in October. And we disclosed the content of what that 30(b)(6) witness testimony would be. We had --

THE COURT: Without referring to a name?

MR. BRAILSFORD: Without referring to a name. In fact, it's -- I don't think the rule requires you to actually identify a name until just prior to the deposition itself.

But we disclosed a 30(b)(60). We disclosed the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

content of the testimony. They did ask to take the person's -- the 30(b)(6) deposition. The person that we had -- we believed was going to be our 30(b)(6) representative unexpectedly retired. So that left us to kind of figure out who our 30(b)(6) representative would be. We disclosed that name. There was some discussion back in mid-December of who the person would be, Mr. Street. We provided several dates when he would be available.

Even though the discovery deadline had closed, that is a discovery as far as we saw that. That discovery's going to keep us from asking questions, but we would certainly allow Defendant to ask questions if they needed to.

So we made Mr. Street available, scheduled flights. We had a tentative agreement --

THE COURT: Was there a requested deposition for the 30(b)(6) witness before the discovery deadline?

MR. BRAILSFORD: There was.

THE COURT: Okay.

MR. BRAILSFORD: And so we were --

THE COURT: And tell me what happened when that request was made.

MR. BRAILSFORD: That was made late October, is my memory. That's when they made the request.

THE COURT: Right. And what was your response to that?

MR. BRAILSFORD: Yes, we'll try and find out -- identify exactly who it's going to be and what dates that person will be available.

THE COURT: And then when is the date that you actually disclosed Mr. Street?

MR. BRAILSFORD: The name? The -- December -- I want to say 18th, I believe -- 17th or 18th.

THE COURT: So it took from this date in October until mid-December to come up with a name?

MR. BRAILSFORD: Yes, Your Honor.

THE COURT: Why is that?

MR. BRAILSFORD: Holidays. My understanding was there were some people out for bereavement leave. And so it took the client some time to figure out who that person would be. That's my understanding.

THE COURT: Okay. Mr. Hauf, is that essentially your understanding of the time frame and what happened?

MR. HAUF: We were unaware of why they wouldn't disclose the name of the 30(b)(6), other than it was disclosed that they'd had a 30(b)(6) October 16th, in their second disclosure statement. So it was that reason that we made the request later in October, because it wasn't disclosed until October 16th. But the rest of the timeline is accurate, Your Honor.

THE COURT: And then why did the deposition not

happen after you learned Mr. Street's name in mid-December?

MR. HAUF: Frankly, Your Honor, some of the same reason. We were given late notice, and the notice was for the first and second week in January. At that time, it was, frankly, too little, too late for us to get the deposition taken before trial.

THE COURT: Okay. Mr. Brailsford.

MR. BRAILSFORD: Well, that's the first I've heard that. We had a tentative agreement that his deposition would be January 9th. We had that conversation back in mid-December, so we were planning on January 9th the deposition going forward. And it was not until the first week of January that I learned from Defendant that they were not going to take his deposition. And there was no explanation as to why they were not going to take his deposition.

THE COURT: Mr. Hauf, it's simply that there was not enough time to do this. If -- January 9 was several weeks ago.

MR. HAUF: Yeah, Your Honor, the -- I think we had discussed timelines around the end of December. So essentially, at that point, we were -- yeah, essentially, we could not make the time to do the deposition prior to the trial, because trial was -- at that moment, we were working on some of the other items that needed to be addressed at trial. So frankly, Your Honor, it was two weeks -- two to three weeks before trial that we had the deposition. So 20 days, about 3

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

weeks. So there wasn't time for our office or resources to conduct the deposition prior to the trial, frankly, which is why we were trying to get it scheduled in December, if at all. And we weren't able to do that.

So I don't recall having a conversation mid-December about a January deposition.

THE COURT: Well, according to Mr. Brailsford, January 9 was going to be day they were good to go, Mr. Street was going to go, and then it just didn't happen. Is that misstating what happened?

MR. HAUF: I think it was more, we can do it on January 9th, so whether you guys are ready or not, this is when we could do it. So that was essentially the conversation. We had made requests, frankly, throughout November to get the disclosure.

THE COURT: Give me a second here, please.

Mr. Brailsford, when I look at the substance of what the testimony's going to be, I'm wondering how it really differs from what Mr. Twyford talked to us about today.

MR. BRAILSFORD: Well, it will be different because we're going to be talking a little bit more in depth about the bank's decision-making process.

THE COURT: But not specifically as to this loan?

MR. BRAILSFORD: It will be specific to this loan as well, yes.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: And so is Mr. Street something more than a 30(b)(6) witness then?

MR. BRAILSFORD: No, he's speaking on behalf of the bank. Correct, that is what he's doing, but he was on the loan committee. So I'm not sure if that answers your question or not.

THE COURT: And therefore, being on the loan committee, he was involved in the process of approving this loan.

MR. BRAILSFORD: Yes, Your Honor.

THE COURT: And other loans before this one with this borrower?

MR. BRAILSFORD: That we don't know. We've never actually explored that issue with --

THE COURT: And you're not going to today either?

MR. BRAILSFORD: No, Your Honor.

THE COURT: We're only talking about the Hamilton loan.

MR. BRAILSFORD: Only talking about the Hamilton.

THE COURT: And the bank process generally.

MR. BRAILSFORD: Yes, Your Honor.

THE COURT: Okay. This is really an unfortunate way to go about this trial. It seems like there's problems on both sides. It seems to me that January 9 would have been enough time to do a deposition, get an understanding as to what this

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

witness was all about.

But that said, you know, to want the 30(b)(6) witness back in October and not get it until mid-December, that strikes me as really problematic.

All right. Let's listen to this testimony. And I'm going to give Mr. Hauf quite a leeway in what he's going to ask this witness as well.

MR. BRAILSFORD: Yes, Your Honor. And if I may. I want this on the record. My conversation with Mr. Hauf was not a take-it-or-leave-it deadline. We offered several dates. He told me let's reserve 9th, but I'll confirm and get back with you. That conversation took place on December 18th. He never did get back to me.

So I reached out back to him on two different emails, trying to say, hey, is this going to go forward because I've got a client that's got -- I've got a client that's trying to plan flights. In fact, I have emails from December 30th, December 18th that -- where we're expressing, hey, there are the times, we're available any time on these particular dates. I offered four different dates. Actually, December 17th is the day I reached out to him and identified Mr. Street and the dates that he would be available for deposition.

So the reason why January 9th came out, that was Mr. Hauf. Mr. Hauf said let's reserve that date. He was supposed to confirm it with me. And he never did. So I kept

reaching out to him to try and get clarification, is it going to go forward on that date. And it wasn't until the first week of January where it was just we're not going to take his deposition, no explanation why.

And when we talked back in December 18th, he never said anything about, you know, January is a problem. That was a date that he chose. So I just wanted that on the record.

THE COURT: So Mr. Hauf, let's consider this. You're going to hear from Mr. Street for the first time as we sit here today. If you conclude at the end of his testimony that you would rather pick up tomorrow with his cross and in the meantime I'm understanding the Plaintiff is going to be calling Dr. Raiffe, then we can proceed that way, in other words give you some opportunity to formulate what your cross is going to look in in view of what you're hearing here today. That's just an option.

If you decide let's get after it and you're going to go straight into the cross, that's up to you. Okay?

MR. HAUF: Understood, Your Honor. I'll see if -- based on the testimony, I'll try and do cross today since it is an out-of-state witness.

THE COURT: Well, I appreciate that accommodation. But I'm telling you, I'm mostly interested in making sure we minimize the prejudice here. I'll just leave it all.

Mr. Brailsford, if you would, please.

MR. BRAILSFORD: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BRAILSFORD:

Q Mr. Street, would you please state your name and spell your last name for the record, please?

A Sure. Craig Roger Street, S-T-R-E-E-T.

Q And Mr. Street, where do you work?

A I work for United Midwest Savings Bank.

Q And what do you do for the bank?

A I'm the executive vice president/chief lending officer for the bank.

Q And when did you -- when did you start working for Midwest Bank?

A I was part of recapitalization of the bank and of which I was a director which -- and then that occurred in January of '16 and then officially going to work for the bank in February of 2016.

Q And what did you -- where did you work prior to -- yeah. Where did you work prior to working for Midwest Bank?

A Immediately prior to Midwest, I worked a little over ten years for Huntington National Bank as the director of SBA lending. Spent my entire working career in some capacity or another in SBA lending.

Q So your tenures at prior were?

A Let's see. Technically, it was early 2006 to August of

2014 at Huntington National Bank as director of SBA lending.

Q And where did you work prior to --

A Prior to that --

Q -- Huntington Bank?

A -- was a number of -- combination of small banks. It was one employer but as is common in community banking had several different names. So from 1998 through 2006, was a number of different banks but all under one roof. So it was Bank First National which then evolved -- I'm sorry, County Savings which was then Bank First National which was then Unison Bank which was ultimately acquired by Huntington.

Q And --

A All of those in one capacity or another in SBA -- SBA lending and SBA sales manager.

Q So how many years total do you have in SBA lending and SBA sales management?

A I started in '94. So almost 26 -- almost exactly 26 years.

Q So your current job, you manage SBA lenders?

A Current job I am an executive with the bank. I sit on a variety of executive committees, one of which is the bank's management loan committee. I have direct supervision over our commercial lenders of which Spencer Twyford is one. Respectively, a chief lending officer is ultimately your -- your driving sales for a bank. In a bank, it's -- it's a sales

management type role.

Q Now, you mentioned your background is in SBA loans. What distinguishes an SBA loan from other types of commercial loans?

A Sure. So the SBA program is government guaranteed lending program designed to encourage banks to take, you know, more risk than what they otherwise might.

So, you know, examples of which banks -- banks can choose how they strategically utilize the program and in different ways. One of the primary ways in which our bank focuses on are business acquisition loans which would be, you know, loans to in many cases, professional practices, fit -- fit that model very specifically. But banks that have historical cash flow that can be underwritten but may not have assets that would support form a collateral perspective a loan the way a conventional loan might.

Q Are you familiar with the underwriting process?

A Yes, I am.

Q Do you have personal knowledge of the underwriting process?

A I do.

Q Can you walk us through what a typical SBA loan approval process looks like?

A Sure. So as --I won't -- I won't duplicate what Spencer spoke to this morning. But, you know, the -- the front line of the origination process is with our lenders that work directly

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

with referral sources and borrowers to put together a loan application. Those -- once there is a complete package which of which we have an application package that meets both the bank and the SBA's standards, those packages are submitted to our underwriting department.

Underwriting then -- that's where, you know, for the lack of a better term, layman's terms, the number crunchers, they -- they get understanding not only of the financial particulars of a transaction but also the narrative beyond who is -- who is this borrower, what are they doing, what's their business. Those underwriters then prepare a package, one of which is -- is one of the exhibits referenced earlier is a credit memorandum for presentation to the bank loan committee.

In my role, I typically see -- that's where I first see transactions unless I'm otherwise invited in to opine which varies from transaction to transaction.

Q Okay. So it sounds like documents are sent out to the borrower, and the borrower sends documents back. Is that correct?

A Yes.

Q And does -- how does the personal financial statement -- how does that fit in that packet?

A Personal financial statement is a foundational document. One of the -- one of the key requirements of SBA -- the SBA program, is -- is also a bank requirement, is determining

something what's called global cash flow. Global cash flow with -- with most small businesses, it is -- you have to understand what the individual's personal debt structure is, and then from there determine -- you know, small businesses come -- you know, some are C corp, some are LLC, some are schedule S sole proprietorship. So it's sometimes difficult to distinguish between what the business's cash flow is and what the owner's cash flow might -- you know, might be.

You know, example, one person might make an application to buy a business and be qualified to buy it where that same business wouldn't -- wouldn't qualify with another person because one person may have a higher personal debt structure than the other.

So for -- for all of my career and every -- everything that -- any -- any training manual or any, you know, continuing education that I've ever been a part of with SBA, it always starts with what's the global cash flow. And how you determine the global cash flow is figuring out by first determining what someone's personal debt structure is which them comes back to the personal financial statement. So sorry, that was a long answer to that question. But it is a very key foundational document to the underwriting process.

Q And as a member of the loan committee, is it your understanding that the personal financial statement -- it be accurate, that it's vital be accurate?

A Vital. Absolutely.
Q Why is that?
A Well, as a foundational document as -- I'm afraid I might repeat myself. It -- it -- there's no way to underwrite a loan without it being accurate and without knowing and having a good sense of what the -- what the borrower's obligations are.
Q As a member of the loan committee, do you rely on the personal financial statement?
A Absolutely.
Q Does the bank have other means to verify a borrower's financial information other than what's listed on the personal financial statement?
A What typically occurs is that a credit bureau is obtained usually in conjunction with -- with the application. That can happen at different stages in the process. As Spence spoke to, sometimes that's done very early in the process but always done in the course of underwriting the transaction. And so it is not done exclusively to verify the -- the personal financial statement. But it is -- it is, one, a requirement of SBA that you do it and -- and considered, I think, prudent -- prudent underwriting in any small business lending.
And that credit bureau is often then referenced against the -- the personal financial statement to just confirm what -- what the individual -- what personal debts are outstanding. And it's not always all inclusive.

Q Based on your 26 years of experience in the SBA lending, is it your understanding when a borrower fails to disclose over a million dollars in debt on a personal financial statement -- is it your understanding that they're trying to hide debt?

MR. HAUF: Objection. Speculation.

THE COURT: Sustained.

BY MR. BRAILSFORD:

Q Have you ever had a situation where someone failed to disclose a substantial debt and it was a simple mistake?

A Not that I can recall, no.

Q Have you ever had a situation where someone failed to disclose the true address and it was just a mistake?

A Again, not that I can recall.

Q I'm going to ask you some questions about the Hamilton loan.

MR. BRAILSFORD: Can you pull up Exhibit 14, please?

BY MR. BRAILSFORD:

Q Now, is -- it's your -- is it your understanding that Dr. Raiffe applied for this loan in May of 2016?

A Yes.

Q And do you know the purpose of the loan?

A My understanding -- yes, yes. I --

Q What was -- what's your understanding of the purpose for the loan?

A To acquire the practice, the -- the Hamilton practice. I

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

can't recall the seller's proper noun.

Q Okay. You're being shown what has been marked as Exhibit 14 titled business purpose affidavit. Have you ever seen this document before?

A Yes.

Q Where have you seen it?

A It's part of our loan file, part of the closing package.

Q Is it kept in the regular course of business for the bank?

A Yes.

Q And it is part of Dr. Raiffe's file on the Hamilton loan?

A That is correct.

MR. BRAILSFORD: Your Honor, move to admit Exhibit 14.

THE COURT: Any objection?

MR. HAUF: No objection, Your Honor.

THE COURT: 14 will be admitted.

(Exhibit 14 Received)

MR. BRAILSFORD: Thank you.

Can you show Exhibit 15, please?

BY MR. BRAILSFORD:

Q I'm showing you what's been marked as Exhibit 15. It's been called an unconditional guarantee. Have you seen this document before?

A I have.

Q And if you need to see more pages, just let me know. It

looks like it's page 1 of 5, so there's more pages.

MR. BRAILSFORD: Make sure that -- can you just flip through those pages?

BY MR. BRAILSFORD:

Q Let me know when you've had a chance to -- to just look at the page.

A Sure. The standard SBA guarantee document.

Q Have you seen this document before?

A I have.

Q And do you know what it's used for?

A This is the SBA guarantee form, one of a number of closing documents that's part of our loan file.

Q You said part of your loan file. Is that where you've seen it in the past?

A That is correct.

Q Is it kept in the regular course of business from Midwest Bank?

A That's right.

MR. BRAILSFORD: Your Honor, move to admit Exhibit 16.

THE COURT: 15?

MR. BRAILSFORD: I'm sorry. 15.

MR. HAUF: No objection, Your Honor.

THE COURT: Exhibit 15 will be admitted.

(Exhibit 15 Received)

MR. BRAILSFORD: Will you pull up Exhibit 16, please?

BY MR. BRAILSFORD:

Q Okay. You are now being showed what's been previously marked as Exhibit 16. I'll call it the affidavit of no adverse change.

A Uh-huh.

Q Have you seen this document before?

A Yes, I have.

Q Where have you seen it?

A Part of our loan file.

Q When you say part of your loan file, are you referring to the loan file for Dr. Raiffe on the Hamilton loan?

A Yes. I'm sorry. Part of the Hamilton, yes.

Q And is this document kept as part of regular course of business for Midwest Bank?

A Yes, it is.

MR. BRAILSFORD: Your Honor, move to admit Exhibit 16.

THE COURT: So 14, 15, and 16 were all admitted as I understood it. Am I wrong about that?

MR. BRAILSFORD: I moved to admit 14 and 15.

THE COURT: I mean before we ever started today, I thought 14 and 15 and 16 were all admitted.

MR. AUSTIN: Your Honor, my notes have 18 and 19. And I just clicked off. 18 and 19 that's unopposed in the

joint pre-trial statement. My understanding is those were admitted at the beginning of the day. 14, 15, and now 16 all had objections in the joint pre-trial statement.

THE COURT: Okay. Sorry. I had it exactly wrong. So okay. So now we're on Exhibit 16.

Mr. Hauf, any objections?

MR. HAUF: No objections.

THE COURT: It's admitted then.

(Exhibit 16 Received)

MR. BRAILSFORD: Thank you, Your Honor.

Can you show Exhibit 17, please?

BY MR. BRAILSFORD:

Q Mr. Street, you are now being shown what's been previously marked as Exhibit 17 called the closing certification. Have you seen this document before?

A Yes.

Q Where have you seen it?

A Part of the Hamilton Dr. Raiffe loan file.

Q Is this document or -- kept in the regular course of business?

A It is.

MR. BRAILSFORD: Can you show a couple more pages of this, please? Keep going. Make sure I have everything covered.

///

BY MR. BRAILSFORD:

Q So you have seen this before?

A Yes.

Q And you have seen this in Dr. Raiffe's file?

A That is correct.

Q And it is kept in the regular course of business?

A It is.

MR. BRAILSFORD: Your Honor, move to admit Exhibit 17.

MR. HAUF: No objections, Your Honor.

THE COURT: 17 will be admitted.

(Exhibit 17 Received)

MR. BRAILSFORD: Will you show Exhibit 1, please?

BY MR. BRAILSFORD:

Q Mr. Street, this is the document that's been previously marked and admitted as Exhibit 1. Do you recognize this document?

A I do.

Q What is it?

A This is Dr. Raiffe's personal financial statement.

Q Were you on the bank's loan approval committee for Dr. Raiffe's loan to purchase the Hamilton practice?

A I was.

Q Do you consider Exhibit 1 to be a written statement with respect to Dr. Raiffe's financial condition?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

A Yes, I do.
Q Is it your understanding that Dr. Raiffe signed and submitted Exhibit 1 to Midwest Bank in May of 2016?
A Yes.
Q Did the bank have any reason to believe that someone other than Dr. Raiffe signed and submitted the personal financial statement marked as Exhibit 1 to the bank?
A No.
Q Are you aware of any other means that the bank could receive the information contained in Exhibit 1 but through Dr. Raiffe?
A No.
Q If the -- if you or the bank, speaking on behalf of the bank, had learned that someone other than Dr. Raiffe had submitted or signed the Exhibit 1 and submitted it to Midwest Bank, what actions would Midwest Bank had taken?
A I mean, that would have been an enormous red flag and a -- a number of different things. The underwriting would halt. But -- but also you would almost have to do an investigation as to see what -- what had occurred, who had submitted it, whether it was an error or, you know, something -- an error in preparation or actually an intent, you know, by somebody else to defraud the bank.
Q Is it your understanding that this document marked Exhibit 1 is required to be signed by a borrower?

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

A Absolutely.
Q Is it your understanding that this document admitted as Exhibit 1 is signed under the penalty of perjury?
A It is.
Q Did you as a member of the credit committee on Dr. Raiffe's loan rely on the information provided in Exhibit 1?
A We did.
Q Did you believe it was reasonable to rely on the information contained in Exhibit 1?
A We did.
Q Did you believe it was reasonable to rely on that information because it was signed under the penalty of perjury?
A Yes.

MR. BRAILSFORD: Can you show Exhibit 47, please? You can go to the front page. Thank you.

BY MR. BRAILSFORD:
Q I'm showing you what's been marked and admitted as Exhibit 47. Mr. Street, do you know what this?
A Yes, I do. This is the bank's internal credit memorandum.
Q Do you know who it was prepared by?
A It was prepared by Adam Weesie, an underwriter with the bank.
Q Was it prepared for the loan committee?
A It was prepared for the loan committee for presentation

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

for approval of the loan.

Q To your knowledge, does it contain at least a portion of the bank's analysis of the Hamilton loan?

A It does.

MR. BRAILSFORD: Will you go to page 139, mid-139? And if you could highlight that first sentence for me.

BY MR. BRAILSFORD:

Q Okay. We pulled out some text from Exhibit 47. Reading that text, is it your understanding that information was pulled from the personal financial statement to be incorporated into this analysis?

A That's right.

MR. BRAILSFORD: Go back to Exhibit 1.

BY MR. BRAILSFORD:

Q Was the bank aware that Dr. Raiffe had purchased a home in Arizona?

A We were not.

Q Was the bank aware that that Arizona home had a related indebtedness of 1.5 million?

A No, we did not know that.

Q According to Exhibit 1, where did Dr. Raiffe live?

A At the 70 -- I'm sorry. I need my cheater. 7601 Royal Portrush in Solon.

Q Is -- was that the bank's understanding where Dr. Raiffe lived?

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

A It was.
Q Is there any information in Exhibit 1 that indicates that Dr. Raiffe had $1.5 million of debt related to an Arizona property purchase?
A No, there wasn't.
Q Sir, any -- any information in Exhibit 1 that indicates that Dr. Raiffe was living in Arizona?
A No.
Q Do you consider the fact that Exhibit 1 does not contain 1.5 million in debt for a house Raiffe purchased in Arizona to be material?
A Extremely material.
Q Do you consider the fact that Exhibit 1 shows Dr. Raiffe residing on Ohio and not Arizona to be material?
A Yes, very much so.
Q As of July 20th, 2016, did Midwest Bank know that Dr. Raiffe had 1.5 million in debt related to a home he purchased in Arizona?
A No, we did not.
Q As of July 20th, 2016, did Midwest Bank know that Dr. Raiffe had moved or was planning to move to Arizona?
A We did not.
Q To your knowledge, did Midwest Bank approve Dr. Raiffe's loan for the Hamilton practice?
A We did.

Q Based on your 26 years of experience with SBA lending and the fact that you were a member of the loan committee for the Hamilton loan, is it your understanding that it's substantially likely that the bank would not have approved the Hamilton loan if it had known Dr. Raiffe had an additional 1.5 million in personal debt?

MR. HAUF: Objection. Speculation, foundation.

THE COURT: Mr. Brailsford?

MR. BRAILSFORD: I'm asking for his understanding, Your Honor, based on the lack of information what the bank would have done -- or what he would have done.

THE COURT: Sounds like speculation to me. The objection is sustained.

BY MR. BRAILSFORD:

Q Was Dr. Raiffe able to repay the Hamilton loan?

A He was not.

Q Do you know if -- if Midwest Bank obtained a judgment against Dr. Raiffe for the unpaid loan?

A We did.

MR. BRAILSFORD: Will you pull up Exhibit 11, please? Do you know how many pages? Is it showing how many pages it is?

MR. AUSTIN: 13.

BY MR. BRAILSFORD:

Q We'll scroll through some of these pages so you can take a

look at it to familiarize yourself with the documents that have been marked as Exhibit 11.

A I'm familiar with this document.

Q Have you seen it before?

A Yes.

Q Okay. What is it?

A Judgment we obtained against Dr. Raiffe, part of the -- it's part of the loan file, the ongoing action.

Q So this document is part of the bank's loan file on Dr. Raiffe?

A Uh-huh. Yes.

Q Is it your understanding that the Franklin County Court of Common Pleas entered a judgment on November 3rd, 2017 against Dr. Raiffe in the amount of $372,000 and change?

A Yes.

Q Has Dr. Raiffe made any payments on the amounts owed to Midwest Bank since November 3rd, 2017?

A No.

MR. BRAILSFORD: Move to admit Exhibit 11.

THE COURT: Any opposition to admission of 11, Mr. Hauf?

MR. HAUF: I'm only clarifying. Is this exhibit being admitted as just the judgment or it's the entire file?

THE COURT: What --

MR. HAUF: So these documents consist of just the

judgment?

THE COURT: Let's spin through Exhibit 11 and see exactly what's there.

It looks like it's the judgment itself, the domestication of that judgment in Arizona, and the recordation of the domesticated Arizona judgment.

MR. BRAILSFORD: Yes, Your Honor.

MR. HAUF: And so I have no objection to -- I don't believe that foundation was given for the Arizona judgment portion. But otherwise, I wouldn't have objections to the entry of the exhibit.

THE COURT: Well, the Arizona portion is included within this exhibit. So I don't understand your objection. It's -- are we admitting the whole document or is there some piece that you think should not be admitted?

MR. HAUF: At this point, Your Honor, I don't think foundation has been given for the -- I object based upon the foundation for the domestication portion.

THE COURT: That it was properly done or that it was done at all, proper or not?

MR. HAUF: Yeah. I -- there hasn't been testimony with regard to the domestication portion of the judgment.

THE COURT: But it's pretty clear from what we just saw that Exhibit 11 contains the domesticated judgment which, in turn, was recorded in Maricopa County, right?

MR. HAUF: Correct, Your Honor.

THE COURT: So I'm not following the objection.

MR. HAUF: Yeah. So I'll withdraw my objection for --

THE COURT: Thank you.

So Exhibit 11 is admitted.

(Exhibit 11 Received)

BY MR. BRAILSFORD:

Q Had it come to your attention that the personal financial statement did not include $1.5 million of personal debt, what would your next steps had been?

A Oh, we would've -- we would've halted the -- the underwriting or the approval process, depending on what stage it occurred, and -- and would have made substantial effort to determine what -- why -- why the document wasn't correct.

Q If you had learned that Dr. Raiffe's true address was Arizona and that he was no longer living in Ohio as indicated on Exhibit 1, what steps would you have taken or the bank would have taken?

A Given -- given that our -- our underwriting was based upon an existing model that it occurred in state of Ohio and that it, you know, had become somewhat known to our lender and, with some degree of proximity, you know, the fact that it was -- the move to Arizona was just jarring insomuch as it was -- it was inherently different than the business model as we understood.

And that -- that distance and what the intent was was just unaccounted for and wasn't contemplated in what we -- I mean, we considered that to be a departure from what -- what the business model was and what we had underwritten.

Q Thank you.

MR. BRAILSFORD: Let me just check, Your Honor.

BY MR. BRAILSFORD:

Q You mentioned it indicated a departure of the business model that you had conducted your analysis. Would you consider that departure material?

A Very much so.

Q Would you consider it material enough to the point where the bank may not approve the loan?

A Certainly.

MR. HAUF: Objection. Speculation.

THE COURT: The objection came after the answer. But what's the response to that objection of speculation?

MR. BRAILSFORD: We'll withdraw the question.

No further questions, Your Honor.

THE COURT: Strike the answer as well then.

Okay. So Mr. Hauf, you've heard the testimony of Mr. Street. Are you now wanting to reconvene with him on cross after you've heard all of their case or what's your desire?

MR. HAUF: I'd like to potentially reconvene on cross after I've heard their case. My thought is that we still have

the last witness to go. And then we'll see where we end there.

THE COURT: Okay. I think that's fair enough.

So Mr. Street, we're going to ask you to step down. But we're also going to ask you to stay nearby because at some point you're going to have cross-examination. But it's at least going to occur after Dr. Raiffe is brought to the stand by the Plaintiff. Thank you.

Mr. Brailsford, you ready to call your next and, as I understand it, last witness?

MR. BRAILSFORD: Yes, Your Honor. Last, final witness. The bank calls Dr. Raiffe.

THE COURT: Dr. Raiffe, would you please come forward? If you'd come up here, sir, and be sworn in.

DR. DAVID RAIFFE, PLAINTIFF'S WITNESS, SWORN

THE CLERK: Thank you. You can take a seat.

THE COURT: Dr. Raiffe, if you'd please have a seat in the witness box.

Are you ready, sir?

THE WITNESS: I'm sorry. What?

THE COURT: Are you ready?

THE WITNESS: Yes, sir.

THE COURT: Okay. Mr. Brailsford?

MR. BRAILSFORD: Thank you, Your Honor.

///

DIRECT EXAMINATION

BY MR. BRAILSFORD:

Q Dr. Raiffe, would you please state your full name and spell your last name for the record?

A Sure. David M. Raiffe, R as in Robert, A-I, double-F like in Frank, E.

Q Thank you. Dr. Raiffe, I understand you have a bachelor's degree; is that correct?

A Yes, sir. George -- George Washington University.

Q What's your degree in?

A Science.

Q And after you graduated from George Washington University, is it true that you attended dental school?

A Yes, sir.

Q And did you attend dental school at Case Western Reserve University in Cleveland, Ohio?

A Yes, sir.

Q Would that have been 1991?

A I graduated in 1991. Yes, sir.

Q My understanding, a DDS is four years; is that accurate?

A For the most part. It took me five.

Q Okay. And, Dr. Raiffe, you also have a master of business administration also from Case Western Reserve University; is that correct?

A Yes, sir.

Q Did you obtain your MBA in 2008?
A Yes, sir.
Q And an MBA -- my understanding is that's two years; is that correct?
A Correct.
Q So I'm counting at least ten years of post-high school education; is that accurate?
A Seven.
Q Bachelor's degree?
A Oh, I'm sorry. Yeah. Right.
Q You're proud of your DDS and your MBA; is that correct?
A Yes, sir.
Q In fact, you sign your name with DDS and MBA, do you not?
A Yes, sir.
Q Now, Dr. Raiffe, it's my understanding that you have owned about nine different dental practices at one time or another; is that correct?
A Yes. It was at least eight.
Q All of them located in Ohio?
A Yes, sir. All over.
Q And my understanding is that you applied for loans for all of those except your first one; is that correct?
A Yes, sir.
Q And those would have all been SBA loans; is that correct?
A I believe so. Yes, sir.

Q So you have experience with the SBA loan application process, correct?
A It's not that hard.
THE COURT: What was the answer?
THE WITNESS: Yes, sir.
BY MR. BRAILSFORD:
Q And the loan that we're here today about, the Hamilton loan which was for about $400,000, that was an SBA loan, correct?
A Yes, sir.
Q So providing a list of assets and liabilities in a loan application process is not something that's foreign to you; would you agree?
A I've never filled one out, to be quite honest with you.
Q You understand that every time you apply for a loan, you have to provide a list of assets and liabilities, correct?
A Yes, sir. A list was provided.
Q And that would have done every single -- that would have been done every single time that you applied for an SBA loan, right?
A I imagine it would've.
Q It sounds like your testimony here today is that you didn't do it?
A That's correct. I've never filled one out personally.
Q Who did it for me?

A I had a regional manager who did all my financial applications.
Q And that regional manager, would that be Opal Anderson?
A Yes, sir.
THE COURT: The name is Opal Anderson?
MR. BRAILSFORD: Yes, Your Honor.
BY MR. BRAILSFORD:
Q Opal Anderson, is she in the courtroom here today?
A No, sir.
Q Did you ever tell any of the lenders that were giving you SBA loans that Opal Anderson completed your list of assets and liabilities in your own applications?
A Spencer never asked me once, sir.
Q So your answer is none of the banks ever asked you if you were the one that filled it out?
A That's correct.
Q You understand that the document would be signed under the penalty of perjury, correct?
A I never signed it.
Q We'll get to that.
A I'm sorry. Say that again, please.
Q Yeah. We'll get to that. Do you agree that it's important to accurately complete documents that show your assets and liability so the lender may assess whether to approve a loan, correct?

A Will you say that again, please? I'm sorry.
Q Would you agree that it's important to accurately complete documents that show your assets and liabilities so that a lender may assess whether to approve a loan? Would you agree?
A I imagine. Yes, sir.
Q You understood that the bank would rely on financial information that was provided for the loan, correct?
A I imagine. Yes, sir.

MR. BRAILSFORD: Show Exhibit 13, please. Pull up that first paragraph for me.

BY MR. BRAILSFORD:
Q The last sentence starts about midway down, one, two, three, four lines down where it says:

"Borrower understands and agrees that, A, in granting, renewing, or extending any loan, the lender is relying upon borrower's representations, warranties, and agreements as set forth in the agreement. The granting, renewing, or extending of any loan by lender at all times shall be subject to lender's sole judgment and discretion. And all such loans shall remain in effect, terms and conditions of the agreement."

Do you understand that?
A Can you say the last part again, sir?
Q Having read this -- and your prior testimony is, I

understand, that you understood that the bank would be relying on information that was provided to it, correct?
A Yes, sir.
MR. BRAILSFORD: Can you pull page 2? And the paragraph that starts with financial information.
BY MR. BRAILSFORD:
Q This is pulled from the second page of Exhibit 13. Let me know when you've read that financial information section.
A Yes, sir. I've read it.
Q Based on that language, would you agree that Midwest expressed that it would rely on representations, warranties, and agreements provided by you?
A I don't understand the question. Can you say that again, please, sir?
Q Based on the language in this clause here that starts with financial information, would you agree that Midwest Bank expressed to you that it would rely on representations, warranties, and agreements provided by you?
A Yes, sir.
MR. BRAILSFORD: Can you scroll down a page, please, Anthony? Another one. Keep going. Keep going. I want to go to the signature page.
BY MR. BRAILSFORD:
Q This is page 10 of Exhibit 13. Is that your signature, Dr. Raiffe?

A I believe so. I can't -- I believe so.

MR. BRAILSFORD: Okay. Let's pull up Exhibit 2.

BY MR. BRAILSFORD:

Q Now, Dr. Raiffe, I'll represent to you that this is a Zillow printout. You were previously shown this in your deposition and as well as your debtor's exam. Do you recognize the home in that picture?

A Yes, sir.

Q Is that your home?

A Yes, sir.

Q Is that your home at 6329 East Skinner Drive in Cave Creek, Arizona?

A Yes, sir.

Q And you purchased this home in April 27th of 2016, correct?

A I believe so. Yes, sir.

Q So about one month prior to the application for the Hamilton loan, correct?

A Yes, sir.

MR. BRAILSFORD: Can you go to Bates 1436?

BY MR. BRAILSFORD:

Q Now see in that top line there where it says April 27th, 2016? Now, that's the date you purchased this home, correct?

A Say it again, please.

Q The date there, April 27th, 2016, I believe you just

testified that that's the date you purchased the home?
A Yes, sir.
Q And this document indicates that you paid 1.5 million for that home; is that correct?
A Correct.
MR. BRAILSFORD: Can you pull up Exhibit 5, please?
BY MR. BRAILSFORD:
Q Dr. Raiffe, this is a document that's been previously marked as Exhibit 5. It is a deed of trust. And you see the address there?
MR. BRAILSFORD: Can you go to the next page? Next page, please. There we go.
BY MR. BRAILSFORD:
Q You see the address 6329 East Skinner Drive?
A Yes, sir.
MR. BRAILSFORD: Okay. Go to Bates 1266, please.
BY MR. BRAILSFORD:
Q Do you see the first paragraph there? It says there is a loan for $1.2 million.
A Yes, sir.
Q And that was a $1.2 million loan for the purchase of your Cave Creek home, correct?
A Yes, sir.
Q Now, you previously testified you paid 1.5 million for the home, correct?

A I don't believe so. The house was worth a million-five. But I owed -- I had a mortgage of 1.2 million.
Q And you also took out a loan from your dad and your brother, correct?
A Yes, sir.
Q And that was a $300,000 loan, was it not?
A Yes, sir.
Q So you had 1.5 million that you owed on the home, correct?
A Yes, sir.
Q 300,000 to your family -- or your dad and your brother and then 1.2 million to another bank, correct?
A Correct.
Q And to be clear, it was not a gift; you were supposed to repay your dad, correct?
A Yes, sir.
Q You were supposed to repay your dad about 3,000 a month, correct?
A Yeah. I was supposed to.
THE COURT: What was the answer?
THE WITNESS: I was --
THE COURT: Supposed to?
THE WITNESS: I was supposed to. Yes, sir.
BY MR. BRAILSFORD:
Q And your monthly mortgage to the bank for the $1.2 million loan was about $5,500 a month, correct?

A That's correct.
Q My understanding it's gone up a little bit today?
A It came up and went down. Yes, sir.
Q So as of April 27th, 2016 when you're buying this home, it was your understanding that the combined monthly payment for the home in Arizona was about $8,500; is that correct?
A I don't understand. What was 8,500?
Q So the payments for the home, for the Arizona home --
A Uh-huh.
Q -- the combined payments including the money that you were supposed to pay to your dad and --
A Oh, okay.
Q -- the money you were supposed to pay --
A Yes, sir.
Q -- to the bank was about $8,500?
A Correct. Had I paid it -- had I paid my dad and brother back, yes, it would have been. But I never did.
Q And you're planning to keep your Arizona home, that $1.5 million home, through this bankruptcy, correct?
A Yes, sir.
Q Now, you've been contemplating moving to Arizona since about 2013, if not sooner, correct?
A Yes, sir. 2013, 2014, around that time. Yes, sir.
Q Okay. But it was never a certainty until you actually moved to Arizona, right?

A I must've blanked out. Say it again, please.
Q Your move to Arizona was never a certainty until you actually did, correct?
A That is correct.
Q It was always something you talked about but was not something you were certain was going to happen, correct?
A Maybe -- let me clarify. We had been wanting to come here since 2013 or so. Another Ohio winter would've killed me. But we had been looking here since 2013. We kept making trips out here. Yes, sir.
Q But you were actually considering moving to Southern Ohio to be close to your son if you didn't get admitted to dental school here in Arizona, correct?
A Why -- I never contemplated moving anywhere in Ohio, Southern Ohio ever. Why would I?
MR. BRAILSFORD: Can you pull up Exhibit 10?
BY MR. BRAILSFORD:
Q Dr. Raiffe, do you remember giving testimony on May 3rd, 2018 in reference this case?
A I suppose. I don't --
Q Did --
A Okay.
Q When you gave that testimony, did you raise your hand and swear to tell the truth?
A Sure did.

Q Whole truth and nothing but the truth?
A That's true.
Q So here's a question. "Okay. Now, walk me through your decision to relocate from Ohio to Arizona."
A Uh-huh.
Q "My son is in dental school here."
A My --
Q "At Arizona State?"
A No. My son was not in dental school at that time. No, sir. He is now. At that time, he was an undergrad at Arizona State. He's been here since 2014, 2015, I believe. But I wouldn't -- but again, you asked me if I was going to relocate to Southern Ohio. No way, no how, ever. Never.

MR. BRAILSFORD: Take that down. No, not the whole thing. I'm sorry. Just the cutout.

BY MR. BRAILSFORD:
Q So let me read this to you, Dr. Raiffe, okay?
A Say it again, please.
Q Let me read this to you.
A Okay.
Q Let me read this question and answer to you, see if it jogs your memory. Start with line 16 on page 15. The question is, "Okay. Now, walk me through why you decided to relocate from Ohio to Arizona." Your response was --
A "My son is in dental school here."

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Q Yes. And then the question was --
A "At Arizona State?"
Q Let me finish, sir.
A Oh, I thought you wanted me to read. I'm sorry.
Q I'll let -- I'll let you know when I have a question for you.
A Okay.
Q Thank you.

Question was, "At Arizona State?"

Your response was, "No. He went to undergrad at Arizona State. he's going to school at Midwestern."

Question, "Okay. When did your son start dental school?"

Answer, "He's finishing up his first year in two weeks a year ago."

Question, "So a year ago. What, he started in 2017?"

Your response, "Yeah. Yes."

Question, "In April of 2016, did you know he was going to be attending Midwestern Dental School?"

Answer, "No, no. He was going to -- do you want me to finish or do you want me to just shut up?"

Question, "Go ahead."

Line 7, answer, "We were kind of debating whether to stay in Ohio" --
A Oh.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Q -- "move to Southern Ohio if he got accepted to -- if he didn't get accepted to Arizona schools or California schools. If he was only going to get accepted to Ohio State and Case Western which are the two dental schools in Ohio, we would have moved south."
A South.
Q "But he was actually a smart kid and got accepted everywhere, much smarter than his dad."
A Your interpretation -- my moving south was Arizona, not Southern Ohio, sir. I'll stand corrected. I must've misspoke. I would never think about moving to Columbus. South is Arizona.
Q Are you aware of any Ohio States or Case Westerns located here in Arizona?
A I -- I beg your pardon? Can you repeat that, please? Say it again, please.
Q Are you aware of any schools in Arizona titled Ohio State or Case Western?
A No.
Q Okay. So you actually moved to --
MR. BRAILSFORD: You can take that down, please.
BY MR. BRAILSFORD:
Q So you actually moved to Arizona toward the end of May 2016, correct?
A Yes, sir.

Q And your business experience, you testified you owned about nine dental practices; is that correct?
A Yes, sir.
Q And eight of which you obtained SBA loans for, correct?
A Yes, sir.
Q And so you have experience in applying for SBA loans, right?
A Yes, sir.
Q And you applied for this loan here from Midwest Bank to purchase the Hamilton practice in Ohio, correct?
A The application was submitted to get the loan for the purchase of the Hamilton practice. Yes, sir.
Q And the amount of that loan was 400,000, right?
A Yes, sir.
MR. BRAILSFORD: Can you show Exhibit 1, please? Thank you.
BY MR. BRAILSFORD:
Q Now, as part of the loan application process, you were required to submit a personal financial statement, right?
A Yes, sir.
Q And this document here is dated --
MR. BRAILSFORD: If we could go to the second page.
BY MR. BRAILSFORD:
Q May 17th, 2016, on the first page May 29th, 2016. But it's dated in May of 2016, correct?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

A Yes, sir.
Q So it's dated roughly two weeks to a month after you purchased the Arizona home, correct?
A Yes, sir.
Q And this document does not list your Arizona home, does it?
A No, sir.
Q And this document does not show $1.5 million in debt related to that Arizona home, does it?
A No, sir.
Q It doesn't include the $300,000 loan to your father, does it?
A No, sir. I never -- never paid him back, sir.
Q This document actually shows your residence located at 7801 Royal Portrush Drive in Solon, Ohio, correct?
A The paper does. Yes, sir.
Q But it doesn't show your one-and-a-half-million-dollar home that you just purchased, correct?
A That is correct.
Q You never attempted to correct the information in Exhibit 1, did you?
A No one ever told me it was wrong. And I've never seen this before you showed it to me at my -- my discussion with you.
Q So your statement is you never signed this document?

A That is correct, sir.

MR. BRAILSFORD: Pull up Exhibit 10, please. And if you'd go to page -- is that Exhibit 10? Go to page 1, please. Pull up lines --

No, actually, let's go to -- let's go to 105, starting with line 2 so we can get some reference here.

BY MR. BRAILSFORD:

Q Dr. Raiffe, this is your testimony that you said you offered under oath back in May of 2018 it looks like. And if we start at line 2, because I want to give you the background of what we're talking about here, talking about the actual -- what's been marked as Exhibit 1.

And the question is -- question, "I'll represent to you this is from Midwest Bank. This is a personal financial statement that you provided to them in conjunction with the loan that is underlying the judgment."

Okay. And then you're asked some questions about why the house is not on that loan, okay? So now we go to the next page. We go down to line 16.

MR. BRAILSFORD: If you can pull that out, 16 through 19.

BY MR. BRAILSFORD:

Q And your testimony in May of 2018 under oath was,

"This was completely out of my hands. This was filled in by Opal or Chris Vandiford who was the

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

practice broker and found this practice. So they said sign here. So my hope was that Opal would run it. Chris would find it and would get the financing."

So your testimony as of May 3rd, 2018 was that they filled it in and told you to sign here, right?

A Yes, sir. That's what it says.

Q Now your testimony is you never signed it?

A I don't believe I ever signed it, sir. I told you that before. I spent $38 on a signature stamp for Opal who'd use it all the time for all my practices. I had eight financial personal statements. I don't recall filling any of them in. I don't have the temperament to do it, still don't.

Q So your testimony in May of 2018 was they told you to sign here. And now your testimony is it was a stamp, correct?

A I don't remember signing it, sir. I told you that before. I'll tell you it again.

MR. BRAILSFORD: Can you pull up Exhibit 1, second page again?

BY MR. BRAILSFORD:

Q If you don't remember signing it, how can you be so sure it's a stamp, Dr. Raiffe? Look at this signature. That is your signature, is it not?

A I can't tell you for sure whether it's my signature or not, sir. That's on that personal financial statement that you

showed me at my deposition. I told you before. I'm not sure it's my signature. It's most likely a signature stamp used by my regional manager who did everything for me.

Q Signature --

A Personal financial statements, all my -- my income taxes. She did everything for me. That's why I paid her.

Q I --

A Oh, I'm so sorry.

Q You answered my question. Thank you.

A I ramble a little.

Q So it sounds like your testimony is you're not sure if that's your signature, it might be a stamp?

A Yes, sir.

Q Okay. Were you aware that we asked you to produce that stamp?

A I beg your pardon?

Q Were you aware that we asked you to produce that stamp?

A I wouldn't have the stamp. Opal would have the stamp. Why would I have my own signature stamp?

Q You're not answering my question, sir.

A I apologize. No, I don't recall you asking me to produce that stamp.

Q Okay. This is a discovery request --

MR. BRAILSFORD: If you can scroll down, please.

///

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BY MR. BRAILSFORD:
Q -- submitted to your attorney. I want you to read the bottom part there, request for production. Do you see that?
A No. Truthfully, sir, I don't remember seeing that.
MR. BRAILSFORD: Can you pull up the interrogatory right above it?
BY MR. BRAILSFORD:
Q See where we asked you if you can't provide the stamp -- you can't produce the stamp, explain why you can't produce it? Do you see that?
A I see it now. I don't recall ever seeing it before, sir.
Q So is it your testimony that your attorney never gave this to you?
A I don't recall him ever asking me where my signature was. This is -- I am looking at it for the first time now, sir.
MR. BRAILSFORD: Can you scroll down?
BY MR. BRAILSFORD:
Q Sent to your attorney on October 28th, 2019.
A Yes, sir.
Q If your whole defense is that that signature on the personal financial statement is a stamp, don't you think that stamp is kind of important, Dr. Raiffe?
A I would imagine. Yes, sir.
Q Wouldn't you want to produce it?
MR. HAUF: Objection. Argumentative.

THE COURT: Mr. Brailsford?

MR. BRAILSFORD: I'm asking him a simple question. It's not argumentative. It's -- the whole crux of his case is it's a stamp. I'm asking where the stamp is. We asked for it.

THE WITNESS: Well, if you want the stamp --

MR. BRAILSFORD: I'd --

THE WITNESS: -- I'd imagine you'd have to get Opal Anderson here. I recall you saying you were going to subpoena her.

MR. BRAILSFORD: I'm not asking you a question at this time. There's not a question on the --

THE COURT: Okay. Please ask your question.

BY MR. BRAILSFORD:

Q Would you agree that that stamp is important?

A It does have some relevance. Yes, sir.

Q Some relevance or a lot of relevance?

A I see some relevance.

Q You didn't produce it, correct?

A I was never asked to, no, sir, or to respond to your question.

MR. BRAILSFORD: Pull up Exhibit 13, please. And go to the signature page, please.

BY MR. BRAILSFORD:

Q Now, Dr. Raiffe, when I took your deposition in October, your testimony was that you had never seen Exhibit 13 which is

the business loan agreement and that you were not sure if that was your signature.
A I --
Q Do you recall that testimony?
A Not particularly, sir, no. But I don't recall. I can't see what this particular piece of paper is, sir.
MR. BRAILSFORD: Can you go to the front page, please?
BY MR. BRAILSFORD:
Q This is the business loan agreement. It's been previously marked as Exhibit 13. It's the business loan agreement. Borrower Hamilton Family Dentistry, David M. Raiffe, DDS, LLC. Lender, Midwest Business Capital. Do you see that?
A Yes, sir. I see that.
Q Okay. Now, let's go to the signature page. When I asked you back in October if that was your signature, your response was you're not sure if that's your testimony.
A I'm not sure. If there was a notary near my name, I would have to say yes, it is. But again, I don't see a date or a notary stamp at all, sir.
Q So is it your testimony you don't know if that's your signature on it?
A I'm not sure if that's my signature or not, sir. That's what I just answered you previously I'm pretty sure.
Q Is that a stamp?

A I don't know, sir.
Q Could it be a stamp?
A Possibly.
Q Okay. Let's look at Exhibit 14, please, first page. This is the document that's been marked as Exhibit 14. It's the business purpose affidavit. Do you see that?
A Yes, sir.
Q This is also part of the file for your loan, for the Hamilton loan. Now, when I questioned you in October 2019 under deposition, you testified that you weren't sure if this was your signature, that Opal just may have stamped your signature. Do you recall that testimony?
A Not particularly. No, sir. But --
Q Well --
A -- now that I see that there's a notary, it must be my signature.
MR. BRAILSFORD: Pull up Exhibit 21, page 1 of 2.
BY MR. BRAILSFORD:
Q Starting at line 17, I gave you at the time what was marked Exhibit 9. I asked you, "Is that your signature at the bottom?" "I don't know."
Actually, let me scroll this down because I want to make sure that we understand what Exhibit 9 was.
MR. BRAILSFORD: Go up to 102, please.
///

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

BY MR. BRAILSFORD:
Q The bottom there -- okay. We're talking about -- this document is a business purpose affidavit for the Hamilton Family Dentistry loan application.
MR. BRAILSFORD: Go to the next page, please.
BY MR. BRAILSFORD:
Q Said okay. At this point in the deposition, you started writing your -- signing your name on a notepad. Do you remember that?
A No. Oh, this is --
"I'm writing my signature. I don't know."
"You don't know?"
"Don't know."
"What do you know? Are you pretending writing -- are you practicing writing a signature?"
"Yes, I do it all the time."
"It looks slightly different. That's all."
"How so?"
"Just a little different, little quirks."
"You showed me something. I'm just trying to see if I signed my name the same way -- the same way twice."
MR. BRAILSFORD: Let's go back to the next page. Oh, I'm sorry. Go back to 103. I want to read that last question.
BY MR. BRAILSFORD:
Q Question starting on line 25, "Can you think of any reason

anyone else would sign your name for a business purpose affidavit for the Hamilton Family Dentistry?"

And your answer then was, "If Opal was there at this meeting which would have been in July possibly when we got the capital to purchase it, she would have been there. She could've just went and stamped it."

Do you remember testifying to that?

A Yes, sir.

Q And then I pointed out to you, "Do you see the notary seal at the bottom of the document?"

MR. BRAILSFORD: Can you pull up that document side by side, Anthony, Exhibit 14? 21.

BY MR. BRAILSFORD:

Q So you testified there on line 6 -- on 5 and 6 she could have went and stamped it. And then I pointed out to you, "Do you see the notary seal at the bottom?" And then I asked you, "Does Opal have a notary seal from Molly Holloran (phonetic)?"

You said no, you don't believe so. So then I asked you if Molly Holloran notarized this, that's your signature, do you think she would do that if you weren't the person signing it. You said you don't know what she would do, you doubt it.

So then I summarize, so we have a business purpose affidavit with what appears to be your signature right above your signature line, notarized by Molly A. Holloran. And you testimony is you don't know if that's your signature for a loan

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

that you were given.

A Now that I see it, sir, it's notarized. So it must be my signature.

MR. BRAILSFORD: Okay. Can you go up another page on Exhibit 21, please? I just want to check something.

MR. AUSTIN: 103 or 105?

MR. BRAILSFORD: I'm blocked by the upper right-hand corner of my screen. So I can't see it.

MR. AUSTIN: You're on 104 right now.

MR. BRAILSFORD: Oh. Go to 105, please.

MR. AUSTIN: Oh, sorry, going that way. 103.

MR. BRAILSFORD: No, no. Go the next page higher.

MR. AUSTIN: 102.

MR. BRAILSFORD: This is page 102? Go to page 103.

MR. AUSTIN: 103.

MR. BRAILSFORD: Go to page 104.

MR. AUSTIN: 104.

MR. BRAILSFORD: Okay. Go to page 105.

MR. AUSTIN: 105.

MR. BRAILSFORD: Okay. We'll move along.

BY MR. BRAILSFORD:

Q So we know that the signature on Exhibit 14 is, in fact, your signature because it's a notary public, right?

A Yes, sir. If there's a signature, it's notarized, it is indeed my signature.

Q Okay. Let's look at Exhibit 16. Now, this is the affidavit of no adverse change for the Hamilton loan. Do you see that?

A I didn't understand what you said, sir. I apologize. Say it again, please.

Q This document previously marked as Exhibit 16 is the affidavit of no adverse change for the loan, the Hamilton loan. Do you see that?

A Yes, sir.

Q Okay. Now, back in October, I asked you if that was your signature in the middle there. And you testified that you weren't sure if that was -- if that was your signature either. Do you recall that testimony?

A No. But I stand corrected. If there is a notary, it is indeed my signature, sir.

MR. BRAILSFORD: Exhibit 21, 71, please.

BY MR. BRAILSFORD:

Q Line 2. My question to you was,

"You have in front of you Exhibit 6. This is an affidavit of no adverse change and agreement to correct errors and omissions that was submitted to Midwest Bank that you applied for. I'll give you a chance to review it."

MR. AUSTIN: Sorry, I -- sorry. Let me back up.

THE WITNESS: I'm sorry. I didn't hear question. I

apologize.

BY MR. BRAILSFORD:

Q I haven't asked a question yet. I'm just reading your --

A Okay.

Q -- prior testimony. You said you don't remember the testimony where you testified that you weren't sure if that was your signature on what's been marked and admitted as Exhibit 16. So I'm reading back your testimony.

THE COURT: He's already acknowledged that this is his signature on Exhibit 16. And I see that he didn't recognize that back on page 71 of his deposition. So I think we can move on.

MR. BRAILSFORD: Okay. Absolutely.

Exhibit 17, please. Go to the front page.

BY MR. BRAILSFORD:

Q This has been previously marked and admitted as Exhibit 17 as the closing certification for the Hamilton loan. Do you see that?

A I apologize. Are you asking me about what's on my screen now, sir?

Q Yes.

A I see it.

MR. BRAILSFORD: Okay. Let's go to the signature page on that. Go back to page 2, please. Okay. I'm sorry, 3.

///

BY MR. BRAILSFORD:

Q Now, Dr. Raiffe, I recognize this does not have a notary public signature. Do you know if those are your signatures?

A It could be my signature. It's not notarized. I can't absolutely swear to it, sir.

Q Does it appear to be your signature?

A It's my name.

Q Could it be a stamp?

A Could be. It's not notarized. So the notary has to watch me sign it.

Q And let's look at the next page. Are those signatures your signatures?

A Possibly, sir. Same answer.

Q Could those be stamps?

A Excuse me, please?

Q Could those be stamps?

A I don't know. There's no -- there's nothing -- there's no notary there.

Q Well, how many stamps of your signature are out there, Dr. Raiffe?

A Probably two, at least one Opal had.

Q Who had the other one?

A Opal had it. No, or -- Opal or the office manager in Akron had it. Now, when we fired her, we couldn't find it. So I had to buy Opal one.

MR. BRAILSFORD: Okay. Pull up Exhibit 26, please.
BY MR. BRAILSFORD:
Q Dr. Raiffe, this is a document we received from your attorney. It's the escrow closing for the Arizona home. See the address there, property address, 6329 East Skinner Drive? You see that?
A Yes, sir.
Q There's a signature, David Mr. Raiffe, DDS, MBA at the bottom. Do you see that?
A Yes, sir.
Q Does that appear to be your signature?
A Yes, sir.
Q Are you sure?
A No. But if I in Arizona here, it would be my signature.
Q Could it be a stamp?
A I was in Arizona, sir. No. I wouldn't need a stamp. I'd sign my own name to it.
MR. BRAILSFORD: Show Exhibit 39, please.
BY MR. BRAILSFORD:
Q This has been previously marked as Exhibit 39. This is the borrower's closing affidavit for the Arizona home. Do you see that first box that's marked under occupancy status?
A Yes, sir.
Q So this document appears to show that the Arizona home is your primary residence, correct?

A Yes, sir.

MR. BRAILSFORD: You can go to page 2. Page 3.

BY MR. BRAILSFORD:

Q Is that your signature at the top, Dr. Raiffe?

A Notarized in Arizona. Yes, sir.

Q That's April 27th of 2016, correct?

A Yes, sir.

Q As of April 27th, 2016, your primary residence was here in Arizona, correct?

A Yes, sir.

Q So you've been shown several signatures, Dr. Raiffe, today, correct?

A Yes, sir.

Q Some of them you are sure that it's your signature because it has a notary public, correct?

A Yes, sir.

Q The ones that don't have a notary public, you're not sure if it's your signature or it's a stamp, correct?

A Questionable. Yes, sir.

Q And that would also apply with Exhibit 1, the personal financial statement. You're not sure if that's your signature or it's a stamp, correct?

A Right. I stand by that, sir. Yes, sir.

Q Okay. So every signature related to this loan, if it doesn't have a notary public stamp next to it, you are not sure

if that's your signature?
A I can't be certain it is mine, sir. I've never filled this form out. I've never seen it before you showed it to me at my deposition. I told you that before. I stand by it.
Q You just don't recall seeing --
A No. I've never seen this this form before. I told -- I'm very certain of that.
Q So the one document that is signed under the penalty of perjury that's missing 1.5 million in debt and it has the wrong address, that's the one document you're sure you did not see before?
A Are you referring to this, sir?
Q Yes.
A It has a few other errors too also. Yes, sir.
Q And you're sure that's the one document that you're sure you've never seen before?
A I've never seen this before. I've told you that.
Q Okay.
A This -- I'm sorry. You didn't ask me a question. I apologize.
Q You never told Midwest Bank about the $1.5 million of debt or the fact that you had moved to Arizona, had you?
A I've spoken to Spencer lots of times about moving to Arizona. I told him -- I spoke to him living in Arizona here before I got the final loan. You asked me that previously too.

MR. BRAILSFORD: Can you pull up Exhibit 10, please? Go to page 106.

BY MR. BRAILSFORD:

Q Look at line 11.

MR. BRAILSFORD: Can you pull that out, 11 through 13?

BY MR. BRAILSFORD:

Q Question, "Dr. Raiffe, did you inform Midwest Bank while you were getting this loan that you were moving to Arizona?" Answer, "I don't remember talking to them at all."

A I stand by that too. Midwest Bank was -- Spencer is not Midwest Bank as far as I'm concerned. Even though he represents the bank, he's my banker. I never spoke to anybody on a committee. Again, I'm making a distinction with the difference. Midwest Bank, like someone from the bank, would call me. I never told them that. I talked to Spencer all the time or often enough that he knew I was moving to Arizona, wanted to for years, wanted to be with my son --

Q There's no --

A -- wanted to --

Q -- question.

A -- escape the cold weather.

Q You answered --

A I'm sorry. You asked me --

Q You answered the question --

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

A -- a question. I'm just --
Q -- Dr. Raiffe.
A -- giving you the details.
Q The question is, so as I understand your testimony, you agree you never talked to Midwest Bank about the fact that you were moving to Arizona?
A I make the distinction of I don't consider Spencer Midwest Bank. Spencer is my personal banker. I spoke to him plenty of time. I just think of -- like I do now, if the bank were to call me like that other gentleman who testified before, if they ask me -- he's the bank, not Spencer. It's just a -- I make the difference. You may not.
Q Where does Spencer Twyford work?
A At -- depending, Lorraine bank, Midwest Bank --
Q At the time of this loan, Dr. Raiffe --
A He worked for --
Q -- as of --
A He worked for --
Q -- May 2000- --
A He worked --
Q Let me finish my question.
A I believe he worked for Midwest Bank.
Q Let me finish my question.
A Sorry.
Q In May of 2016, where was Mr. Twyford working?

A 2015?
Q 2016.
A Oh, I'm sorry. I believe he worked for Midwest.
Q Okay. He helped you get this loan from Midwest Bank, did he not?
A As he did with every other one. Yes, sir.
Q Okay. So you're asking -- your testimony is, to split the hair, saying that your belief was that you notified Spencer about the move to Arizona, but you don't consider Spencer to be Midwest Bank, correct?
A No. I'm just making distinction. Midwest Bank to me represents an institution. Spencer is just a personal banker. My -- I apologize if there's some misunderstanding, but I -- I don't consider Spencer Midwest Bank. But Spencer knew certainly years before I was moving to Arizona. There was no secret there, sir. I told you that before too.
Q Okay. So I just want to make sure I understand your testimony. You did not inform Midwest Bank -- this is a yes or no question. Yes or no.
A Okay.
Q Did you inform Midwest Bank while you were getting this loan in May of 2016 that you were moving to Arizona?
A I don't know if it's a simple yes or no, sir. I apologize. It's -- I'm not splitting hairs. I talked to Spencer. That was the only connection I had with Midwest Bank.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Q You never went into the bank and you never told the bank that the address on my personal financial statement is wrong, it's actually Arizona, correct? You never made that change?
A I don't even know where the bank is, sir. No. I never did that.
Q Okay. Despite the fact that you had actually moved to Arizona by that time, correct?
A Say it again, please.
Q Despite the fact that you had actually moved to Arizona by that time, correct?
A I had moved to Arizona the end of May, May of 2016. Yes, sir. I had spoken to Spencer before I left. I spoke to Spencer years before I left. I spoke to Spencer while I was here. And I even spoke to Spencer before I got the loan on the end of July. It was no secret, sir. I'm sorry.

MR. BRAILSFORD: Your Honor, move to strike his answer as not responsive.

THE COURT: Mr. Hauf?

MR. HAUF: Your Honor, he answered the question. I think it was directly relevant to what was answered.

THE COURT: I agree. Motion to strike is denied.

BY MR. BRAILSFORD:
Q Dr. Raiffe, you previously testified that the failure to include the $1.5 million debt for your Arizona home was not a situation where you simply forgot about it, correct?

A I didn't forget about anything. I mean, to put it on the form itself, sir? I don't understand your question. I apologize.
Q I'll re-ask the question.
A Okay.
Q You previously testified that the failure to include the $1.5 million debt for the Arizona home was not a situation where you simply forgot about that debt, correct?
A Never forgot -- but I never included it. I didn't fill it out. I told you that before too.
Q And you hadn't forgotten that you actually move to Arizona, correct?
A I don't think I forgot about moving anywhere, sir.
Q So your testimony is that --
MR. BRAILSFORD: Can you pull up Exhibit 1, please?
BY MR. BRAILSFORD:
Q Your testimony is that Mr. -- Ms. Anderson filled out your personal financial statement in your behalf, right?
A Yes, sir. As well as she had presumably done every other time to secure the loan.
Q But you never told the bank that, did you?
A Spencer never asked.
Q Is that a no?
A That would be a Spencer never asked, so I wouldn't -- he didn't ask either way.

Q There's a lot of personal financial -- a lot of personal information on this Exhibit 1. Would you agree?
A Yes, sir.
Q So in order for Ms. Anderson to fill out this document, she'd need to know your social security number, right?
A Yes, sir.
Q Is that your social security number?
A I beg your pardon?
MR. BRAILSFORD: Oh, it might be on a different page. Strike that.
BY MR. BRAILSFORD:
Q Ms. Anderson would need to know how much money is in your IA account -- or IRA account, correct?
A Yes, sir.
Q She'd need to know how much money is in your checking accounts, right?
A Yes, sir.
Q She'd need to have information about your taxes, right?
A Yes, sir.
Q Need to know about your car payments?
A Yes, sir.
Q Ms. Anderson would need to know about the value of your cars?
A Yes, sir.
Q She'd need to know about your mortgage payments?

A Yes, sir.

Q At least the mortgage payments in regard to the house in Solon, Ohio, right?

A I wasn't making them. So -- but she would have access to everything I would.

Q So you gave Ms. Anderson access to all this personal information for you?

A Yes, sir.

Q You gave her access to your checking accounts?

A Yes, sir.

Q Savings accounts?

A I never had a savings. Checking.

Q Retirement accounts?

A I never had a retirement account.

Q IRA?

A Yes, sir.

Q Ms. Anderson, she would have completed this document at your direction, correct?

A Here. Send this into Spencer. Get us another loan. Yeah. I trusted her completely.

Q So you would've forwarded this document to her?

A No. I never saw the document. I never had it.

Q Your testimony was just that you just sent it to her and told her to fill it out and send it to --

A Or if Spencer would've sent it. But more accurately,

Spencer -- she lived much closer where Spencer worked. So she would've picked up this form, filled it out, sent it in, coordinated it with the accountant, the bank, went into all my personal and business accounts, filled it out, and sent it in, sir. That's how we had done it seven, eight times.

Q And did Ms. Opal -- she would have completed this document, Exhibit 1, with your permission, correct?

A Yes, sir.

Q She would have completed it with your knowledge, right?

A She completed it with me saying are you done yet, send it or, I just filled it out, we're just wanting for the -- the bank to act on it.

Q Dr. Raiffe, you have an MBA, right?

A Yes, sir.

Q You ran eight or nine different dental practices at one time, right?

A Are you conflating having an MBA with the successful running of a dental practice? It cost me $90,000 to find out that was the case. So thank you for reminding me.

MR. BRAILSFORD: Move to strike. He's not even answering my question.

THE WITNESS: Sorry. Yes, sir. I do have an MBA.

THE COURT: Sir, just please answer the questions that are asked of you.

THE WITNESS: Thank you.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BY MR. BRAILSFORD:
Q Was the personal financial statement completed with your knowledge?
A Yes. She didn't do it -- she didn't sneak around and do it.
Q I mean, the loan was for you, correct?
A The loan was for the practice, sir. Correct.
Q Right. But this personal financial statement doesn't say Opal Anderson anywhere, does it?
A No, sir.
Q Okay.
A Why would it?
Q So Ms. Opal Anderson was not filling out this document on her behalf, correct?
A Yeah. She has a vested interest in getting the loan also, sir, so we could run the practice and make some money.
Q Did you ensure that Ms. Anderson's work was complete and accurate?
A No. Never checked it, never saw it.
Q Dr. Raiffe, you, not Ms. Anderson, is personally liable on this loan, correct?
A Oh, absolutely, sir.
Q And this personal financial statement was filled out and signed under the penalty of perjury, right?
A Yes, sir.

Q So your previous testimony is that you had six or seven dental practices going at one time; is that correct?
A Yes, sir.
Q So you're no stranger to running a business, correct?
A I -- I'm -- I'm aware of the challenges of running a business. Yes, sir.
Q Your dental practices were making money, were they not?
A Yes, sir.
Q In fact, I think you previously testified that you were making about half a million dollars a year as of 2016; is that correct?
A Yes, sir, if not more.
Q And you previously testified that Mr. Vandiford -- he's a broker, correct?
A Yes, sir, in Ohio.
Q And he's the broker that helped you with this loan, correct?
A I beg your pardon? Say it again.
Q Mr. Vandiford, is he the broker that helped introduce you or connect you with Mr. Twyford for this loan?
A No. I -- I had been -- Mr. Vandiford introduced me in 2010 to Spencer. And he also introduced me to Opal at that time. So he didn't need to reintroduce me every time we had a practice.
Q Was Mr. Vandiford the broker that helped you on this loan?

A No. No. He didn't -- he didn't have nothing to do with the loan. He just found the practice.
Q So helped you find the practice?
A Yes, sir.
Q Okay. And my understanding is his role in your business model was to find a dental practice for you to purchase; is that correct?
A Yes, sir.
Q Okay. And Ms. Anderson's role in your business model was to oversee or ensure the various dental practices were running correctly, right?
A Yes, sir.
Q And your job was to get the financing, correct?
A Yes, sir.
Q So despite the fact that it's your job to get the financing, you're actually having Opal do that work for you, correct?
A Yes, sir.
Q You understood that as the person applying for the loan, the bank would want to know your financial situation, right?
A Yes, sir.
Q I mean, that's just logical. So you understood the need to provide documents that accurately reflect your financial situation?
A Yes, sir.

Q Correct? You understood that you were personally liable for this loan, correct?
A Yes, sir.
Q Ms. Anderson is not liable for the loan?
A Not at all.
Q Mr. Vandiford is not liable for the loan?
A Not a dime.
MR. BRAILSFORD: I want to show Exhibit 44, second page.
BY MR. BRAILSFORD:
Q Do you recognize this?
A Yes, sir. It was a text between myself and Chris Vandiford, I believe.
Q Okay.
THE COURT: And Chris who?
THE WITNESS: Oh, I'm sorry, sir?
THE COURT: Between yourself and Vandiford?
THE WITNESS: The -- the practice broker that he was talking about a minute ago.
THE COURT: Vandiford?
THE WITNESS: Chris Vandiford. Yes, sir.
BY MR. BRAILSFORD:
Q So this is -- on the left side of the screen, that is a text that Mr. Vandiford sent to you?
A I believe so. Yes, sir.

Q And that your response is on the right, correct?
A Yes, sir.
Q Okay. So did Mr. Vandiford send you a text on April 25th, 2016 at 1:41 p.m. to say too bad you're leaving, found the ultimate goldmine and Parma Heights?
A Yes, sir. He was always looking for practices to buy.
Q And your response was I'd buy it, associates work it, we split profits?
A Yeah.
Q Correct?
A Yes, sir. That's our business model.
Q But your business model was to buy a practice, work it, and train associate dentists, was it not?
A No, sir, not at all. My goal was to get -- find -- have Chris find it, let me get the financing, and Opal staff it with a dentist, practice manager, dental assistant, dental hygienist. I was never going to work the practices, never did.
Q None of the practices?
A They would call me in for a day or so if an associate had a -- an associate had a problem like taking out wisdom teeth because they're not sure how to do it. But I didn't work at -- these practices were way far from my home. I spent most of my time in Akron which was my favorite practice.

MR. BRAILSFORD: Exhibit 21. Let's go to page 34, line 13.

BY MR. BRAILSFORD:

Q So on this question, I'm asking about that too bad.

A Say again, please. I'm sorry.

Q I'm asking you about the text from Mr. Vandiford that says too bad.

A Okay.

MR. BRAILSFORD: Can you pull that up?

BY MR. BRAILSFORD:

Q Okay. Do you remember back in October when I took your testimony, your deposition, I asked you -- if you look there on line -- on page 34 line 13, "So why does it say too bad? What does that mean?"

And your answer, "Because he had the belief" -- assuming that's Mr. Vandiford, correct? He? Mr. Vandiford?

A "Because he had the belief that he wanted me to work the Ohio practice to teach the associate how to better dentistry. I had done that for years, but it's time to leave."

Q Well, stop, stop, stop. I'll handle this.

A I'm sorry.

Q I'll ask you a question. So then my question to you was, "You couldn't do that from Arizona?"

And your answer was, "I tried flying back. Sometimes the problem, since you asked me directly, having an associate means it's a revolving a door, that they" --

A Uh-huh.

Q -- "don't take it seriously. It's not -- it's like living in a motel room. It's not your home. These folks have no buy-in. They just really -- I fired people several times because they" -- next page -- "they weren't up to my standards."
A I apologize like now. That was a long answer too. Sorry. I'm sorry. I don't recognize your question. Chris thought it would be --
Q Let me read line 21 to you from page 35. "So page 3 of Exhibit 3 where it says too bad you're leaving, found the ultimate goldmine in Parma Heights."
A Uh-huh.
Q Your response, "Uh-huh."
My question is, "What I'm trying to understand is, what does it matter if you're leaving?" And your answer is,

> "Because I wouldn't be able to work there to take it from this level to the next level, having done this for almost 30 years versus having an associate who, generally speaking, are relatively new grads. They can't do the level of product that I can do."

A Correct. Yes.
Q Now, as I just understood your testimony now, your testimony was that you were never going to be working.
A My goal was never to work the practice. I mean, if I had to go in for a day or so to teach an associate how to do

something better, I wasn't going to spend -- I heard Spencer reference that he felt that -- he was under the belief, the mistaken belief, that I was going to spend -- working several days a week like -- Hamilton, it was five and a half hours from my house. I would never do that. I was gone. I was leaving.

My goal was to get the associates up to speed, teach them if they needed to do better surgery which I'm really good at, and then leave. They're on their own. If not, we'll get another associate.

It's the old -- the old analogy I used to use is you didn't expect Sam Walton to work the register at 3,000, you know, Wal-Marts. Same with --

Q Dr. Raiffe, the question to you -- or the statement from Mr. Vandiford who was your broker for years, correct?

A Uh-huh. Good friend.

Q His concern is that you're leaving, correct?

A Yeah, because I can't buy any more practices.

Q Was it his -- you couldn't buy any more practices because you were leaving Ohio?

A No. I was leaving. It was hard to -- I stopped. I was going to retire. I was going to work here a couple days a month, and that was it. That was my goal back in 2015 even.

Q Did you tell the bank when you were looking to purchase the Hamilton practice that you were looking to retire?

A No. No. I said -- Spencer for some reason felt that I

was going to work several days a week in Hamilton. And I'm thinking that never crossed my mind at all, never thought about it, never dreamed about it. It would be impossible for me to do. I was leaving.

Q The fact that you're retiring, that was --

A No. I was semi-retiring, sir. I apologize. To me, retiring is working a couple days a week, working a couple days a month. I would never -- I would never retire. I'd be bored to tears. I tried it, didn't work.

Q You would agree, Dr. Raiffe, that a move to Arizona and the fact that you are semi-retiring is a big change to your business model, correct?

A Not at all. No, sir, not at all. That's why I had a regional manager to take care of everything. So I felt comfortable leaving.

Q Dr. Raiffe, you'd no longer be working the practice or training new dental associates, would you?

A I never was unless there was a problem and I had to fly back and show them how to do something and fly back out.

Q Your new model --

A You -- you had -- no. My model has --

Q My --

A -- not changed.

Q Let me ask the questions.

A I'm sorry.

Q And you can answer, okay?
A Thank you.
Q This will go a lot quicker if you just answer my questions.
A Got it.
Q So your new model was you would just by the practice and let associates work it, right?
A Or have the existing doctor stay on for a little while if they wanted. Yes, sir.
Q Whereas your previous model was the problem with you not being there in Ohio, the problem with you being semi-retired in Arizona was that because you wouldn't be able to work there to take it from this level to the next level, having done dentistry for 30 years versus having an associate who, generally speaking, are relatively new grads, they can't do the level of production I can do. You see that?
A Yes, sir. It's a fact.
Q Okay. So in order for you to take a dental practice to the next level, you need to work it to prepare that -- and teach those associate dentists how to work --
A If need be but --
Q -- the dental practice --
A -- no, that wasn't --
Q -- right?
A No, sir. That wasn't my model. My model was me leaving

to Arizona, having Opal keep the practices up. It worked well.

Q Associate dentists are a revolving door, are they not?

A They are unless you find the right one.

Q They don't care for your practice the same way you do, do they?

A Unless it's the right one and we'd offer them a buy-in.

Q Newly graduates dentists can't produce at the same level that you can, given your 30 years of experience practicing dentistry, right?

A That's a statistical fact. Yes, sir. That's why we didn't hire new grads. We hired experienced dentists.

Q And you never told Midwest Bank that you were moving to Arizona and that you were planning to semi-retire, did you?

A I told Spencer for years I was moving to Arizona. Yes, sir.

Q Well, which one, Doctor, is it? Is Spencer Midwest Bank or is he not Midwest Bank?

A I don't consider --

Q Because I'm getting a little confused as to which one --

A I'll unconfuse you --

Q -- is which.

A -- then. Spencer -- I considered Spencer a friend. He wasn't the bank itself.

Q So my question to you is, did you tell Midwest Bank about your intent to move to Arizona and semi-retire?

A You're -- you're splitting words. You're -- I can't answer that question, sir. I -- I told Spencer for years I was moving. If you -- if you consider Spencer Midwest Bank, then yes, I did tell Midwest Bank. But I still don't. Spencer is more of my personal banker. I talked to him. I like him.
Q Dr. Raiffe, let me ask you to assume that someone -- someone asked you to loan them several hundred thousand dollars and you're in a position financially that you had the position to loan that kind of money to someone, okay? Before you loan that person several hundred thousand dollars, you'd want to know if they had the ability to repay you on that loan, would you not?
A Yes.
Q Would you expect that person to be honest with you about their financial situation?
A I would hope so.
Q Would you expect that person to be honest with you about where they were living?
A If it made a difference, yeah.
Q Would you want that person to be honest to you about their assets and their debts?
A I imagine. Yes, sir.
Q And if that person that was seeking a loan from you -- if they had a brand new debt that they hadn't told you about, you'd want to know about it though, would you not?

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MR. HAUF: Objection. Speculation.

THE COURT: Mr. Brailsford?

MR. BRAILSFORD: I'm asking -- yeah. I'll withdraw the question.

BY MR. BRAILSFORD:

Q You previously testified that Ms. Anderson had access to all your personal financial information, correct?

A Yes, sir.

Q You would expect her to be honest and forthright then -- in the personal financial statement if, in fact, she's the person that filled it out for you, correct?

A I'm having trouble hearing. I'm sorry, sir.

Q Given that Ms. Anderson had access to all your personal financial information, you would expect her to be honest in applying -- in filling out --

MR. BRAILSFORD: Let me -- let me strike that. Let's start over.

BY MR. BRAILSFORD:

Q Given that Ms. Anderson had all your personal financial information, you would expect her to fill out the personal financial form accurately and thoroughly, correct?

A Yes, sir.

MR. BRAILSFORD: I have no more questions, Your Honor.

THE COURT: All right. Mr. Hauf, we're at 2:20- --

or 3:22 right now. I'm proposing we break at 20 till for five minutes. And then I'm going to do this discovery hearing which ought to take a few minutes. Are you prepared to continue until 20 till or should we break until we're done with that?

MR. HAUF: For various personal reasons, I'd like to break now if we could.

THE COURT: Break now and stay on break until we're done with the discovery hearing that starts at 3:45?

MR. HAUF: Correct. So we would come back sometime after 4 then I assume.

THE COURT: I think we can safely call it 4:00 then. Fair enough?

MR. BRAILSFORD: Yes, Your Honor.

THE COURT: Okay. We'll adjourn until 4:00.

MR. BRAILSFORD: Thank you, Your Honor.

THE COURT: You're welcome.

Step down, sir.

(Recess)

THE COURT: Let's go back on the record then in the Raiffe case, please.

THE CLERK: In the case 18-15086, David Raiffe, with adversary 19-98.

THE COURT: Okay. We've had the appearances already.

And any housekeeping details we need or are we ready for the cross-examination?

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. HAUF: Your Honor, based upon the timing that we had, we don't think that we'll be able to take the cross of Mr. Street until tomorrow. So my suggestion was we could start with that after the cross in this case -- today.

THE COURT: Wait. In other words, we're done today or what?

MR. HAUF: No. We would -- I would conduct the cross. And then there may be some cross, redirect. And then we can start first thing in the morning.

THE COURT: You're doing Dr. Raiffe's cross right now?

MR. HAUF: Correct.

THE COURT: Okay.

MR. HAUF: We have no problem waiving cross and starting with direct if you'd -- if the parties are acceptable to that because we don't have a lot of time.

MR. AUSTIN: Your Honor, that's why I'm standing at the podium. I was given Mr. Brailsford a rest. He's been on his feet a lot today.

Obviously, we called Mr. Raiffe in our affirmative case. Our understanding is Mr. Hauf wants to call Mr. Raiffe as part of his affirmative case. And so we have the issue of are we crossing or are we doing direct. Mr. Hauf -- I think he's indicating he'll waive his cross and just -- I think we would then -- we can't rest because then we still have to

finish up with Mr. Street.

But we then would be amenable to allowing him to call Mr. Raiffe as the first witness in his affirmative case, start with his direct. We would then have a cross of Mr. Raiffe and a redirect. That's going to obviously bleed in over till tomorrow. And then we would wrap up the day --

THE COURT: With Mr. Street tomorrow.

MR. AUSTIN: -- with Mr. Street's cross from Mr. Hauf and then a redirect that we would have of Mr. Street tomorrow. I think that concludes the case. The redirect of Mr. Street and any further cross of Mr. Raiffe would end our affirmative case. I imagine that's going to put us at midday tomorrow.

THE COURT: Okay. So Mr. Hauf, it sounds like you're calling Dr. Raiffe. It's going to be in your case in chief. It's wide open, not limited just to what cross would be. And I'm happy to get started here with the understanding that we'll stop at 5 and then pick up again tomorrow.

MR. HAUF: Okay, Your Honor. Yeah. What I was -- so we'll start with -- can I come to the podium? That will be easier.

No. So what I had suggested was -- if I understand, my suggestion was to waive our cross. We can start on direct. But my thought was since we don't have much time and they'd have to end their case in chief, I could start with cross on Mr. Street tomorrow morning.

THE COURT: First thing in the morning?

MR. HAUF: Correct.

THE COURT: Fine.

MR. HAUF: That way he can --

THE COURT: In other words, we start with Dr. Raiffe today, do what we can, but tomorrow morning first thing is Mr. Street, get him back on a plane, and then we're finishing up with Dr. Raiffe.

MR. HAUF: Right. My thought was I'd ask a few questions on cross and then --

THE COURT: Of who?

MR. HAUF: Of Dr. Raiffe. I'm sorry. So I'd ask a few questions of cross of Dr. Raiffe in their case in chief. And then we could do a cross on Mr. Street in the morning. And then they could finish their case. And I could call Dr. Raiffe on direct.

THE COURT: Okay. Why don't you call Dr. Raiffe? He's still under oath. We'll ask him whatever you can ask him until 5:00. But first thing in the morning, Mr. Street is on at 9:00.

MR. HAUF: Okay. That's -- that'll work for us, Your Honor.

THE COURT: Whether we call it conclusion of their case on Dr. Raiffe by cross-examination or whether it's the opening of your case, frankly, I don't really care. Let's just

get him on the stand.

MR. HAUF: My goal, Your Honor, was to try and get Mr. Street to testify so he could leave --

THE COURT: First thing in the morning?

MR. HOFFMAN: -- first thing in the morning. That was --

THE COURT: Fair enough.

MR. AUSTIN: Your Honor, I hate to be a fly in the ointment. And I appreciate Mr. Hauf's concessions and the Court's concessions. Mr. Street, since he is the bank's representative here, had made plans to be here through the entirety of trial. So rushing him off back to Ohio in the cold I don't think is as much a concern as Mr. Spencer who was testifying in his personal capacity and needs to get back to work.

Our preference would be let's finish with Mr. Raiffe completely. Let's get a witness wrapped up and done. And then we can turn our attention to Mr. Street, finish him, get him completely done. And then the parties are done.

I appreciate that we have sophisticated counsel and the Court is well-versed in trial. But I think just for simplicity's sake, it makes sense -- let's finish Mr. Raiffe. He's on the stand. Let's get all of that testimony out. Let's finish with Mr. Street tomorrow. He's got plans to stay till Wednesday, so we're not worried about a flight home late

tomorrow. And I think that's the easiest, most logistical -- logical and logistically proper way to do that.

THE COURT: So the question is, Mr. Hauf, are you prepared to finish with Dr. Raiffe before you've heard everything that Mr. Street is going to say?

MR. HAUF: That was not necessarily my intent. My thought was we have, what, 40 minutes. I would be ready to cross Mr. Street tomorrow first thing. I'd have no problem doing that. And then we can finish his testimony. And then the only --

THE COURT: And then they close their case.

MR. HAUF: Right.

THE COURT: Right.

MR. HAUF: And then the only -- the only witness I had was Dr. Raiffe. So my thought was we finish with his testimony.

THE COURT: Okay. Let's have Dr. Raiffe come up right now. We'll hear what he's got to say. Whether you want to call it his cross or your direct, I don't care. But we know first thing in the morning is Mr. Street followed by conclusion of Dr. Raiffe.

MR. HAUF: Thank you, Your Honor.

THE COURT: Dr. Raiffe, you're still under oath. You understand that, correct? Dr. Raiffe, you're still under oath. You understand that, correct?

THE WITNESS: Yes, sir.

THE COURT: Okay. Go ahead, Mr. Hauf.

CROSS-EXAMINATION

BY MR. HAUF:

Q Dr. Raiffe, I've opened Exhibit Number 47. This is page MID00133. That's the Bates stamp on it. I'll expand it to full screen. I've done this for the purpose of highlighting the practices that you had at the time in Ohio.

With -- with regard to process, there was a lot made in process -- in your direct examination about your process after your purchase these practices. So I wanted to start with that in the time we have left and talk about your process in purchase.

A Okay.

Q So dating back to the first practice that Mr. Twyford helped you acquire, what was your process when you would purchase one of those practices in setting those up for transition?

A That's not there, but it was the Akron Family Dental. The -- the process was essentially we would purchase it. Opal would run it. The existing dentist would stay on at least a year, so that's our hope. And Opal would hire new staff, new -- if needed or new hygienists or new dental assistants if needed. And life went on. The dental -- the existing dentist would become dental associate.

Q Okay. So if I understand this, Opal, Ms. Anderson, would replace the managerial staff?
A If needed. If needed.
Q Okay. And then was that an important element that the previous owner, the dentist who was the previous owner, became --
A Yeah. It was just for -- it works better for a transition. The -- the existing patients know them. He knows them; they know him. They're comfortable. Why rock -- why upset the applecart?
Q Okay. And in any of these practices, did they have additional dentists or what we'll call any nonowning dentist as an associate?
A Yes, sir. They had -- they were associates. They had them.
Q Okay. And what type -- so there was a lot of -- there was a lot of issues made around the statements related to your production and your output. What type of training did you give those -- those associates who were not the previous owner of the dental practices you acquired?
A Generally speaking, the -- the only thing I actually helped them with was how to do better wisdom tooth extractions. If they were struggling, I would show them how to do it.
Q Okay. So let's go down the list. You talked about Akron. Then what about Bucyrus Family Dental? Did the owner of that

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

practice stay on after purchase?
A Yes, sir.
Q Do you recall how long?
A Yeah, at least a year.
Q And what about Warren Dental Group?
A Yes, sir. The -- the doctor stayed on for a while.
Q How long?
A At least a year --
Q Okay.
A -- or two.
Q And then New Carlisle Family Dental?
A Yes, sir. There was an existing dentist and an associate dentist there also.
Q And did both of those individuals stay on?
A Yes, sir.
Q And then what about My Family Dental?
A Yep. They stayed on for a little while so -- eight months I think with -- with Reynoldsburg.
Q And Mentor Family -- or Mentor Dental Care?
A Yep. They had an existing dentist. And they had an associate dentist. They stayed on.
Q For how long?
A At least a year.
Q And then what Doc Raiffe Management Group?
A That was North Royalton. That was Dr. Schaffer. He

stayed on.
Q For how long?
A Well, we sold it at least a year later.
Q So in your previous statements about your ability to produce more than a grad --
A Yeah.
Q -- does that -- does that statement hold true of these doctors who sold you their practices, meaning --
A No, no. They weren't -- they weren't recent grads. They had been experienced. They had been practicing for years. They didn't -- they didn't need me.
Q So their production output would have been equivalent to what your production output would have been?
A Not more. Yes, sir.
Q And with regard to Hamilton, what was different about Hamilton?
A Dr. Reppart left. He didn't stay on. There was no associate. We tried to replace it with an associate.
Q So unlike all the other dental practices you had previously purchased, Hamilton did not retain its -- its primary dentist?
A That's correct. Yes, sir.
Q Was there anything else particularly interesting about Hamilton?
A He had practiced there for a long time. The people --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

once they found out he was no longer there, they didn't cross the river. It's right -- it's right next to Kentucky. They stayed on their side of the river.

Q So -- so --

A And we -- we expected a certain percentage to leave but not that much.

Q Given that we're in Arizona and we don't have many rivers or --

A Oh, sorry.

Q -- many state borders, how close was Hamilton to -- what was it, Kentucky?

A Right there, next door.

Q Okay. And so -- so in this practice, it was common for what, Kentucky residents to --

A Yeah.

Q -- to come to Ohio?

A Yes, sir.

Q Okay. And that was primarily because they knew the previous owner?

A Yes, sir.

Q Okay. And all of your other practices -- so the ones listed here and then the -- the ones when I say listed here on the exhibit and then the practice you said that wasn't listed with those purchases, were any of those practices near a border?

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

A No.

Q Okay. And in that -- in that area, especially in where -- where the practice was located near -- where did you say, Oklahoma?

A Kentucky.

Q Kentucky. Okay. Near Kentucky, was it -- was it a problem that they'd have to cross the border to --

A It just -- you had an older dentist. He had been treating generations of families. And once they found out he was no longer there, they figured why bother crossing, go find a local dentist. So it hurt us.

Q And what do you mean by that, it hurt you?

A No. You always expect that for -- when you transition a practice, statistically about eight to ten percent of the patients will leave just because the older doctor is there. But we ended up losing closer to 50 percent.

Q Okay. And that was -- when did you start experiencing that patient loss, immediately or --

A No, no, no, not immediately. We noticed it about eight months later, seven months later. We just noticed that there wasn't a whole lot of what's called recall which is where hygiene -- sees their patients twice a year. We were having trouble filling it. These people weren't coming back to the practice.

Q Okay. And then once you bought this practice, since this

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

was the first practice you had purchased without retaining the selling dentist --

A Uh-huh.

Q -- what was the plan for -- for management and hiring --

A Hire an --

Q -- a new dentist?

A Hire an experienced associate, someone who could handle the load, someone who could -- hopefully someone from around the area. They like that, if they know you, grew up and went to the high school with them.

Q Who is responsible for hiring those dentists?

A The regional manager.

Q Which was --

A Opal.

Q -- Ms. Anderson?

A Sorry.

Q Okay.

A Opal.

Q And when you -- when you took these other practices, all the practices except for Hamilton, the ones listed in the exhibit, how much production or work did you do in the first year or six months of --

A Me personally?

Q Correct.

A Nothing. I wasn't there. I wasn't supposed to be there

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

unless an associate -- or unless a dentist or an associate needed some help with surgery or had to do it better. I wasn't -- that's not part of my business model.

Q And so then in training -- for purposes of training, how -- did you have a regimented requirement for training? When did you go to train anyone who --

A Me --

Q -- worked in the practice?

A Me personally? I didn't go to the practice. There was no reason for me. They had their own -- they had their own dentist. They had their own office manager. I just would interfere with them. They don't need me.

Q So if there was a procedure or there was --

A On the rare occasion. If it turned out that Opal told me that Dr. Jones needs some help taking out lower wisdom teeth, I'd go down there, show him how to do it, and head back home.

Q Did you have regular schedules at any of the other practices say for the --

A To go --

Q -- Hamilton.

A To go there?

Q Yeah.

A No.

Q And how far away were those practices from your -- your hub or your house?

A Bucyrus was an hour and 45 minutes. Warren was about an hour, depending on the weather. New Carlisle was three and a half hours, depending on the weather. My Family Dental was two and a half hours, depending on the weather. Mentor was closest. It was about 50 minutes, depending on the weather. North Royalton was about 50 minutes, an hour, depending on the weather. It depends on the weather. It shows a lot.
Q Okay. And so -- and how far away was Hamilton from you?
A Five hours.
Q So that was the farthest practice?
A Yeah.
Q And with these practices that you purchased, did you -- did you enter into retention agreements with the previous owners, the previous dentist who you --
A No. The only thing we entered into in was a non -- if they were going to work for - -they could not work within so many miles for so many years. It was a noncompete clause.
Q Okay. But with all the other dental practices that are listed here, say, for Hamilton --
A Uh-huh.
Q -- you had employment agreements with those dentists?
A No, no. They could -- we wanted them to stay as long as they were comfortable.
Q Okay. So they -- they stayed throughout the transition period?

A    Yeah.  No one -- no one was bolting.
Q    After -- after your -- the dentist left -- the dentist who had previously owned the practices, after they departed which seems to be anywhere from eight months to a year --
A    Uh-huh.
Q    -- what was the patient retention like after that?
A    It was pretty good.  We had an associate.  We would just hopefully transition -- the patients understood that their -- you know, if Dr. Jones is leaving after a year, he would let them know.  We would let them know.  We would bump up the associate -- you know, Dr. Jones is -- they had seen him.  They had seen the associate there at the practice.  So it's not like a new face.
     An associate doesn't mean a new grad.  It just means a non-owning dentist.  That's all.
Q    Did you hire any new graduates for any of these practices?
A    No.  No.  That's stupid.  No.
Q    What would you say is the average amount of experience that you would typically employ in these practices?
A    Eight years, ten years if not more.  Eight years.  I wouldn't hire a new graduate.
Q    Okay.  And what about Hamilton?  How old was the -- how experienced were the dentist that you hired there?
A    He was okay.  I never met him.  I just heard he was okay. He was not a new grad.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Q Okay. And how often would you -- what methods would you use to monitor the ongoing operations of these practices?
A Me, none. No. That's -- that was the responsibility of the regional manager. That was Opal's job.
Q Did you have any scheduled appointments or any scheduled check-ins with Opal to determine how the practices were --
A No.
Q -- were running?
A No. Just whenever she called me, if there a problem, she would've told me.

MR. HAUF: Okay. A lot of direct.

What I can do, Your Honor, is I can start on my direct or I can -- this is what I would have done on cross. And they can recross if they'd like.

THE COURT: Just keep asking questions. And we'll figure out where we're at tomorrow.

MR. HAUF: Okay.

BY MR. HAUF:
Q So we'll start at where they say is a good place to start at the beginning. So in 2016, did you obtain a loan for $400,000 from Midwest Bank?
A Yes.
Q And what was the reason for that?
A To purchase Hamilton Family -- Hamilton Family Dental.
Q And what time period did you identify that -- that

practice for purchase?
A By a couple months before we decided to buy it. January, February-ish.
Q Okay. And then at the time you were buying the Hamilton practice specifically --
A Yes, sir.
Q -- what was your occupation at the time?
A I was licensed as a dentist. My job was essentially to acquire new practices.
Q Okay. And as we previously discussed, you weren't the producer at those practices, correct?
A No, no, no, but I was -- I was responsible for them.
Q Okay.
A To get the financing essentially.
Q Okay. And how many other practices had you purchased or sold in that time?
A Seven-ish. Seven or so.
Q And how long had you been buying and selling dental practices?
A I sold my first one in 2005 with -- I met Spencer in 2005, 2006. And I had purchased more practices since 2010.
Q So then the last -- the Hamilton practice was purchased --
A 2016, correct.
Q So --
A Six years, six-ish, if not more.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Q Okay. So -- so from you first sale to the last purchase, it was 11 years?
A Yes, sir.
Q And prior to Hamilton, you were successfully able to manage all of those -- those seven other practices?
A Well, not me. The regional manager did it. I didn't go there. She --
Q Let me be clear. So the -- the practices you were managing, were they -- were they profitable?
A Yes, sir.
Q And they were able to pay you a salary?
A Yes, sir.
Q And how did -- how was Opal Anderson, your regional manager, paid?
A She was paid four percent of the production of every practice on a monthly basis.
Q And what was your pay at the time or what was your salary --
A Right.
Q -- from those practices?
A I was getting $1,500 a week per practice -- or per week.
Q $1,500 per practice?
A Practice per week. Yes, sir.
Q And this was in 2016?
A Yes, sir.

Q So seven times $1,500 a week?
A Yes, sir.
Q What would you estimate you were making?
A 10,000-plus a week.
Q Okay. And how much were you making a year?
A Oh.
Q If you had to estimate.
A Well, 500-plus a year, if not more.
Q Okay. And then with regard to these practices, we've already had testimony about your ownership of the practices listed here on the exhibit; is that correct?
A Yes, sir.
Q And were all of these practices SBA loans?
A Yes, sir.
Q And were you aware that the -- was the Midwest loan an SBA loan as well?
A Yes, sir.
Q And with an SBA loan, does the government guarantee the loan itself?
A Yes, sir, up to 75 percent.

MR. BRAILSFORD: Your Honor, objection to relevance.

THE COURT: Mr. Hauf, the objection is relevance.

BY MR. HAUF:
Q Are these loans easier to acquire because of the government?

MR. BRAILSFORD: Objection. Speculation.

THE COURT: Mr. Hauf?

BY MR. HAUF:

Q Have you ever applied for a non-SBA loan?

A No, sir.

Q So you've only applied for SBA loans specifically?

A Yes, sir.

Q Have you ever been denied a loan for an SBA loan?

A No, sir. I don't believe so.

Q So you've never applied for a loan --

A Oh, no. I'm sorry. There was one we -- I had applied for one. I was going to buy a practice. I'm sorry. I was going to buy a practice in Arizona here with a partner in 2014, '15, something like that, a few years before Hamilton.

Q Okay. And --

THE COURT: I'm not understanding the answer here.

MR. HAUF: Sure. So let me clarify.

BY MR. HAUF:

Q So my question was, have you ever been denied a loan? And if so, when?

A I -- I was applying -- I had applied to purchase a practice with a partner in 2014, I believe. And the -- Spencer's bank turned us down because they felt the partner was too inexperienced.

Q So you attempted to get this loan through Spencer?

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

A Every -- every loan. Yes, sir.
Q Okay. And at any time during the denial process, did Spencer make any indication that the loan was denied because it would be in Arizona?
A No. It was --
MR. BRAILSFORD: Objection, Your Honor. That's hearsay.
THE COURT: Mr. Hauf?
BY MR. HAUF:
Q So to your knowledge, was the reason that the loan was denied because it was in Arizona?
A Not at all.
MR. BRAILSFORD: Objection. Foundation. And he's also leading the witness, Your Honor.
THE COURT: Mr. Hauf?
MR. HAUF: I'll rephrase the question.
THE COURT: Please.
BY MR. HAUF:
Q What was your process in applying for the Arizona loan?
MR. BRAILSFORD: Objection. Relevance, Your Honor.
MR. HAUF: Your Honor, this goes towards, A, his prior contact with Spencer and the fact that he had attempted to get a loan in Arizona. I think that's very relevant towards the bank's knowledge. And whether or not the bank denied him an Arizona loan based upon the fact that it was in Arizona I

think is also relevant.

MR. BRAILSFORD: Your Honor, at the time of this alleged Arizona loan, Spencer was not mid -- with Midwest Bank. And I think Dr. Raiffe has previously testified that he did not view Spencer Twyford as Midwest Bank. So again, this Arizona loan has no relevance to this case whatsoever.

THE COURT: So Mr. Hauf, it sounds like Spencer was not with this bank at the time in 2014. Where is the relevance?

MR. HAUF: Sure, Your Honor. All these loans were SBA loans. These loans existed -- or the previous loans we've discussed also existed prior to this loan application. So the relevance is was this loan denied because it was in Arizona.

THE COURT: But how would he know that?

MR. HAUF: Typically they'll tell him why it was denied. Especially if Spencer, as he said, doesn't necessarily represent the bank, Spencer would have at least relayed -- or we can find out the doctor's understanding of why the loan was denied.

MR. BRAILSFORD: Your Honor, why the loan was denied has no bearing or relevance here because that loan did not involve Midwest Bank.

THE COURT: Mr. Hauf?

MR. HAUF: I think his state of mind as to why his loan was denied is important. This case hinges upon the

doctor's state of mind individually. And so I'd like to see whether or not there was any indication that the loan was denied because of his personal debt or whether it was denied for some other reason.

THE COURT: The objection is overruled. But --

MR. HAUF: So based upon --

THE COURT: Let's establish who was where, when, and let's make this quick.

MR. HAUF: Okay. Thank you, Your Honor.

BY MR. HAUF:

Q Who helped you -- who -- with whom did you discuss getting the loan?

THE COURT: For the -- for an Arizona purchase?

BY MR. HAUF:

Q For the Arizona purchase.

A I was working with the local practice broker here. And it was the local practice broker's son who's a recent dental school grad. And we were going to buy two practices and merge them. But Spencer told me that he had to decline the loan because the other --

MR. BRAILSFORD: And this is hearsay, Your Honor.

THE COURT: Let's first establish where Spencer was working.

MR. HAUF: All right.

///

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

BY MR. HAUF:
Q Where was Spencer working at the time of this application to your knowledge?
A A different bank. This was in 2014, 2015. It could've been Lorraine. It could've been National City. I don't remember which bank.
Q He wasn't with Northwest?
A No, sir.
Q Okay. And so you applied for the loan?
A Midwest.
Q Or Midwest.
A Yes.
Q You applied for the loan through a local broker who contacted Spencer?
A Yes, sir.
Q At your direction or did they simply work with Spencer?
A No. I -- spencer was always my go-to banker.
Q So you instructed the broker to contact Spencer?
A Yeah.
Q And then Spencer said he -- the bank would not fund the loan why?
MR. BRAILSFORD: Again, this is hearsay, Your Honor.
THE COURT: It is hearsay.
MR. BRAILSFORD: And there is no foundation.
///

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

BY MR. HAUF:

Q To your understanding, why did the -- the bank denied the loan, correct?

A Yes, sir.

Q And was there ever an understanding as to why they denied the loan on your part?

A Yes, sir.

Q And what was that understanding?

MR. HAUF: I think we're, again, in hearsay, Your Honor.

THE COURT: Well, it's --

MR. BRAILSFORD: I'm asking what his personal understanding was.

THE COURT: You're asking what the understanding is. And that's not hearsay. But please answer the question without telling us what somebody told you. You have to come to -- tell us what your understanding was as to what --

THE WITNESS: My -- my understanding is that a bank, Spencer, felt the -- my future partner was too inexperienced.

BY MR. HAUF:

Q Okay. Thank you. And --

THE COURT: Can we move on then?

MR. HAUF: Yes.

BY MR. HAUF:

Q And you then continued to purchase practices after that?

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

A Yes, sir.
Q What practices did you purchase after that?
A The first one was Kenmore Family Dental in Akron.
Q Which stayed afloat and turned a profit, correct?
A Excuse me?
Q Which continued to operate after its purchase?
A Yes, sir.
Q And paid you your stipend of $1,500 a week?
A Yes, sir.
Q And what was the next practice you purchased?
A I believe the next one was Bucyrus Family Dental.
Q And same question as before. That one continued to operate --
A Yes, sir.
Q -- and was profitable? And so these loans were all accepted based upon your personal status, your financials at the time, correct?
A Yes, sir.
Q Now, in applying for these loans, you had testified previously that your regional manager, Opal Anderson --
A Yes, sir.
Q -- she was the one who helped you complete or fill out the information necessary to acquire these loans?
A I think she did more than help. She did it.
Q And what do you mean by that?

A She said Chris found us a new practice.

MR. BRAILSFORD: Objection. Hearsay, Your Honor.

BY MR. HAUF:

Q So without telling me what she said, what was your process in acquisition?

A Oh, okay. The practice broker, Chris Vandiford, would approach me, said I think we've got a great practice for you, go look at it. I said, yep, it looks nice. He said, I'll contact Spencer; we'll get things going.

Q Okay.

A That's essentially -- that's exactly it actually.

Q And then would Spencer call you?

A Why? About what?

Q About the SBA process, the loan?

A Oh, no. He -- he never dealt with me. No.

Q Spencer Twyford?

A No, no. I know. Spencer Twyford. Why would -- he would never deal with me. He -- Opal was the person that -- they -- they talked the same language. It works better. She filled out everything, took care of it.

Q Okay. And besides filling out loan documents, what other duties did Opal have?

A Filled out credentialing information for me, took care of whatever loans I had. She paid my bills personally. She would make sure I got paid every week. That's more important than

anything. Make sure -- if I had credit cards that needed to be paid, she paid them for me.

Q So let's break that down. What type of information did she need to work on your credentialing?

A Everything, mostly name, rank, and serial number. Credentialing is pretty straightforward; where I went to school, years in practice, whether I had malpractice coverage. It's basically the credentialing insurance companies needed so you can be employed -- so you can get -- work with their insurance.

Q Okay. And then you said that she also paid all the practice bills; is that correct?

A Yes, sir. Yes, sir.

MR. BRAILSFORD: Objection. He's asking for hearsay, Your Honor.

MR. HAUF: I'll rephrase the question, Your Honor.

BY MR. HAUF:

Q She said -- you also said that one of her duties --

A Yes, sir.

Q -- was to pay the practice bills.

A Yes, sir.

Q And --

A She took care of staff, equipment, supplies, taxes, mortgage, everything. She did it.

Q Did she pay the payroll as well? Was she responsible for

processing the payroll?
A Everything.
Q And you also said that one of her duties, more or less, was that she was responsible for paying your personal expenses also?
A Yes, sir.
Q And what did those personal expenses consist of that she would be responsible for paying?
A Car loan -- car leases I should say, car leases, credit cards. That was mostly it. Yeah.
Q Okay. And so -- and once again, this testimony was already given to some extent. But what personal information would she normally have access to in order to complete that -- those job duties, credentialing, bill payment?
A Everything; my bank account, all the practice accounts, my personal bank account, my tax returns. Everything.
Q Did she have access to your personal financial records as well?
A Yes, sir.
Q What about your bank -- or your birthday? Did she also have access to that?
A Yes, sir.
Q And then did she have the passwords for your bank accounts, your online access?
A Yes, sir.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Q And this is for both business and personal?
A Yes, sir.
Q Did she know your bank account numbers?
A Yes, sir.
Q Did she know all of your bank account numbers and the financial institutions with --
A Yes, sir.
Q -- respect --
MR. BRAILSFORD: Objection. Foundation.
BY MR. HAUF:
Q To your knowledge, based upon her interactions with your personal finances, would she have been aware of all of your --
MR. HAUF: Well, let me back up. Let me withdraw the question.
BY MR. HAUF:
Q You said that Opal was responsible for paying your personal bills?
A Yes, sir.
Q How did she pay those?
A I would give her --
MR. BRAILSFORD: Objection to foundation.
THE COURT: Mr. Hauf?
MR. HAUF: Well, at this point, I'll rephrase the question.
///

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BY MR. HAUF:

Q So in this particular circumstance, you said that Opal was functioning as essentially your personal bookkeeper?

A We used -- we used to call it a gal Friday back in the old days. Yes, sir.

Q Okay. And as part of that process, she would pay all of your -- she would pay most of your personal expenses?

A Yes, sir.

Q And these expenses would include -- what about utilities?

A No. Mostly -- it mostly is my credit cards, my car loans, and anything that related to the practices which was plenty.

MR. BRAILSFORD: Your Honor, we've allowed several leading questions to go. But we want an objection that counsel is leading, continuously leading the witness.

THE COURT: Okay. Mr. Hauf, let's try to avoid leading questions.

MR. HAUF: Okay. I will do my best, Your Honor.

BY MR. HAUF:

Q With regard to her functions with your accounts personally, you already testified that she paid all of your personal expenses.

A Yes, sir.

Q And what oversight did you provide in that process?

A Why would I?

Q And did she complete the paperwork for your Arizona home

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

purchase?
A    Yeah.
Q    How did that process come about?
A    They gave me a stack of financial stuff.  I told her to fill it out, send it.
Q    And let's back up a bit and talk about the Arizona home purchased.  How long had -- have you been looking to move to Arizona?
A    2014 easily.
Q    Okay.
A    Six years.
Q    And how did you identify this house, this purchase?
A    My wife identified it.
Q    Okay.  So did you fly to Arizona to look at the house?
A    Many times.
Q    And what period did you start looking at the house to purchase?
A    2014-ish.  We'd fly out here, start looking at houses.
Q    Okay.  And so once you identified a house that you wanted to purchase --
A    Once my wife identified a house I wanted to purchase.
Q    -- what was your process after that?
A    What do you mean?  Applied for a -- a loan.  They had to run my credit score.  I had to fill out -- paperwork needed to be filled out.  I needed a deposit which I didn't realize.  I

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

needed 20 percent down.

Q Was this a standard loan?

A As opposed to what?

Q Was it your understanding that this was just a regular loan?

A Yeah.

Q Conventional --

A I never bought a house before, so this was new to me.

Q Okay. And why did you give Opal so much access to your personal information?

A I trusted her.

Q And I'll turn now to what would be Exhibit 1, Plaintiff's Exhibit 1. Okay. We've had a lot of testimony about this. Can you identify this document?

A Yes, sir. It states it's a personal financial statement from the Small Business Administration.

Q And what date is on the top?

A May 29th, 2016.

Q Do you know why it states that date?

A No, I do not.

Q Prior to May 29th, 2016, how many loans did you take out with the Small Business Administration?

A Seven, I believe.

Q Do you know if the same forms were used for all seven of those applications?

A I have no idea.

Q And I'll scroll down here on page 2. Do you know if -- is that your signature?

A I've testified before, sir, I can't be sure. It's most likely from my regional manager.

Q Okay. And is this document correct?

A No. There's a couple boo-boos on it.

Q Why not? What are those --

A Well, if you -- I have to go to other -- the previous page, the first page I guess. If you look at it, it -- one of the things that just -- if you go up a little further, I'm sorry. Right -- the date's not right. I wasn't anywhere near Hamilton on May 29th I can assure you. If you go down a little further, it says my income was 80,000 a year. That's just not close. And that's just -- it's kind of glaring.

Q Are there any other issues that you've identified in there?

A If you go to the second page, well, if you look where it says one dental group, I -- well, you missed it. But if you go up a little further, it also shows my residence, Royal Portrush in Solon. I didn't own the house. That's my wife's property. May 17th, I wasn't near a fax machine, definitely not from Warren because we were -- we were moving. I was -- if I -- if I needed to fax something, I had a fax machine at home. There's no reason for me to drive an hour and ten minutes to

Warren to fax something.

Q And with regard to this document, it does list -- did this list all of your personal liabilities to your knowledge?

A No, sir.

Q What would --

A Oh. Doesn't describe my debts. We had car loans. I had student loans. I had loans from my stepson's car, my daughter's car, my car. It doesn't list it anywhere, sir.

Q Okay. And I don't know if I can get this to the side screen. We'll try. On Exhibit 47, page --

A Excuse me.

Q -- 151. So I've zoomed in on this. This is page 151. I'll scroll to the top. This is your personal financial statement.

A Okay.

Q Look at installment debt. Can you identify those debts?

A You mean on the left-hand side, number 1 to 10?

Q Correct.

A Yeah. They're just loans I had out for one car, two car, three cars, four cars, five cars and my student loans. And there's also a first data lease which I have no idea what that is. I have no idea.

Q And are all of these loans -- were you currently paying all of those loans when this --

A At that time? Yes, sir.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. HAUF: Okay. A minute, Your Honor. Let me shut these down so that we can compare that with Exhibit 1.

BY MR. HAUF:

Q On the right, I have those loans listed there and the current balance. Do you see what the current balance is in that exhibit?

A Yes, sir.

Q What's that current balance? I'll try and frame exhibit so you can --

A You keep moving it. 260,000 and change, I believe.

Q Okay. And on Exhibit 1 -- I'll highlight that. Do they list those -- what does the auto installment account say?

A I don't see it listed on there, sir.

Q And on the right, are all these liabilities your personal liabilities? Do you know?

A Yes, sir.

Q And they are not listed on the personal financial statement?

A No, sir. I don't see it.

Q At any time, were you requested to amend the personal financial statement that had these liabilities?

A No, sir. I don't believe so.

Q And on the -- on the bottom next to the signature, is there a date by your signature?

A No, sir.

Q And is there a social security number next to it?
A No, sir.
THE COURT: Mr. Hauf, you've got a minute.
MR. HAUF: Okay.
BY MR. HAUF:
Q Did you have any intent to defraud Midwest in May, June, or July of 2016?
A No. Why -- why would I do that? I was making tons of money. Money was rolling in. No. No intent to defraud anybody, sir.
Q Did you believe you could pay back the loan?
A Yes, sir.
Q How much is the payment on a $400,000 loan?
A Rule of thumb is essentially it's $1,000 for every $100,000 you borrow, give or take. It's crude, but it's close. So a $400,000 loan, monthly repayment would probably be 3,500-ish, 3,600 or so.
Q At the time, was Hamilton making money to pay that loan?
A Yes, sir.
Q At the time, were you personally making enough money to pay that loan?
A And then some. Yes, sir.
MR. HAUF: And since we're at 5:00, I --
THE WITNESS: Okay.
THE COURT: Okay. We're going to adjourn for the

day. And then it's my understanding, Mr. Street, you can count on being the first witness at 9:00 tomorrow morning.

Correct, Mr. Hauf?

MR. HAUF: Correct.

THE COURT: Okay. We'll see everybody at 9:00 in the morning.

(Proceedings Concluded)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated: February 3, 2020

Harold Ferguson

eScribers, LLC
7227 N. 16th Street
Suite #207
Phoenix, AZ 85020