UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| DAVID RAIFFE CH: 7 | ) | 2:18-BK-15086-DPC |
| | ) | |
| UNITED MIDWEST SAVINGS BANK DBA MIDWEST | ) | ADV: 2-19-00098 |
| vs DAVID RAIFFE | ) | |
| | ) | |
| CONTINUED TRIAL | ) | |

U.S. Bankruptcy Court
230 N. First Avenue, Suite 101
Phoenix, AZ 85003-1706

January 28, 2020
9:00 a.m.

BEFORE THE HONORABLE DANIEL P. COLLINS, Judge

APPEARANCES:

For United Midwest Savings Bank dba Midwest Business Capital:
Anthony W. Austin
Philip L. Brailsford
Craig Street
FENNEMORE CRAIG
2394 East Camelback Road
Suite 600
Phoenix, AZ 85016-3429

For David Raiffe:
Adam E. Hauf
HAUF LAW, PLC.
8102 N. 23rd Avenue Suite E
Phoenix, AZ 85021

Proceedings recorded by electronic sound technician, Renee Bryant; transcript produced by eScribers, LLC.

INDEX

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES: | | | | |
| Craig Street | | | | |
| (By Mr. Hauf) | | 4 | | |
| (By Mr. Brailsford) | | | 44 | |
| (By Mr. Hauf) | | | | 61 |
| Dr. David Raiffe | | | | |
| (By Mr. Hauf) | 66 | | | |
| (By Mr. Brailsford) | | 87 | | |
| (By Mr. Hauf) | | | 111 | |

| EXHIBITS: | Offered | Received |
|---|---|---|
| F | 67 | 67 |


escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

THE CLERK: In the case 18-15086, David Raiffe, with Adversary 19-98.

THE COURT: Appearances on the Raiffe matter, please.

MR. HAUF: Good morning, Your Honor. Adam Hauf, appearing on behalf of the Debtor Defendant. And the Debtor is in the room.

THE COURT: Morning.

MR. BRAILSFORD: Good morning, Your Honor. Phil Brailsford and Anthony Austin on behalf of United Midwest Bank and Craig Street here on behalf of the bank as well.

THE COURT: Thank you. Any preliminary matters we should be discussing before we get started this morning? Mr. Brailsford?

MR. BRAILSFORD: Not from the Plaintiff, Your Honor.

THE COURT: Mr. Hauf?

MR. HAUF: Not from our side either, Your Honor.

THE COURT: Okay. Then I understood that we were going to call Mr. Street back to the stand, is that correct?

MR. BRAILSFORD: That's my understanding, yes, Your Honor.

THE COURT: Mr. Hauf, you're ready to proceed with his cross-examination?

MR. HAUF: I am, yes.

THE COURT: Okay.

MR. HAUF: That is our understanding as well, Your

Honor.

THE COURT: All right. Mr. Street, if you'd come forward. You're still under oath. You understand that correct?

THE WITNESS: Yes, sir.

THE COURT: All right.

MR. BRAILSFORD: And, Your Honor, we do not have a travel restriction, just to make sure that's --

THE COURT: Okay.

MR. BRAILSFORD: -- clear.

THE COURT: Mr. Street, it sounds like we've got you as long as they want to have you.

THE WITNESS: Beautiful city. Excellent coffee.

THE COURT: Not in my chambers.

CRAIG STREET, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION

BY MR. HAUF:

Q Good morning, Mr. Street.

A Thank you.

Q Thank you for being here this morning. So we already heard your testimony on direct. What I'm going to do is ask you a few very specific questions. I'll start with what was Exhibit -- Plaintiff's Exhibit 1.

MR. HAUF: Go full screen on that.

///

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BY MR. HAUF:
Q Now, in your previous testimony, Mr. Street, you stated that Exhibit 1, the personal financial statement is a foundation document, is that correct?
A Yes, it is.
Q And -- and typically if there's any significant or major errors in the document, do you require the applicant to go back and amend those errors?
A If we're aware of them, sure.
Q Okay. And so I want to draw your attention here to a portion of the exhibit under section 1, a source of income, salary. Do you see that portion of the exhibit?
A I do.
Q And it lists the applicant's salary at $80,000, is that correct?
A It's what it says.
Q Perfect. Thank you. I will go to Exhibit 47, Plaintiff's Exhibit 47. And I want to go to -- now, this the -- this exhibit is the underwriting exhibit, correct?
A Yes.
Q And so this would be what underwriting uses as his personal financial statement?
A Right.
Q And I want you to look at -- this is the individual financial statement of David M. Raiffe. You see that?

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

A Sure.
Q Perfect. Thank you. And so the first thing I want to draw your attention to is this, these are installment debts. Do you see that?
A Yes.
Q And so if I understand this correctly, all these installment debts total including what are ostensibly student loans and vehicle loans, $261,000. Is that -- let me zoom out a little bit more -- is that correct?
A What I see.
Q Okay. And so if I can go back to what was the installment -- or the personal financial statement. And this was the applicant's personal financial statement. I will zoom in on what are the automobile installment accounts. And that's -- that's about $150,000. Do you see that?
A Yes.
Q And then where would his student loan accounts be listed on there?
A Well, you would expect to see them in installment accounts. And I would interpret this where it says -- immediately under installment account auto, there's installment account other, it says 906 ST loans. So I would have interpreted that as -- that could conceivably be student loans.
Q Okay. So as far as just the automobile loans, it seems a little bit light as far as what the total amounts would be.

With those automobiles and those numbers listed, would you have him generally go back and amend that to include the higher values listed in his underwriting personal financial statement?

MR. BRAILSFORD: Objection. Speculation.

BY MR. HAUF:

Q It's a normal -- under your normal process, we see that it differs from the personal financial statement in the -- in the underwriting personal financial statement. From this personal financial statement, would you normally, as part of the process, have the borrower amend the financial statement to make those two numbers jive, if in your underwriting financial statement you found additional liabilities?

MR. BRAILSFORD: Objection. Calls for speculation.

MR. HAUF: Your Honor, we're talking about the process and what they would generally do in a case like this.

THE COURT: Overruled. Please answer the question.

THE WITNESS: Sure. In order to answer the question, I think I would need to speak more to the -- to the underwriting process. And when this document is received as we've already spoken to, there are a number of things that happen, one of which is a personal credit bureau.

So that conversation typically takes place with the underwriter and the lender and then -- and conceivably then with the borrower.

So, you know, if we're trying to say does this line

up exactly with the underwriting document, you know, obviously it does not. And in some cases, you know, this -- the question then is what constitutes materiality as to what that dialog is in the underwriting process between our borrower and the underwriter.

So I can only assume -- I never saw the personal financial statement. I typically don't. That's an application document. And then it is translated into a credit memorandum by -- you know, an experienced underwriter and lender. And so what -- what transpired in that dialog to why, you know, it doesn't reconcile, I will freely tell you, do I wish it reconciled more closely, I do.

BY MR. HAUF:

Q Okay.

A But it's not -- it's not inherently problematic or automatic that there be some discrepancy.

Q So in the loan committee, is the only document you're reviewing then, the credit analysis, this Exhibit 47?

A Unless there are other questions that a committee member would have. This is -- again, we do a large volume of loans. And we -- depending upon exposure, we have different committee levels. For a loan of this size, it would be unusual for me to look at anything other than just this credit document because all of the required information is underwritten and encapsulated into this document.

Q    Plus --
A    That doesn't mean --
Q    Plus more information such as --
A    Oh, yeah.
Q    -- things you find in the --
A    Right.
Q    -- credit reporting, for example.
A    Exactly.  It is all -- it is all compiled and it comes to us in this package.  That -- you know, again, these are human beings, you know, processing, you know, and in communication with a live borrower that are, you know, that are assimilating this information.  So oftentimes as is the case and as we've heard from Dr. Raiffe, there are moving parts and with some borrowers, you know, getting -- getting the exact number, I mean, the sheer magnitude of the debt clearly he was buying and selling and doing things.  And that's not automatically atypical so -- for someone with a business the size that his enterprise was.

So, you know, for this to not line up exactly is not automatically problematic, but I understand -- I mean, I can understand from the question you know where you are going is no, it does not.  It does not reconcile exactly.  And I wish it did.
Q    Understood.  And believe we're in the field where we wish things always reconciled.  So you said it's not -- it's not

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

uncommon for borrowers to buy and sell assets in between the application process and the underwriting process --
A There's --
Q -- if I understood that correctly. I'm trying to --
A There is. And there is a degree of materiality that does not have a specific definition as far as materiality to when you would request a new personal financial statement. If someone's gotten a new credit card or a car, you may -- you may say, okay, and the underwriter will note, you know, in the analysis. You know, it's --
Q So --
A -- you know, at some dollar amount, I mean, for the sake of argument, let's say over a million dollars, that would be considered, you know, material. Or an address.
Q What about the -- so if I understand correct, you said you don't -- you never saw the personal financial statements. Since there's two, which one were you talking about, the Exhibit 1 or this 47, this underwriting document?
A Underwriting memo and the underwriting document that we're referring to that you have up on the screen right now, that document in its totality is what I saw. I did not see the personal financial statement until some point in time after the loan closed.
Q Okay.
A I think the first time I may have seen that was either

when the loan began to experience difficulty or it may have come up at one point. I know one of these practices was sold and I believe our bank financed one of those sales. And so at some point, in the normal course of business, we require updated personal and business financial information in the servicing of the loan.

Q Under --

A But I did not see the personal financial statement at the time of origination.

Q Okay. And so you see what this document is, the --

A Sure.

Q -- the underwriting document.

A Sure.

Q And this has all the changes and anything that deviates from the personal financial statement.

A Uh-huh. I mean, I can speak to our opinion on the salary number as well, if you'd like.

Q Yeah. Well, let me get to that then. So I have a -- I'm going to ask you a question with regard to -- I'll go to Exhibit 47. And let's move to what would be Bates stamp 53. Actually that would be Bates stamp -- so this is -- let me bring that full screen for you. Okay. So -- so this document -- this is the personal cash flow exhibit. This is the -- this is where you would list his income, is that correct?

A Right.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Q And would this income include his wife's income typically?
A It -- it would depend upon if the spouse were guaranteeing the loan or if she were part of the business. So, typically, it is a very broad -- I can't really answer because it would depend upon the spouse's involvement in the business --
Q Well --
A -- and/or her willingness to be a guarantor.
Q And that's fair enough. Let me direct it a little more specifically. Here it says spouse is not a guarantor.
A Right.
Q You see that? So this wouldn't include the spouse's income?
A Right.
Q And so I'm looking at the -- and as -- I think you testified to this, but this column here notes how many months we're discussing?
A Yes.
Q And so this -- these columns here, 13, 14, 15, 16, that would be his income for those years, is that correct?
A This is a document that I think I alluded to yesterday which is used to determine what we call global cash flow.
Q Okay.
A So those numbers are typically taken from the -- those would be taken from the W2 wages from someone's tax return. So -- well, go ahead and answer (sic) your question --

Q Well, my --
A -- because I can speak to the 80,000 difference and why that was not alarming as well.
Q Well, yeah, I guess that's my question is --
A Sure.
Q -- is to me -- well, what is considered material? Because in this case, 2015 showed $265,000 for the three --
A Sure.
Q -- months. In 2016, it showed 53,000. So it looks like 2016 is about commensurate with 2015's income, is that correct?
A Can you repeat that?
Q Sure. So -- 2016 based upon these numbers are showing the same trends and income as the previous years?
A Yes.
Q Okay.
A It would seem like it, sure.
Q And so why is $80,000 disclosure in income not material when it was actually $265,000?
A Right. So this -- I mean, I can't speak specifically to Dr. Raiffe's intent. I'll speak to small business owners. I think as I alluded to and why we calculate global cash flow, small business lives and businesses are typically very intertwined, hence the need and the foundational -- the requirement for what we call global cash flow.

We heard -- we heard yesterday Dr. Raiffe say he was making $500,000 a year. I'm not here to speak -- that's between him and the IRS because that's not what -- you know, what his W2s were showing. So but we're not --

Q Well --

A -- we're not -- I'm not here --

Q Hang --

A -- I'm not here for that.

Q Well, since you bring that up --

A So often --

Q -- specifically, let's look at Exhibit F, which is the -- the 1040 for 2015. So this would have been the full tax return that -- now you would have required this 2015 tax submittal, right?

A Exactly. And here's a good example. I can explain it all. Sorry. I'm not trying --

Q Well, no. I'll --

A -- to get ahead of you.

Q -- I'll -- let me just direct the questions. I do appreciate your expertise. So --

A You bet.

Q -- Line 7 is wages, tips and W2, is that correct?

A Sure.

Q And then if we go to -- I don't know why it wouldn't let me. Let me go to the W2. So this is Mrs. Raiffe's W2.

A Okay.
Q And so you can see her W2 income. Would that normally be incorporated into that Line 7, since it was a joint return?
A Yeah. You would -- I mean, that number would be part of that, sure.
Q Okay. So if we go back and look at Line 7 again --
A Yeah.
Q -- what we're looking at is -- it looks like wages would include hers of about 100 and --
A Uh-huh.
Q -- $100,000. And then it looks like the combined amount is $766,000.
A Right. Right.
Q So from a global cash flow perspective, would you use what is Line 22 in your calculations? Or did you derive your own numbers from --
A Again -- again, we take it -- we don't take things directly from here. There's pieces of this -- and this is a great example of what we're talking about and why global cash flow is so important and why we look at this. There were salary wages from multiple people, salary -- you know formal salary and W2 wages. Then there were business income that -- that we then have to separate out. Are these -- are we underwriting all the businesses? Because, you know, Dr. Raiffe had a lot going on and was -- and was at this point in time,

there were a lot of business entities generating quite a bit of income.

Q Okay. So that's --

A So --

Q So when you're creating a loan, that's a pretty document-intensive process then.

A It is.

Q And so you had this income information, obviously, because of the 2015 --

A Sure.

Q -- income. And then we'll go back to the 47. Whatever formula you use, you derived that his income was $265,000 for 2015 -- oh, let me zoom that in for you so you can see it easier.

A Yes. Yes.

Q So 2015, you said his income was $265,000. And that was just -- that was a number that you calculate and derive from his tax returns and his -- and his other financials?

A What we -- what we typical -- what is typically done, and again, this is -- this is science and art, and particularly when the -- every underwriter is charged --

Q Well, and specifically -- I don't mean to interrupt. I don't want any sort of, kind of, inside baseball. What we're just looking at is kind of the 30,000-foot view. So when we're looking at these numbers, it sounds like the PFS has no

bearing on how you calculate these numbers. You look at his tax returns --

A I would not say that, no.

Q Well, in this particular case, it said 80,000. And this number said 265,000. Is that correct? They are different?

A I would agree that 80,000 does not equal 265,000.

Q There's that old joke that attorneys don't become attorneys because they're good at math, right? So the $265,000, you put in all the -- as you said, Dr. Raiffe had a lot of -- a lot of irons in the fire. You put all those documents together and do you derive that number for him, for this global cash flow?

A We underwrite what an individual -- global cash flow means determining what is recurring and what an individual borrower needs for themself (sic), and then to -- to pay their own personal responsibilities and obligations. So --

Q So --

A -- we attempt to determine what is for certain going to -- a borrower, what are they taking and what are they, not necessarily living on but what do they need to live on? And then from there, we incorporate all the other income that is available for servicing business debt. Hence the term global cash flow. It's a process. And the more -- the more variables you have, the more room for error there is.

Q Right. I guess my question really is -- is really

isolated. It's going to be -- Dr. Raiffe didn't re-prepare his income numbers and give them to you for this underwriting package.

A Didn't re-prepare?

Q So, when you created this $265,000 income number --

A Uh-huh.

Q -- you don't call Dr. Raiffe up and say, "Hey, your income's not the same on your personal financial statement submitted. Please give us a new income number."

A I can't speak to what dialog transpired in the underwriting process.

Q So in the a typical loan --

A Uh-huh.

Q -- in a case like this, we have a doctor who you said is quite busy, he has a lot of things going on and doctors can typically sell --

A Sure.

Q -- and buy new assets while this is happening.

A Right.

Q Who -- who runs this calculation? How do you derive this number? I don't want the facts -- or the formulas or how you derive it. I just want to know who puts it together in your office. Does --

A Our underwriter would put that together either in conjunction -- sometimes they speak with the customer directly.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Often, most often, they go through the lender.
Q Okay.
A Which in this case would have been Spencer. So Adam, to put proper nouns to this, as our -- the names on this document with -- from United Midwest, Adam Weesie was the underwriter, Spencer Twyford, as the lender, would have been working in conjunction. Based on the history that Spencer had with the doctor, you know, I can only assume that most of that dialog went through Spencer.
Q Okay.
A I don't know.
Q And then, I want to go down here to -- we're still on the, what is the underwriting PSF. So this was the document that you saw, right?
A Uh-huh.
Q I want to point to the residential mortgage. We talked a little bit about this before.
A Right.
Q So, as part of this global cash flow, what the doctor is paying for a mortgage payment would be included in that, is that correct?
A You have to -- right. That's a living expense. And this was spoken to a little bit in Spencer's testimony. What is typical is you get a household, personal financial statement. With your -- most run of the mill small business owners, you

don't have, you know, one spouse owning -- you know, and assets being held in one person's name. So -- in a case like this one that, you know -- and this is not unusual, many professionals have, you know, especially their house titled in maybe one spouse's name or the other. So again, part of calculating global cash flow is you have to account just because Dr. Raiffe, the mortgage was in his name and the house was in there, he lived in the house and we had to account -- we -- you know, prudent underwriting is your account for some amount of a living expense.

Q Okay. So --

A If they rent an apartment, we ballpark a rent number cause no one -- no one has zero rent expense.

Q And we discussed that. Unless --

A Housing expense.

Q -- I think -- I think the example was if you have a paid off house.

A Yeah. And even then you're still paying property taxes and you own a house. So there's some amount. So prudent underwriting says there's some number here. And in this case -- in this case, the mortgage was disclosed. And that's why we used the -- the 23,000 was annual payments from the number --

Q So, even though --

A -- that was disclosed.

Q So in global cash flow, which you've mentioned several times, this is part of that process, it sounds like -- is global cash flow one of the more important measurements of one's ability to repay a loan or whether you decide to give them a loan?
A Yeah, that's fair.
Q Okay. And so if I understand global cash flow correctly, it's essentially how much money will the doctor need to support himself and his personal expenses in the business. Is a fair summary?
A That's fair.
Q And so, if -- if there is a new debt added, the big concern with that debt liability is that it would affect not the debt itself but the service on that debt, how much the debt will affect the global cash flow.
A Sure.

MR. BRAILSFORD: Objection. Calls for speculation.

BY MR. HAUF:
Q So, I'm asking in a typical loan and as it relates to global cash flow how the bank would look at a new loan and the associated payment.
A Having -- having an accurate assessment of what an individual's total obligations are is very important.
Q Absolutely. We all agree on that. But what's also -- it sounds like more important is how much those obligations cost

to service, is that correct, as part of that entire global cash flow.

MR. BRAILSFORD: Your Honor, that misstates his testimony.

THE COURT: Please re-ask the question.

MR. HAUF: Sure.

BY MR. HAUF:

Q So my understanding with global cash flow is it determines as we previously stated how much will be required to service the Debtor's personal needs -- or the borrower's personal needs and their business needs. And so you need to know how much debt they owe because that will then tell you what their payments are on that debt and then factor into that entire global cash flow number. Is that correct?

A I'm not sure how it's different than what we've said. But okay.

Q Okay. So my question really is, and this is if -- if a new debt is added -- so we talk about dentists buy and sell and have different debts and income. If a new debt is added between the PFS and this underwriting process, is the amount of debt as important as the payment? Meaning, if I had a very small debt and it had a huge payment, would that -- that significantly affect the global cash flow, would that be a material change?

MR. BRAILSFORD: Objection. Calls for speculation.

MR. HAUF: Once again, I'm asking about his opinion on a general loan, not this specific loan.

THE COURT: Overruled.

THE WITNESS: I think both are important. I think again this gets to the magnitude if you were to borrow $10 million, $100 million, but it's interest free for X number of years, you're still going to have to pay it at some point so I guess I wouldn't say that the -- one is certainly more immediate than another, but I would not say that one is relevant and the other one is not. They're both -- they're both debts. If I'm extending credit to somebody over an extended period of time, then knowing what they're total obligations are or may be in the future is certainly relevant.

BY MR. HAUF:

Q Well, let me use a smaller example since I've not personally had the opportunity to deal with $20 million.

A Right.

Q Let's talk about $50,000. So if I --

A Sure.

Q -- if I take a 20 percent interest loan on a -- per year -- on $50,000 and the servicing is something like $2500 a month, the debt load may not be that high, but the payment -- would that more significantly affect global cash flow?

A Obviously higher payments have a more immediate impact.

Q Okay.
A And -- but both are relevant because at some point in time, they've got to be paid. So that gets into -- and I apologize, I can't tell you -- I mean, everything is relevant in perspective to the amount of the debt.
Q Right. And so there's -- is there a threshold debt amount where if someone has a debt incurrence they automatically get disqualified for a loan or do you need to find out payments and figure out the calculation as it relates to global cash flow?

MR. BRAILSFORD: Your Honor, we're teetering dangerously close to the debt to income ratio that Defense fought so hard to keep out.

MR. HAUF: I don't see how I'm talking about debt to income ratio. I'm really just talking about cash flow. And that's really what I'm interested here is --

THE COURT: You're really talking about two different things. One is the magnitude of debt generally. And then you're talking about this global cash flow analysis. And I think you've established that just because you have a huge debt doesn't mean you're going to dramatically change the global cash flow. So I get that, but let's focus --

MR. HAUF: Okay.

THE COURT: -- on what you want him to answer without treading on these ratios that we agreed we weren't going to go

into.

MR. HAUF: Thank you, Your Honor.

BY MR. HAUF:

Q So let me back a bit from this. You mentioned something I wanted to touch base on and that was you said that you don't normally look at anything but the -- you said for a loan of this size you don't look at anything but the 47 or the underwriting documents. What did you mean by a loan of this size?

A So, in our bank, the management loan committee of which I am a member of had -- at the time this loan was made had approval authority up to a million and a half dollars. There are transactions where -- that are more involved. The larger a loan amount is, for example, an automatic one would be when a loan exceeds my committee's approval authority and we are presenting to our board loan committee on say for example, a $2 million, I will -- I tend to look more closely at certain documents, but not automatically.

In our world -- so my reference and the characterization was to -- was that, in our world this was a fairly small loan. It was a, obviously, a fairly complicated underwriting and fairly complicated borrower, but a fairly small exposure. So hence why in this case -- and there are many other cases, I don't read more than the credit -- credit memo. I certainly wish that I had.

Q And so let's look at -- let's see if I can easily do this. We're still on what was the Number 47.
A Sure.
Q This was the -- this is the underwriting document, since this was the document, so --
A Sure.
Q I wanted some expansion on -- make sure I -- there we go. So I'm just -- this is the first page of Exhibit -- so you have some reference. This is Exhibit 47. This is the first page of the credit analysis.
A Sure.
Q And so I'm just looking here. And I'm not going to ask you about LTV. That's not what I care about. But can you see what it says at the end? Not a policy exception. It's mitigated by the government guaranty.

MR. BRAILSFORD: Your Honor, objection. It's not relevant.

MR. HAUF: I absolutely think this is relevant. It goes towards why they gave the loan.

MR. BRAILSFORD: This is testimony about essentially insurance.

MR. HAUF: Your Honor, the --

THE COURT: Well, the exposure to the bank, Mr. Hauf, is essentially suggesting is a different scenario if there's insurance, namely, a SBA guarantee.

MR. HAUF: Correct, Your Honor.

THE COURT: I do see the relevance here, so objection overruled.

BY MR. HAUF:

Q So as I said at the end of this statement, it says that the higher LTV is not a policy exception, it's mitigated by the government guarantee. Do you see that?

A I do.

Q So this one was granted because it had a government guarantee?

MR. BRAILSFORD: Objection, Your Honor. Misstates his testimony.

MR. HAUF: I'm asking if this loan was granted because it had a government --

THE COURT: Go ahead and ask the question that way, please.

MR. HAUF: Okay.

BY MR. HAUF:

Q Was this loan granted because it had a government guarantee?

A All -- our bank does not make conventional loans. We only make SBA loans.

Q Well, I'm asking in this specific case was this loan granted because it had the government guarantee?

A Yeah, I'm -- so I think what you're pulling from this is a

required -- it is required as a SBA preferred lender that we document why we are using the program and that we clarify why the -- why the loan is eligible. And one of the requirements of the SBA program is that you demonstrate why credit is not available on conventional terms. And one of the things SBA has specifically told lending institutions all across the country is simply saying you don't make conventional loans is not enough. You need to specifically document why.

So in this case, the loan to value, there was essentially no collateral on the loan, which is a permissible, you know, mitigant and reason why lenders typically use the SBA guarantee which is kind of what I speaking to about SBA loans yesterday. So this -- this statement is a true statement --

Q So --

A -- but I cannot -- I cannot say we only made it because it was an SBA guaranteed loan because all we make are SBA and USDA guarantee loans.

Q Right. But what you're telling me, if I understand, I want to make sure I summarize the testimony correctly, is that this -- he could not have gotten the conventional loan for this, i.e. --

A Not from us.

Q Right. And so the only reason you gave him this loan was because it was an SBA loan backed by the federal government.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. BRAILSFORD: Objection. Misstates testimony.

THE COURT: What I'm understanding the phrase "the higher LTV is not a policy exception as it is mitigated by government guarantee." What I'm understanding that to mean in the underwriting package is that "here's a basis for going into an SBA guarantee because the loan to value is a problem, therefore we need the SBA guarantee."

THE WITNESS: That's fair.

THE COURT: Is that right?

MR. BRAILSFORD: Uh-huh.

THE COURT: Is that a yes?

THE WITNESS: Yes, that's fair.

BY MR. HAUF:

Q And -- okay. I did have a question on the global cash flow.

A Sure.

Q With regard to living expenses, when the -- when the spouse is not a guarantee like in this case, do you assume the spouse pays their own expense as well?

A There's not a catchall for that. It's why you ideally like to have a, you know, like to have a joint statement. So, you know, to say that anything is assumed I think would not be fair. I think that's what you'd like to have explored, you know, in the dialog in between -- when we receive a personal financial statement and it's made very clear that one spouse is

not going to be a party to the loan, you know, the very nature of what you're asking is difficult. And so it's really hard to assume. You have to kind of -- you have to tread lightly because of a regulation called Reg B, about, you know, requiring a spouse. And so -- and so that's -- that's a case by case.
Q And so in general practice, you would normally have the underwriting do that. It would generally show up in the underwriting report then?
A You would -- you would -- that would be an expected part of the dialog to take place between the underwriter and the borrower and the applicant prior to submission for approval.
Q So let me move on to this specific case it relates to locality. So you were -- you were familiar with Dr. Raiffe prior to this loan?
A No.
Q I'm sorry?
A I was not.
Q You were not. Okay. So yesterday you testified about his -- his process. How did you become aware of his process for purchasing --
A Sure. So Spencer and I have worked together for a very long time. There was a period -- so we first started working together in 2003. There was a period where we both -- he left Huntington Bank shortly before I did and was working for what

eventually became Northwest. During that time is when he met and was working with Dr. Raiffe. We may have made the original loan where Spencer first met Dr. Raiffe at Huntington Bank, but I don't have any recollection of it. We were doing hundreds of millions a year and that loan wasn't on my radar. So I became more accurately aware of the relationship that Spence had and the loans that Spence had done. This was shortly after we had already joined United Midwest together and Spencer had told me that's about -- "Hey, I've got a doctor I've made several loans to. He's doing really well. This is what he does." And that's how I became introduced to this particular opportunity.
Q And then do you have the doctor write a specific disclosure about their business process or you just rely on -- in this case --
A I certainly wish we had.
Q -- Spence -- so you don't?
A In this case we did not.
Q Okay. That's --
A That's not an absolutely requirement. In this case, we were trusting and -- I mean, frankly, it just didn't even occur to us that the nature and understanding of the business models were so different from, you know, what -- what we understood them to be to what the doctor testified to yesterday.
Q And then in that realm, could you have conditioned this loan on Dr. Raiffe remaining in Ohio?

MR. BRAILSFORD: Objection. Calls for speculation.

MR. HAUF: I'm asking if general policies, could they -- would that have been a typical standard that they use.

MR. BRAILSFORD: That was not a general policy question, Your Honor. He's asked --

MR. HAUF: I will re-ask --

MR. BRAILSFORD: -- specifically about --

MR. HAUF: I will re-ask the question, Your Honor.

THE COURT: Please do.

BY MR. HAUF:

Q So as -- when you give these loans, is one of your tools in the toolbox in order to ensure qualification protection, are you able to require that the borrower remain in a certain locality?

A I'm not an attorney so I can't speak to the legality of such a condition, but I suspect one would be very difficult to enforce even if you were able to --

Q So let me ask you this. Thank you. So have you ever required a borrower to remain in the state in which you're giving the loan? So in this case, Dr. Raiffe, have you ever required a dentist to stay in the state after you give the loan?

A We did not. I mean, we did not require that he remain a dentist or require -- you know, there's lots of things you can't require. There's a certain amount of good faith in when

you're extending credit that, you know, you have an understanding of who one another are and what the business. But --

Q Okay.

A -- we certainly couldn't have prevented him from -- from doing -- you know, from moving or --

Q So, it's fair to say --

A -- from changing his business model.

Q It's fair to say he was not required to remain in Ohio in order to get this loan?

A We do not have such a distinction in our application process.

Q Okay.

THE COURT: Could it be an event of default if he did move?

THE WITNESS: You could condition for that. But again, I don't think it would be likely because it would be so difficult to enforce. It -- the -- the -- do I wish we had underwritten this more thoroughly? Absolutely. Do I wish that the chasm between our understanding and what was -- you know, what the business model was were narrower? Of course.

BY MR. HAUF:

Q And in the -- in this -- I appreciate your patience, Mr. Street. In the -- in the process of the loan, when we talked about this Arizona house, if it had been discovered that

the Arizona house was in Dr. Raiffe's name or he now had the Arizona house, would the payment then had been factored into the global cash flow?

A Sure.

Q Okay. So it wouldn't have been an automatic denial?

MR. BRAILSFORD: Objection. Calls for speculation.

MR. HAUF: I'm asking if -- this question was asked in his previous testimony. I'm essentially asking if they have any specific policies that would automatically deny a loan such as this or, you know, a circumstance occurs like this. So they have a loan, becomes known, would they automatically deny the loan.

MR. BRAILSFORD: Your Honor, he's asking for testimony specific to bank policies which was something that was not going to be discussed based on the motion in limine.

THE COURT: Ratios we're not going to discuss. But the question is there a policy that if A then B.

MR. HAUF: Correct.

THE COURT: That's your question, right?

MR. HAUF: Correct.

THE COURT: Do you understand the question, sir?

THE WITNESS: I do.

THE COURT: Objection's overruled.

THE WITNESS: I think what we're asking is to talk about a single variable which is when you're talking about the

analysis of an approval of a credit with especially a credit such as this one, you're asking me if one variable would constitute something automatic. But very rarely does one variable occur in isolation. And so what I can say is that that would have changed other parts of our understanding of the loan, which is to the business model. So would that move in and of itself, by itself, constitute an automatic denial, of course no, it would not.

BY MR. HAUF:

Q Okay.

A Would it have led to --

Q That --

A -- considerable other questions? Absolutely. It's not a single variable.

MR. HAUF: I think, Your Honor, those are all the questions I have. Give me just one moment.

THE COURT: While Mr. Hauf's gathering his thoughts, let me ask you a question because you had said you wished there was better underwriting on this one. And one of the things that I thought you said is you wish you better understood at the time of underwriting what Dr. Raiffe testified to yesterday. And is that by way of saying, "We heard Mr. -"how do you say his last name?

THE WITNESS: Twyford.

MR. BRAILSFORD: Twyford.

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: -- Mr. Twyford saying it's his understanding that you transition patients, Dr. Raiffe's out there, active, active, active, but his testimony was that's not the way it was at all. I got the loan. I said hello. I let them do their thing and I stood on the sidelines. Is that what you're saying you wish you understood better his business processes or at least as he testified to it yesterday?

THE WITNESS: To -- yes, as well as -- oops, I'm sorry. This credit memo is not going to win any -- you know, we're not submitting it to RMA. The -- the connectivity for this -- this credit memo reflects a $400,000 loan write up. But a multi-million dollar credit exposure. And so the level of detail I think could have been better as Counsel asked me earlier about, you know, connecting all the dots to the personal financial statement. But I was referring to both of things were things that I wish were different but of course they're not which is why we're here.

BY MR. HAUF:

Q And actually I only have a few more questions. I appreciate it.

A Sure.

Q You said that the bank only gives SBA loans, is that correct?

A We specialize in USDA and SBA loans. We have -- I think in the four years that I've been with the bank, I think we've

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

maybe made two conventional loans.
Q And I'll ask why does the bank specialize in SBA loans? Well, let me be specific. I can tell that --
A BJ (phonetic) business model and we're really doggone good at it.
Q Okay. And you had mentioned in yesterday's testimony about recapitalization.
A Yes.
Q And the bank was recapitalized in 2016, I believe you said.
A Recapitalization is a technical word for we -- we raised money and we bought an 80 percent stake in the bank.
Q Okay.
A Since it wasn't -- since the primary shareholder stayed on and retained ownership, albeit, in a minority position, it's, you know, always been referred to a recapitalization versus an acquisition or that we bought it.
Q Okay. Did the recapitalization affect any of the employees at the bank?
A We hired a whole bunch of new ones but we retained all the -- everyone who wanted to stay.
Q Okay. And so -- so you had new employees you had hired in 2016, then, I assume, after the capitalization, is that correct?
A We brought on -- there were quite a few of us that joined

the bank in a fairly short amount of time, amongst them, Spencer and myself.
Q Okay. Oh, so Spencer had just come on in 2016 as did you in 2016?
A Correct.
Q And so this would have been -- was this Dr. Raiffe's first loan after the recapitalization?
A It was his first and only loan with our bank.
Q Okay. But you -- but you were familiar with him in passing because you had worked with --
A I was not.
Q -- Spencer.
A I was not.
Q Okay. So you had no knowledge of him prior to this loan.
A I did not know who he was.
Q And then did the recapitalization change -- obviously you have new employees. Did it change quotas or did it require any sort of new volumes in loan production?

MR. BRAILSFORD: Objection. Relevance.

THE COURT: I'm failing to see the relevance myself, Mr. Hauf.

MR. HAUF: Your Honor, I'm trying to see whether or not the increased volume created a situation where they needed to bring in more loans. That's what -- and then this was one of those loans. But I will --

THE COURT: Mr. Street, if you can answer that please do.

THE WITNESS: No, it didn't.

BY MR. HAUF:

Q Okay. It didn't change that?

A Not even -- I mean, at that point, we barely had a budget. We were all so happy to be here.

Q Okay. Perfect. And -- I think that's -- those are all the questions I have. I appreciate your time.

THE COURT: Let me ask, Mr. Hauf, would you bring up Exhibit 1, because the essence of your cross has been -- boy, Exhibit 1 has lots of problems with it. One of the biggest I see is when I add up the liabilities, it doesn't work out.

MR. HAUF: Yeah.

THE COURT: So when I add up notes payable, the installment accounts, the other installment accounts, and the mortgages, I don't reach $5,311,489, which by the way is exactly the asset number. So even if there was a transposition of the total net worth in the liabilities line, it still doesn't add up because 2 million -- excuse me -- 221,000 is the net worth number. And if that's meant to be the liabilities number, well, that's grossly off.

What does this all mean to you in terms of the underwriting? Is it just a further measure of the sloppiness or is this fatally flawed in the application? Follow what I'm

saying?

THE WITNESS: Yeah, I do. You know, I think I would go with -- I think I'm comfortable with sloppy. As I just spoke to, I don't think this was, you know, the best -- the best underwriting that I've seen. And that's a good, you know, specific reason -- example of why.

THE COURT: Is this the kind of sloppiness that ordinarily you would expect either Mr. Twyford or Mr. Weesie to say, you know, look, Dr. Raiffe, you got to do this over. The math is wrong. You've got things plugged into the wrong lines. Just do it over again.

THE WITNESS: Had I seen this document prior to approval, yes, I would have asked that.

THE COURT: What I see is total debt that's listed there is adding at 2,345,000 -- excuse me -- 2,354,000. And it's just vastly different than either the liabilities line of 5,300,000 or the net worth line of 220,000 --

THE WITNESS: No.

THE COURT: -- just doesn't make any sense.

THE WITNESS: Right. The fact that it's not dated is also --

THE COURT: Not dated on the signature line --

THE WITNESS: Right.

THE COURT: -- is that what you're saying?

THE WITNESS: Right.

THE COURT: Because it is dated at the very top.

THE WITNESS: Right. But not signed and dated. I mean, there are a number -- there are -- but -- yes, I'm with you on that.

THE COURT: Okay. Follow up?

MR. HAUF: I have one question.

BY MR. HAUF:

Q So on -- typically on these applications, you mentioned the date. Is it normally required that you date and put your social security number on the form?

A It is.

Q Okay. And if it wasn't -- as a standard policy, if it wasn't signed and dated, would you have the borrower then go back and sign and date a new one?

A Again, individually, that item alone would not automatically constitute a go redo it. But --

Q But as you said, if you saw the document, would you have the borrower go back and date it?

A For that reason alone?

Q Yeah.

A Probably not.

Q Okay.

MR. HAUF: That's -- that's all I have, Your Honor.

THE COURT: Go to the very top again --

MR. HAUF: Oh.

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: -- because I thought I heard Mr. Twyford say something along the lines of --

MR. HAUF: Of Page 1 or Page 2, Your Honor?

THE COURT: 1. Very top. Mr. Twyford said something along the lines of got to use the right SBA forms or they're going to kick it back no matter what the content says. And I look at the very top, the expiration date of this form is 8/31/2011. This loan is five years later. Is that the kind of thing that Mr. Twyford was talking about, the SBA would say, hey, you're using the wrong form, get started again?

THE WITNESS: It may have been. I don't know. I think -- so this particular -- this particular item -- a number of these documents have been stamped and whatnot. I'm not accustomed to seeing that document description in the top of this particular form.

THE COURT: I think that was a stamp that happened after --

THE WITNESS: I don't -- I'm not sure. I'm not accustomed to seeing that. And bear in mind, I don't look at these forms every day. To speak to your question as to what Spencer was alluding to yesterday is SBA has their form. And that form is in the public domain. And there are many SBA lenders and many different people that work often in SBA loans, brokers, and et cetera, that will often take that form and put their name on it or use variations of the form.

The fundamental of a personal financial statement hasn't changed in the 26 years I've been in the industry. But the specific form itself has gone through, you know, nuance changes. I believe what Spencer was speaking to when he talked about that was if you submitted a loan without a personal financial statement, it would be kicked back. Or if it was --

THE COURT: But not necessarily this one or the one that is current as of that date?

THE WITNESS: Right. I don't think he was speaking to this one, right. I think -- I think -- also what often happens, especially with -- with -- oftentimes folks that work with professionals, it's not unusual, for example, for higher net worth borrowers of which we don't see a lot, but people will have an accountant-prepared statement and they'll have it on their own, you know, CPA form. Or they'll have a -- I mean, a personal -- you know, SBA doesn't own the notion of a personal financial statement. But they do have their form they like it on.

So -- again, I'm not trying to waste time. I'm -- I think that's --

THE COURT: What I essentially Mr. Twyford saying yesterday is that if you had a CPA-prepared financial statement, you couldn't just attach it to this form and say see attached --

THE WITNESS: Correct.

THE COURT: -- SBA would kick it and say use our form.

THE WITNESS: That is -- you are exactly correct with that characterization.

THE COURT: Even if it's an outdated one.

THE WITNESS: Right.

THE COURT: Because this one seems like it's five years past shelf life.

THE WITNESS: It -- based on that top right corner, I would -- I couldn't disagree with you.

BY MR. HAUF:

Q So one more follow-up question with regard to the preparation of the form along that. If an accountant prepared a personal financial statement, would you then have them transcribe onto a form like this?

A We would typically ask that, yes.

Q Okay.

MR. HAUF: Those are all my questions, Your Honor.

THE COURT: Thank you. Redirect, Mr. Brailsford?

MR. BRAILSFORD: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. BRAILSFORD:

Q Good morning, Mr. Street.

A Hello, again.

MR. BRAILSFORD: Pull up Exhibit 1.

BY MR. BRAILSFORD:
Q So you were asked about Exhibit 1 and I believe your testimony was that Exhibit 1 is not a document that typically you would see as a member of the loan committee. Is --
A Correct.
Q -- that correct? Okay.
A Yeah.
Q Is it your understanding that Exhibit 1 is used to complete the credit analysis memo?
A Very much.
Q And that would be Exhibit 47, is that correct?
A That's right.
Q And so is it your testimony that Exhibit 1 is still a fundamental document even though it's not something you and the loan committee see?
A Oh, absolutely.
Q Okay. Now you gave some testimony just now about it was never going to be a requirement that doctor -- or I believe -- I don't want -- let me start over. I believe you testified that the bank was not going to require Dr. Raiffe to live in Ohio. Is that accurate?
A It wouldn't have occurred to us to ask.
Q And why is that?
A The doctor had a really good thing going. Seemed from, again, my vantage point, which was just in the -- you know, in

the credit presentation, he had established a business model and a practice that was working very well. Clearly, you know, as, you know, as he spoke to and testified to the MBA. You know, he viewed himself as a business owner and as well as a medical professional. And it seemed to be working. We have worked with other doctors who have employed similar practices that are not -- you know, they're not seeing patients every day. They do that as a part of what they do, but they create -- you know, for lack of a better term, it's not so much as a franchise as you would think of it from that perspective but a business model and a standard of care and a business model.

So it seemed like it was working great. He had received several loans. And again, in my experience, without knowing, you know, the doctor personally, you don't see people just, you know, build all that up and then suddenly move to another part of the country. But again, I just didn't know.

Q So, okay, so you didn't know that he was going to move to Arizona.

A Right.

Q And your testimony is that the bank wasn't going to require him to remain in Ohio. But if he was going to move to Arizona, is that something that you would have wanted to know about?

A Oh, my goodness, yes.

Q Is that something that the bank would expect Dr. Raiffe to disclose?
A Sure. Absolutely.
Q Is that something that the bank would consider material?
A Absolutely. Because again it goes to the -- the loan was presented in such a way that -- that you thought, wow, okay. Here's -- you know, he's making this work. It's a little unusual. It has become less unusual present day that doctors, you know, in sole practitioner type, you know, practices have, you know, modeled this concept, having multiple offices. There's always -- as a single practitioner, there's only so much you can make from a business perspective with one location and one patient base.

So this was -- this -- this at the time was -- I wouldn't call it cutting age, but it was a little unusual and so we would have conversation on, you know, our underwriting process of how's he going to do it. How far apart are they?

Oftentimes our dialog is -- not in this credit memo, but oftentimes, our credit discussions and in many of our credit memorandums will be a discussion of how far apart are the offices. How practical is it to get from one to the other. And in this case, you know, I think Spencer had some familiarity with what he understood the, you know, that to be. And it just -- it looked like wow, this guy's got it -- this guy's got it rolling. This on paper looked like this practice

would be a pretty simple -- pretty simple venture for him.

Q Thank you. We have Exhibit 1 there. That's the personal financial statement. That is -- is that a document that was created by anyone at the bank?

A The blank document is a form that we give to applicants. It is expected that they complete -- that the borrower complete the form. We do not -- we do not fill in any of the blanks.

Q Understood. So your understanding is that the borrower filled --

A That is correct.

Q -- this document here?

A That was our understanding.

Q And there has been -- you testified that -- or there's been testimony that this document -- the information in this document is sloppy, correct? Particularly with the -- particularly with the numbers not adding up.

A Yes.

Q Now, did the bank do anything to check and verify those numbers?

A Well, we pulled the credit -- the credit report, which is what I believe led to the credit memorandum having a more detailed itemization of the debts than as reflected on this statement, yes.

Q So is it your understanding that the bank was able to

account for some of the sloppiness in the numbers in Exhibit 1 based on the credit bureau?
A    Yeah.  It is.  In -- as well in what I believe was dialog and discussion that took place in the underwriting process that is unfortunately not documented.  But there -- it is very typical for there to be engagement between borrowers and our underwriting group with the lender oftentimes facilitating that discussion in between the personal financial statement and presentation to the loan committee.  And given in this case that this -- the debt was more elaborate and what that credit bureau showed and there were a lot more debts, you know, that to me at first blush would be indicative of that level of conversation and engagement where a decision was not made to request a new personal financial statement.
Q    And the credit bureau check, did it show the $1.5 million in debt for the -- let me start over.  Did the credit bureau show the $1.2 million mortgage loan for the Arizona home purchase?
A    Did not.
Q    And if the -- that $1.2 million for the mortgage loan doesn't show up in the credit bureau is there any other way that the bank would be able to find out about that $1.2 million debt other than through a disclosure from the borrower?
A    Not in the normal course of business, no.

Q And did the credit bureau show the $300,000 loan that Dr. Raiffe took from his father and his brother to purchase the Arizona loan?
A No.
Q Is that typically a type of loan that would show up on a credit bureau?
A It is not.
Q So would the bank then have to rely on that disclosure from Dr. Raiffe to know about that?
A Correct.
Q Does the bank consider the lack of disclosure for that combined $1.5 million of debt material?
A Absolutely.
Q Now you testified that you have worked with Spencer Twyford for several years?
A Yes.
Q Starting -- what year was that?
A Starting in either 2002 or '03 is when we first -- he first came to work at the bank that I was with. He joined my team was -- I was his direct manager starting in 2004. He was on our team reporting to me through that merger with Huntington and he left Huntington I believe in '13. And then again I left Huntington shortly after that. During that time, he was with Northwest or with a bank that became Northwest. And then he was one of the first of the -- first lenders that we -- when we

were buying United Midwest, he was one of several lenders that we not only recruited but also offered the opportunity to be shareholders and key team members in this -- at United Midwest. He's been under my direct -- I've been his manager or he's directly reported to me from 2016 -- from the time he rejoined United -- or joined United Midwest.  So from 2016 to the present.

MR. BRAILSFORD:  Your Honor, can we take a short break?  I was just notified that Dr. Raiffe stepped out of the courtroom.

THE COURT:  What do we need?  10 minutes?

MR. BRAILSFORD:  Five, ten minutes -- ten's fine.

THE COURT:  Okay.  Let's take a 10-minute break then.

MR. BRAILSFORD:  Thank you, Your Honor.

(Recess)

BY MR. BRAILSFORD:

Q    Before the break you were testifying about Mr. Twyford's -- how you were his supervisor from -- for approximately I believe 13 years.  Is that accurate?

A    Yeah, that's pretty close.

Q    2004 to about 2013.

A    Right.

Q    And then --

A    Small break in between.

Q    And then back from 2016 to --

A    Since 2016, yes, sir.
Q    So he -- did he directly report to you during that period of time?
A    Yes, he did.  And he does.
Q    Now, you were in the courtroom yesterday, correct?
A    Yes, sir.
Q    And did you hear Dr. Raiffe's testimony describing Mr. Twyford as his personal banker?
A    Yes.
Q    Having supervised Mr. Twyford for approximately 13 years, have you ever known Mr. Twyford to be anyone's personal banker?
A    No.
Q    Is that part --
A    That term is -- so Spence -- Spencer is a lender.  All he does are SBA loans.  And the vast majority of which are acquisition loans for medical professionals, primarily dentists.  Spence is a lender.  When you think of the term banker and relationship banker, those are terms in the industry that are much more involved in terms of what the engagement and the level of understanding that -- that a -- in terms -- specifically in terms of products a banker might provide.  And so it connotates a depth of understanding.  Not to say that they didn't know each other, because they had obviously done several deals together.  But Spence is not a banker.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Q Does Midwest Bank even have personal bankers?
A We do not.
Q Do you consider Mr. Twyford to be a good employee?
A He's --
MR. HAUF: Objection. Not in cross.
THE COURT: Mr. Brailsford?
MR. BRAILSFORD: Going to build up to some impeachment testimony from what Dr. Raiffe was testifying to with regard to his business model.
THE COURT: Oh, there's a conflict in testimony between what Mr. Twyford said he thought the business model was and what Dr. Raiffe said yesterday.
MR. BRAILSFORD: That is correct, Your Honor.
THE COURT: So --
MR. BRAILSFORD: I'm going to ask --
THE COURT: -- question of whether Mr. Twyford was a good employee --
MR. BRAILSFORD: I'm going to -- well, let me rephrase this.
BY MR. BRAILSFORD:
Q Have you ever know Mr. Twyford to make up information for the loan approval process?
A Certainly not.
Q Have you ever know Mr. Twyford to make up business model information for a loan application process?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

A Definitely not. Spence is a -- Spence is -- one of his strengths, he's obviously -- he's in sales. And he's charming. He's great at understanding acquisitions. But one of the things that I would typically, you know, characterize is superior to others in his field is that he has a very good understanding of the credit side of the business and understanding what -- things exactly like this. So when he describes, you know, a business model, he gets in depth more so than some traditional employers would with --

Q (Sneezes)

A -- bless you -- relative to details. Like Spence was talking about as far as patient count and how active patient basis and what ideas -- he has a very strong understanding of the elements that go into a successful dental practice.

Q Thank you.

MR. BRAILSFORD: Anthony, can you pull up Exhibit 47, please. And go to Bates number Mid --

BY MR. BRAILSFORD:

Q Now, if you look at the --

MR. BRAILSFORD: Anthony, if you could pull out the two paragraphs there right in the middle where it starts with "Dr. Raiffe checks in with practice working." Thank you.

BY MR. BRAILSFORD:

Q Now, this is Exhibit 47. This is the credit analysis report. And this is -- what I'm showing is a page and what's

pulled up is two paragraphs explaining Dr. Raiffe's business model. And I'll read that to you.

"Dr. Raiffe checks in the with the practice working onsite once a week or is there every other week. He employs associate doctors at each location. Has employment contracts that provide a 90-day notice if leaving. This gives Dr. Raiffe time to find replacements. He also employs Opal Anderson who is a practice consultant that works with each practice to make sure they're doing things the right way. The doctor plans to acquire the subject practice and working the practice --"

MR. HAUF: Objection, Your Honor. None of this was talked about on cross.

MR. BRAILSFORD: His business model was discussed, Your Honor.

THE COURT: Business model was discussed and certainly Exhibit 47 has been discussed throughout the entire trial. Objection overruled.

BY MR. BRAILSFORD:

Q " -- the doctor plans to acquire the subject practice and working the practice for a few months while he trains his associates for the practice." Is that the business model that the bank understood Dr. Raiffe to have?

A Absolutely. We -- the contrast in descriptions, I mean,

were staggering and disappointing to hear.
Q By the contradictions you mean the contradictions between Dr. Raiffe's explanation --
A Description.
Q -- of what his business model is --
A Yes.
Q -- and what's the bank's understanding --
A Yes.
Q -- is?
A Yes. I'm sorry. That's right. And, yes, in terms of how -- how different the engagement level was. While it is not prohibited, we don't require that every dentist we make a practice loan, we're not expecting them to see every patient. But, you know, we do believe they are actively involved. And we thought that was the case here.
Q This type of information that I just read to you from Exhibit 47, is that something that the bank would just pull out of thin air?
A It is -- it is -- no, it -- we would not pull it out of thin air. It is -- it is also -- it's very specific in terms of some of the characterization which again I -- there was -- obviously a disconnect between what we thought was occurring and what was actually occurring.
Q Do you know how the bank obtained this understanding?
MR. HAUF: Objection. Speculation.

THE COURT: Overruled. The question is, does he know.

THE WITNESS: I do not know how it came to be. In the course of underwriting there would be dialog from. You know, our lenders speak with borrowers who then present credit memorandum into our underwriting department. And there's active dialog along the way.

BY MR. BRAILSFORD:

Q Thank you. Did the bank know that Dr. Raiffe planned to move to Arizona and semi-retire?

A No.

Q Would a move to Arizona be material to the approval of this loan?

MR. HAUF: Objection. Speculation.

THE COURT: Mr. Brailsford?

MR. BRAILSFORD: I'm asking about the loan process, Your Honor. I'm asking if that type of information would be material to them. It's not speculation.

THE WITNESS: We find it very material. Again, it's just a fundamental misunderstanding of what our borrower was doing.

BY MR. BRAILSFORD:

Q Again, with regard to the bank's analysis, would the purchase of a home in Arizona be material to the approval of this loan?

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

A I would say yes. Not only -- not only yes, but this isn't just someone who is going to spend some time or, you know, snowbirds in Ohio. I mean, we talked at the break even casually and friendly about it. It's not hard to understand why someone would want to live here versus Ohio especially in the wintertime. But to establish a residency somewhere is a -- that's a big -- you know -- and the amount of the investment in this case being -- this isn't just someone going to spend a little time. This is someone putting down roots and a substantial investment in where you're going to live, which again leads to you're going to be spending -- you're not buying a house that size and that nice to not spend time in it. So very -- fundamental over and above just the numbers, yes. It's -- this business is not going to be run in the manner we thought it would be.

Q And with regard to the bank's analysis for this loan approval, would the $1.5 in debt for the Arizona home be material to the approval of this loan?

A Oh, my -- of course.

MR. HAUF: Objection. Speculation. Foundation.

MR. BRAILSFORD: Goes to the bank's analysis of the loan approval, Your Honor, whether or not that information is material to the bank. It's not speculation.

THE COURT: Overruled.

THE WITNESS: Yes, absolutely material. Incredibly

material.

BY MR. BRAILSFORD:

Q With regard to the bank's analysis in approving this loan, would Dr. -- would information regarding Dr. Raiffe's semi-retiring be material?

A Again, yes. It's just absolute different level of engagement with the business than what we understood.

Q Thank you.

MR. BRAILSFORD: I'm not sure that I have any more questions. Let me just check with my colleague.

BY MR. BRAILSFORD:

Q Two more questions. Well, as of right now, two more questions.

A Yes, sir.

Q With this -- part of Exhibit 47 that's been pulled up here explaining the bank's understanding of Dr. Raiffe's business model, to your knowledge, is this something that Spencer would make up?

A Oh, absolutely not.

Q And yesterday when you heard Dr. Raiffe testify that his business model was to essentially purchase a practice and then sit on the sideline and collect paychecks, was that the first time you'd ever heard that business model yesterday?

MR. HAUF: Objection. Mischaracterizes his testimony.

MR. BRAILSFORD: I can rephrase, Your Honor.

THE COURT: It does mischaracterize the testimony, but I get your drift.

THE WITNESS: So -- can you --

MR. BRAILSFORD: Yeah, let me rephrase it.

THE WITNESS: -- exactly what --

BY MR. BRAILSFORD:

Q When you heard Dr. Raiffe testify as to his business model yesterday --

A Right.

Q -- was that the first time you ever heard Dr. Raiffe explain -- or was that the first time you ever heard that business model?

A The -- it was. His -- his level of disengagement in how he described his activity in the practice was staggering to me. And not at all consistent with what we -- the loan we thought we were making.

MR. BRAILSFORD: I have no further questions, Your Honor.

THE COURT: Mr. Hauf, may this witness be excused?

MR. HAUF: I have just a few follow-up questions if that's okay.

THE COURT: Okay.

///

///

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

RECROSS-EXAMINATION

BY MR. HAUF:

Q Speaking to Exhibit 47 --

A Yes.

Q -- did -- does the borrower normally view any of the information in that exhibit?

MR. BRAILSFORD: Objection. Foundation.

THE COURT: Overruled.

BY MR. HAUF:

Q The --

A Exhibit 47 is the credit memorandum?

Q Correct. Correct. I'm sorry. Yes. So, let me bring it up for you.

A Yeah, the credit memo would not -- the borrower would not typically see this credit memorandum.

Q Okay. And when we discussed -- when they discussed the process and method of the Debtor's practice, do you get a direct statement from the borrower regarding how their practice works?

A A direct statement, such as like a business plan or?

Q Well, let me back up. So you testified you don't know how the bank receives the information about the Debtor's practice, is that correct?

A I don't feel like I said it quite like that.

MR. BRAILSFORD: Objection. Mischaracterizes his

testimony.

THE COURT: What's the objection?

MR. BRAILSFORD: Mischaracterizes his testimony, Your Honor.

THE COURT: Please restate the question.

MR. HAUF: Thank you, Your Honor.

BY MR. HAUF:

Q So if I understand your testimony correctly, in this credit memorandum, there is no way to track who received what information and put that information in the credit memorandum, is that correct?

A In this case, there was not. I believe most of that was conveyed verbally.

Q Okay. But we don't know where it came from specifically?

A I suppose that's fair to say. I think we can narrow it down.

Q Okay. And just to clarify one of the questions that we discussed on cross, I believe you had stated that based upon the business model, there was no need to ask him whether or not he was going to leave because you just assumed he was going to stay, is that -- is that correct?

A It did not occur to us to ask if he was planning to move out of state and across country.

Q Okay. And as far as monikers on what a personal banker is and what a business banker is --

A Sure.
Q -- when we get right down to it, when we're talking about Spencer, Mr. Twyford --
A Sure.
Q -- he maintains relationships with -- directly with the dentists, is that correct? Or the borrowers in this case, let's say.
A I guess it just depends on how you characterize relationship. In our world, and again, I'm not trying to be inside baseball, Spence is the furthest thing from a personal banker --
Q Well, what I mean --
A -- that exists in our industry.
Q What I mean by this is my understanding is he knew the doctor's internal workings enough to simply relay that information to you about his process and sight unseen you accepted that information.

MR. BRAILSFORD: Misstates testimony. Calls for speculation.

THE COURT: Really a statement, not even a question. Do you have a question, Mr. Hauf?

MR. HAUF: I do.

BY MR. HAUF:
Q So I'll restate. You relied solely on Spencer's understanding of the borrower's practice in this case, correct,

with regard to his business process?

A I don't know that I would say solely. I don't know what all dialog took place in the underwriting process and with whom all it took place. So it would not be unusual for our underwriter. The multiple parties that were involved in conjunction with the transactions. I'm thinking specifically of Mr. Vanderford and Opal -- whatever her name is -- as well as Dr. Raiffe. You know, I don't know what all dialog took place amongst those parties. What was known to me was those parties had all worked together on transactions before. But --

Q Okay.

A -- not with our bank and not that I'd been aware of.

Q And if -- if someone had not worked with the bank with a transaction before or the loan amount was higher, would you have required a more detailed explanation in your general business process, a more detailed general -- a more detailed explanation of the borrower's practice?

MR. BRAILSFORD: Objection. Calls for speculation.

MR. HAUF: I'm asking about their general practice, Your Honor, not this particular loan.

THE COURT: Overruled.

THE WITNESS: I think it's likely. I think that's fair.

BY MR. HAUF:

Q Okay.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. HAUF: That's all I have. Thank you, Your Honor.

THE COURT: Last chance, Mr. Brailsford.

MR. BRAILSFORD: I think we're finished with the witness, Your Honor.

THE COURT: All right. May Mr. Street be excused?

MR. BRAILSFORD: He may.

THE COURT: You're welcome to stay, Mr. Street, but you can be excused if you wish.

THE WITNESS: Thank you.

THE COURT: All right. Mr. Brailsford, I'm understanding that you called your last witness and that was Dr. Raiffe. You've done his direct. Are we going to call him back up now for continued cross or maybe call it Mr. Hauf's direct?

MR. BRAILSFORD: Yes. I wasn't sure if Mr. Hauf was finished with Dr. Raiffe on his direct.

MR. HAUF: I was not, Your Honor. So I'd assume that we would complete that.

THE COURT: Essentially, the Plaintiff's case is closed now, is that right?

MR. BRAILSFORD: Yes, Your Honor.

THE COURT: All right. And so, Mr. Hauf, if --

MR. BRAILSFORD: Oh, wait. Well, we haven't had a chance to cross yet so I guess there's some confusion there, at

what point technically it would close. But we're not calling any more witnesses.

THE COURT: Okay. But we're going to finish up with Dr. Raiffe now. And last I understood, Mr. Hauf was working with him.

MR. HAUF: Yes, Your Honor.

THE COURT: Right? Dr. Raiffe --

MR. HAUF: Correct, Your Honor.

THE COURT: -- could you come up again, please. Sir, would you come up to the witness box again, please.

Dr. Raiffe, you understand you're still under oath, correct?

Mr. Hauf, are you ready?

MR. HAUF: I am, yes.

DR. DAVID RAIFFE, DEBTOR/DEFENDANT, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. HAUF:

Q Okay. Good morning, Dr. Raiffe. We'll to some extent pick up where we left off yesterday.

What we were speaking with directly was regarding your intent as it relates to the Midwest loan, specifically as it relates to the Hamilton practice. So this was the loan that was taken out in July of 2016. Do you recall our conversations there? That's where we're at?

A Yes, sir.

Q Did you have any intent to defraud Midwest in May, June or July of 2016?
A No, sir.
Q And at the time did you believe you could pay back the loan?
A Yes, sir.
Q And why was that?
A I had a great income. I was making 10,000 week or so.
Q And so I'll bring up Exhibit F. That is your -- do you recognize this document?
A It's a tax return.
Q And whose tax return is it?
A Excuse me?
Q Whose tax return is it?
A Mine.
Q Okay.

MR. HAUF: I'd like to move to put this document into evidence as Exhibit F.

THE COURT: Any opposition?

MR. BRAILSFORD: I believe it's already in, but no opposition, Your Honor.

THE COURT: All right. Exhibit F is admitted if it hasn't been already.

(Exhibit F Received)

///

BY MR. HAUF:
Q And is this an accurate reflection of what your income was? This was 2015. Is this an accurate of what your income was in 2016?
A I believe so, yes, sir.
Q And if you look at Line 22, what does it show your total income was for that year?
A Total income was $7,766,982.
Q Okay. And after you got the -- so -- so based upon that information, when you took the loan from Midwest for Hamilton, did you believe you could repay the loan?
A Easily, yes, sir.
Q So let's talk about after the loan acquisition. Did something happen so that you couldn't pay the Midwest loan?
A Yes, sir.
Q What happened?
MR. BRAILSFORD: Your Honor, objection to relevance.
MR. HAUF: Your Honor, this all goes towards intent and we can always gather intent from actions before and after the loan was granted.
THE COURT: Okay. Overruled.
THE WITNESS: Well, things were going smoothly until about January or so of 2017. We had noticed that hygiene was not being filled. That's people coming back to get their teeth cleaned twice a year. We had run enough reports. We were

losing about 50 percent of the practice of the patients coming back instead of the usual 8 or 10 percent.

BY MR. HAUF:

Q Which practice was that?

THE COURT: Are we talking about Hamilton or are we talking about all the operations?

THE WITNESS: No. No. Hamilton. Hamilton, sir. Sorry. Say again.

BY MR. HAUF:

Q No, I was asking the same question.

A Oh, Hamilton. What happened -- when we discovered that patients, the loyalty that the previous doctor had were instead of keeping him on like every other practice, we wanted to go -- he didn't want to stay, so we were going to have to get an associate. He just didn't keep the same loyalty. The patients would rather just stay on -- Cincinnati where the practice for Hamilton, it's right near the Ohio River, I believe, and people wouldn't come across the river. They would come from -- they'd stay in Lexington which is the other big city.

Q And what effect did that when -- I'm sorry, you said your patient base. So this is reoccurring patients?

A Yes, sir. When -- well, they weren't coming back anymore. They were going someplace else.

Q So what effect did that have on Hamilton?

A Couldn't pay the bills. It was struggling. It was hard.

It was -- things started to go downhill after that point.
Q And what do you mean by that?
A You expect a certain level of income, certain level of restorative work that's -- is generated from patients coming back every four to six months. And if they weren't coming back, you just can't keep the doctor busy.
Q And what about -- what effect did that have on your other practices?
A The other practices we started noticing at that point that there was some malfeasance. We noticed that there was some bills that weren't being paid. We noticed that there was -- there's about 2017 a month or so, February, March. Money was missing. Things weren't like they're supposed to be.
Q And after the Hamilton loan, did the purchase of the Arizona house affect your ability to pay the Midwest loan?
A No. Given my income -- given my income -- no, that repayment was not a factor, no, sir.
Q Okay. And so, how did you -- did you own the house -- and I think you said yesterday you said I was pronouncing it wrong, is it Solon?
A Solon.
Q Solon.
A Solon.
Q Did you own the house in Solon, Ohio?
A No, sir. It came with the marriage. My wife owned it.

Q Okay. And who paid the expenses or the mortgage on that property?
A My wife. My wife, Marybeth.
Q Okay. And -- on Exhibit 47, we'll go to -- 153. This is the bank's information regarding your personal financial statement. I want to draw your attention to residential mortgage PMI -- or P and I. Do you see that line? I'll highlight it for you. If my -- there we go. You see this line here?

MR. BRAILSFORD: Your Honor, I'm going to object on foundation. This is a document based on previous testimony that Dr. Raiffe never would have seen before.

THE COURT: Mr. Hauf, you're questioning the doctor about something that he didn't prepare and hadn't seen until this trial.

MR. HAUF: Correct. I'm not asking to verify the document, himself. I'm going to verify some information within the document that they had, as to whether or not it pertained to his situation.

MR. BRAILSFORD: Same objection, Your Honor. Foundation. He would have no understanding of how any of those numbers were compiled or put into that document.

MR. HAUF: I'm not trying to prove the accuracy of the document. Well, I'm not necessarily trying to prove whether or not the bank created the document, whether or not

the document exists. My true point is to see if he actually had the expense listed on the document.

THE COURT: You're trying to figure if he -- income and expenses listed here match his true state of affairs at that time?

MR. HAUF: Correct.

MR. BRAILSFORD: Your Honor, he's trying to prove the accuracy of the document. And it's something that Dr. Raiffe has no -- there's no foundation on that whatsoever.

MR. HAUF: Dr. Raiffe would know what his income and expenses are.

MR. BRAILSFORD: He would not know anything about these numbers and how they were compiled.

MR. HAUF: I'm only asking if they match his income and expense.

THE COURT: Well, let's limit it to that effect, though.

MR. HAUF: Okay.

BY MR. HAUF:

Q So, on this P and I line, you see that it -- let's just assume that you can see the years '13, '14, '15, and '16. Do you see the residential mortgage line? I'll -

A Yes, sir.

Q -- highlight that for you now that you've seen --

A Yes, it's 23 -- approximately 24,000 a year.

escribers (973)406-2250 | operations@escribers.net | www.escribers.net

Q Did you pay $23,000 a year for a mortgage in '13, '14 --
A Me? No.
Q -- '15? Who would have paid that mortgage expense?
A My wife, Marybeth. My wife. My spouse.
Q Okay. When you purchased the Arizona house in 2016 --
A Uh-huh.
Q -- who paid the mortgage on that house?
A The house when we first got there, just like now, we split it.
Q What do you mean you split it?
A My wife wanted this house. It's not the house I exactly like. It's a nice house, but it's not as rural as I liked. And at that point, my wife and I agreed that even though we just basically keep everything pretty much separate like we always have, like my folks have, like her folks have, we were just going to split the mortgage.
Q Did you split the mortgage?
A On the Arizona, yes; the Ohio house, no.
Q And how did you split the mortgage?
A The check. I pay by check.
Q What was the ratio? How much did she pay? What did you pay?

THE COURT: What was the answer?

THE WITNESS: I have to figure -- it's 2700 a month, 2800 a month each.

BY MR. HAUF:

Q And so --

THE COURT: It's $8500 a month.

THE WITNESS: I'm so sorry?

THE COURT: I thought the expense was $8500 between what was owed on the first and the second -- or the first and --

THE WITNESS: No. The mortgage on the Arizona house when we first started was 5600 a month.

THE COURT: Right. Plus another 3000 for payment to your father and brother.

THE WITNESS: No, it had nothing to do with my wife. That was my debt. My wife wasn't contributing to anything I borrowed from my dad.

THE COURT: Right now, you're answering only the question about the mortgage, itself, in first position with whoever the lender was.

MR. BRAILSFORD: Yeah. AnthroBank, yes, sir.

THE COURT: That was 5500 a month?

THE WITNESS: 56-ish.

THE COURT: Your wife split that 50/50?

THE WITNESS: Yeah. So it was about 2800 a month each, yes, sir.

THE COURT: And on top of that you personally -- not your wife -- but you personally had the obligation to pay your

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

dad and brother?

THE WITNESS: Yes, sir.

THE COURT: That was 3000 a month.

THE WITNESS: Yes, sir.

BY MR. HAUF:

Q Did you pay your father and brother those amounts?

A No. No. My dad was a multi-millionaire. Once he passed, my mom just forgave it. She had plenty of money.

Q And as far as the -- as far as the primary mortgage, you said you pay by check?

A Yes, sir.

Q How does your wife pay? Does she give you the money?

A No, she sends a check in also.

Q So you would each send in a check to the mortgage company?

A Yeah. I'm the only on earth who still pays by check.

Q And is your wife on the -- to your knowledge, is your wife on the Midwest loan for Hamilton?

A No, sir, just me.

Q Are you still in the Arizona house?

A Yes, sir.

Q How many years have you lived in the house?

A Almost four years. Four years this spring/summer.

Q And --

A Excuse me.

THE COURT: When did your father pass, sir?

THE WITNESS: I beg your pardon?
THE COURT: When did your father pass?
THE WITNESS: Almost three years ago.
THE COURT: Three years ago.
THE WITNESS: Almost three years ago.
BY MR. HAUF:
Q And who was Spencer Twyford?
A Apparently he wasn't my personal banker. He was just my friendly banker.
Q And what do you mean by he was your -- whatever the moniker is -- he was your banker?
A He would drop things off. I -- I guess he's just my banker now. He's just my go to banker, not my friendly -- not my personal banker now.
Q And so what was your involvement with him? What service did he provide to you?
A He got -- every time that we -- I wanted to purchase a practice, he would get us a loan.
Q And for how many loans -- or how many years were you getting loans through him?
A Starting in 2010 and the last one was 2016.
Q And did he obtain all the loans that you had for your practices?
A Yes, sir.
Q And did you see Spencer Twyford before the Midwest loan

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

for Hamilton closed?
A Yes, sir.
Q When and where did that occur?
A When -- it was in an -- the office of the practice broker who brokered the sale down in southern Ohio, New Albany. Came in, I flew back. Saw him and a bunch of other people, Dr. Rephart, Opal, Chris Vandiford. There was an attorney. A few other people there. My good -- my unpersonal banker.
Q And to your recollection, did you ever tell Spencer Twyford you bought a house in Arizona before the closing of the loan?
A Sure. Yes, sir.
Q When was that?
A I can't tell you the exact date, but I know it was toward the end of June of 2016. Called him. Actually, I called him to -- my folks were out visiting -- it was around June 24th. The only reason I remember that because it was -- it was the date -- it was the wedding anniversary of my first marriage and I talked to Spencer, told him. I actually asked him -- not to chat -- but I was asking him if he could refinance the practices and told him my dad was out. Told him my dad -- my dad was like me, kind of a little goofy. And he used to call my current wife by my ex-wife's name and he used to -- he was so excited that we were going to go out to have a nice steak dinner. We were going to Durant's to celebrate our wedding

anniversary but my mom would have to correct him that was the anniversary of my first marriage, not my second marriage. So -- he's not here, but I miss him, but he was funny.

Q So you recall the time period because --

A It was --

Q -- that event?

A It was just -- it was around June 24th. It was my wedding anniversary of my first marriage, not my second marriage. My second marriage is April 2nd.

Q And so what was your conversation with Spencer at that time?

A It was just talked and just told him, you know, can you -- you know, can you refinance the loan, that's what I'm calling for. Told him Arizona is beautiful. It's not snowing. Got to -- have to watch out for the scorpions and the rattlesnakes, which I had at my house, which my mom was mortified that -- just told him it was great. It was just a great life and I'll see him soon.

Q Okay. And so to your knowledge, you had -- you believe you had informed Mr. Twyford of your move to Arizona or that he was aware of your move to Arizona?

A There was no secret. I mean, part of the reason I went is it's -- I had some health reasons. I needed to get out of the damp, cold climate. It hurts. If you have arthritis, it hurts.

Q You said you've never been to the Hamilton dental practice, is that correct?
A That's right. Never seen it.
Q And was it necessary for you to travel between practices to inspect them?
A No. They had a regional manager. That was what she got a lot of money for. She got paid for that.
Q And -- and we'll go to -- I want to go back and ask about one specific question. You said that you had -- in the closing documents, you had seen -- when you came -- when you flew into Ohio to sign the closing documents, you saw Mr. Twyford there.
A Yeah.
Q Did he know you were flying in to sign the documents?
A Yeah. Yeah. Yeah. No secret.
Q Do you recall discussing Arizona with him or what was your discussion like?
A You mean on that particular day? Weather's great. Scorpions are great. Having a good life. Still unpacking. It was just chitchat. I thought he was my personal banker.
Q And were you planning to work in Arizona once you moved here?
A Yeah, I did. Well, the first couple of months, I tried to do what my dad did, but after -- back in September -- so I was here for about two months and given the level of money I was making, I wanted to work still a few days a week. I mean, I

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

didn't want to work six days a week. I won't do that. But three days to keep my hand in. That's my definition of semi-retire.

Q And -- let me bring this up. This is Plaintiff's Exhibit 18. Can you see Plaintiff's Exhibit --

MR. BRAILSFORD: Your Honor, which exhibit is this?

MR. HAUF: It should be Plaintiff's Exhibit 18.

MR. BRAILSFORD: Okay.

BY MR. HAUF:

Q Do you see this email? Can you see who it was from?

A It was from Aftco, which is the local practice broker.

Q Okay. And who is to?

A My personal banker, Spencer.

Q Okay. And it looks like you were also cc'd on that, is that correct?

A Yes, sir.

Q And we had discussed this last -- yesterday, but what's the date on this email?

A January 27, 2015.

Q In 2015. And I'll take a -- take a minute and look at the content of the email if you could.

A Yes, sir.

Q Okay. What was this when it talks about the Scottsdale purchase merger, what was that about?

MR. BRAILSFORD: Your Honor, I'm going to object on

relevance. Again, we're talking about a practice that was applied for for a loan for a Tim Wildung or an Aaron Wildung back in January of 2015, a year and a half before this actual loan occurred and a year and a half -- or at least a year before Spencer Twyford was even an employee of Midwest Bank.

THE COURT: Why are we looking at this, Mr. Hauf?

MR. HAUF: Your Honor, the testimony previously given indicates that Spencer Twyford was essentially the sole source of information for the Debtor and the Debtor's practice. And there was also indication that no one knew he going to move to Arizona and no one had any idea he was planning to relocate. This email goes to show that there was indeed intent to relocate or at least discussions of relocation and these discussions happened in a relatively close proximity to the investigation of the new loan, the Hamilton loan, which was only a year after this.

MR. BRAILSFORD: That's a lot of assumed facts not in evidence, Your Honor.

THE COURT: To the extent we're going to be talking about Mr. Twyford knew and when he knew about Arizona, that's what this is about?

MR. HAUF: Yes, Your Honor. Essentially we're saying -- we're showing that there was communication, at least an intent. And that was documented that the Debtor intended to move to Arizona and had attempted to do so once before in 2015.

THE COURT: Objection is overruled.

BY MR. HAUF:

Q And so this email was regarding a Scottsdale purchase merger?

A Yes, sir. The -- Tim Wildung who is a practice broker, his son had just graduated from a school over in Maryland, I believe, and he and I were going to merge a practice round these here parts in Scottsdale and Shay. And we were very excited about doing it. Dr. Foley and Dr. Alverson, again, were very respected, very -- had been in practice for 30 and 40 years, respectively, I believe. And we were going to purchase the practice, myself and Tim Wildung's son, Aaron.

Q And it looks like here Mr. Twyford was working on the loan for that?

A Yeah. He's the only -- he's the first -- he's the only one I go to.

Q Okay. And so did he -- based on your conversations with him, did he know that you were going to move Arizona yourself?

A Yes, sir.

MR. BRAILSFORD: Your Honor, objection. Foundation.

THE COURT: It's sustained. There's no foundation to indicate he --

MR. HAUF: Understood, Your Honor.

THE COURT: -- knew that he was moving to Arizona.

///

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

BY MR. HAUF:
Q In your discussions with -- so my understanding is whenever you get a loan, your first step is to discuss that loan and processes with Mr. Twyford, is that correct?
A Yes, sir.
Q Is that what occurred with regard to the Scottsdale purchase?
A The potential purchase, yes, sir.
Q What types of information did you discuss with Mr. Twyford?
A Getting a house, moving out here. He was -- he was more concerned with the size of the practice. It was going to be a very lucrative practice. So he often -- wanted to know if I was going to be working here. It says -- blah, blah, blah. Yeah, Dr. Raiffe will work one to two days per week as needed. Okay.
Q And -- and did he ever express concern with your ability to maintain your Ohio practice and this Arizona practice?
A No, sir. I wasn't --
MR. BRAILSFORD: Objection. Hearsay.
THE COURT: Sustained.
BY MR. HAUF:
Q To your recollection, was there ever a discussion regarding your ability to perform and keep your practices in Ohio running?

MR. BRAILSFORD: Objection. Hearsay.

MR. HAUF: I'm not asking for the content or the proof of the discussion. I'm asking if he discussed with anyone, not what was said.

MR. BRAILSFORD: It's a leading question, Your Honor, where he's asking that exact information.

MR. HAUF: I'll rephrase, Your Honor.

THE COURT: Please.

BY MR. HAUF:

Q As part of the discussions you had with Spence Twyford, is feasibility a typical part of that conversation?

A Yes, sir.

Q Now, to your knowledge, are all the loans that you received SBA loans?

A Yes, sir.

Q And did you pay on the Hamilton loan after Hamilton closed?

A Yes, sir.

Q How long did you pay on the Hamilton loan?

A I'm guessing here. Probably through the first of the year -- well, things started getting a little difficult toward the -- well, winter, in December, January, I believe.

THE COURT: Of 2016?

THE WITNESS: Yes, sir. Yes, sir.

///

BY MR. HAUF:
Q Well, '16 was when you got the loan, so it was December, January?
A Yeah, we got the loan in the spring of 2016, yes, sir.
Q Okay. So -- and then you had trouble paying the loan in December, January, you said?
A Things started to get real tough.
Q Okay. And was it at that point that you discovered the fall off from the Hamilton practice?
A Yes, sir. There was some other issues in other practices, yes, sir.
Q Okay. And prior to that, had you made all of your other payments --
A Yes, sir.
Q -- including the Arizona house?
A Yes, sir.
Q And --
MR. HAUF: If you'd give me just a moment, Your Honor.
BY MR. HAUF:
Q A few more questions, Doctor. When you took out the SBA loans, specifically the Hamilton loan, did you understand that it was government guaranteed?
A Yes, sir.
Q And do you know roughly how much of the loan was

guaranteed by the government?

MR. BRAILSFORD: Objection. Relevance.

THE COURT: What's the relevance, Mr. Hauf?

MR. HAUF: The relevance is whether or not the -- he obviously only took out SBA loans so they were easier for him to get. So I assume that he knew what the potential risk was in getting those loans and what the liability would be.

THE COURT: The risk to who?

MR. HAUF: The bank and the government.

THE COURT: Why is that important or why is that relevant?

MR. HAUF: I think it just goes to show what was -- what was owed and why he was able to get the loan.

THE COURT: The objection is sustained.

MR. AUSTIN: Okay. Thank you, Your Honor.

BY MR. HAUF:

Q I have one more question. With regard to the personal financial statement that was dated May 20th, where were you at that time?

A May 20th? Packing.

Q Okay. At any point -- when did you fully relocate to Arizona?

A We left -- we left Ohio on a Thursday, drove cross country Thursday, Friday, Saturday, Sunday and we washed up in Cave Creek Monday afternoon to meet the movers.

MR. HAUF: That's all the questions I have for now, Your Honor.

THE COURT: Thank you. Mr. Brailsford, you ready to move forward?

MR. BRAILSFORD: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. BRAILSFORD:

Q Good afternoon, Dr. Raiffe.

A I'm sorry?

Q I said good afternoon, Dr. Raiffe.

A Oh, howdy.

Q Now there was some testimony yesterday and today about the Hamilton practice and your clients for the Hamilton practice were across a river?

A Yes, sir.

Q And was that the majority of the clients for the Hamilton practice?

A That I don't know. Dr. Repart (phonetic) had been in practice for a lot of years. When you have an older dentist like that you end up treating the parents and when the kids move down the road, they still come to you out of a sense of loyalty.

Q So how many patients at the Hamilton practice were from down across the river?

A Do not know that.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Q Could have been one?
A At least one.
Q And this river that you talked about that's south of Hamilton that the customers, clients were crossing, what river was that?
A I believe it's the Ohio. It's not the Monongahela. I'm not a geography expert, sir. All we know is that once Dr. Repart left, the loyalty that he built up over the decades just wasn't transmitted. They left and they went to find places that are closer.
Q Thank you. Thank you, Dr. Raiffe. You answered my question. This river is directly south of the Hamilton practice, correct?
A I don't know. I've never been there, sir.
Q In fact, it's about 35 miles south of Hamilton, correct?
A I -- I don't know. I've never been there, sir.
Q Are you familiar with Cincinnati, Ohio?
A I've never visited there. No, sir.
Q Know where Cincinnati, Ohio is?
A South, southern Ohio.
Q Is it directly south of Hamilton?
A Don't know. I've never --
Q Approximately --
A -- been there.
Q -- 35 miles south of Hamilton.

A I'll take it at your word. I don't have a map, sir.

Q So is it your testimony that these patients would drive -- well, let me ask you this. Do you know anything about Cincinnati, Ohio?

MR. HAUF: Objection, relevance.

THE WITNESS: No.

BY MR. BRAILSFORD:

Q Do you know if there are dental practices in Cincinnati, Ohio?

A At least one.

Q Do you know if Cincinnati, Ohio is right on the river of the Ohio River?

A You asked me that. I don't know, sir.

Q Is it your testimony that the clients for the Hamilton practice would drive right past Cincinnati, Ohio and go travel 35 miles to the Hamilton practice?

A Yes, sir, I know they would.

Q You also testified that your dad was a multimillionaire. Do you recall that --

A Yes, sir.

Q -- testimony today?

A Yes, sir. I'm very proud to say that he was a -- dropped out of the ninth grade. Could barely read and could barely write, but he made a lot of money. He was a smart man, good investments.

Q Thank you, Dr. Raiffe.

MR. BRAILSFORD: Could you pull up Exhibit 10, please.

BY MR. BRAILSFORD:

Q This is an excerpt from your testimony on May 3, 2018. Do you recall that testimony?

A No, but I can read it.

Q Do you recall being under oath for that testimony?

A As I am now, sir. Yes, sir.

Q Look at line 10. You're asked here, the question is, "Were you -- and I'm sorry to have to go into this, but was the loan from your father, were you required to pay him?" And your answer is, "Yes." The question is, "Did you" -- next question is, "Did you have -- have repaid that?" Your answer is "No." Current question is, "Again -- and, again, would it be fair to say it's probably going to come out of an inheritance if something happens?" And your answer is, "There ain't no inheritance."

A Yes, sir.

Q Question is, "Okay. So what are the terms of the repayment to your late father?" And your answer was, "It was supposed to be 3,000 a month. He came up with that. And once he passed, he expected me to continue paying my mom." Question was, "Have you done that?" And your answer is, "No." Did I read that correctly?

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

A Yes, sir.
Q So your dad, as I understand it, was a multimillionaire that expected you to pay him back the 300,000, correct?
A Yes, sir.
Q And your testimony is that you have not paid him back, correct?
A That's correct.
Q And your testimony is is that despite the fact that he's a multimillionaire, there is no inheritance to take that 300,000 from?
A That's correct.
Q So it's my understanding that you're not going to repay that loan, correct?
A I was supposed to, but I never did. But after my dad passed my mom forgave it. She had lots of money my dad left her.
Q Now there was also some testimony where you alleged that Spencer -- that you told Spencer Twyford that you were moving to Arizona. Do you recall that testimony?
A Yes, sir.
Q And you also just testified that you had mentioned that there were scorpions and things like that in your house here in Arizona. Do you recall that testimony?
A Yes, sir.

MR. BRAILSFORD: Could you pull up Exhibit 22,

please.

BY MR. BRAILSFORD:

Q Do you know Spencer -- were you aware that Spencer Twyford had been called for a deposition?

A No, sir. Wait --

Q Did you know that Spencer Twyford testified in this case on September 5, 2019?

A I knew he was. I don't know the date, sir.

Q Okay. Did you know that Spencer Twyford was asked those exact same questions and he denied that you told him about moving to Arizona?

MR. AUSTIN: Objection, hearsay.

THE COURT: So this is exactly what Mr. Twyford testified to here, so I'm not really certain why we're talking about his deposition. Mr. Twyford's testimony was to the effect of I knew nothing about Arizona. Didn't know about a house. Didn't know about a debt. Didn't know --

MR. BRAILSFORD: Fair enough, Your Honor.

THE COURT: -- about a purchase.

MR. BRAILSFORD: We can probably move on.

BY MR. BRAILSFORD:

Q You were asked just now some questions about the attempt to purchase a practice in Arizona.

A Yes, sir.

Q And that loan was denied, correct?

A Yes, sir.
Q And you testified that your plan was to move to Arizona when you attempted to make that purchase; is that correct?
A Yes, sir.
Q Now you also testified that you plan to work one or -- or a couple of days a week?
A Yes, sir.
Q At the Scottsdale practice?
A Yes.
Q Now your testimony yesterday was that your business model was that you don't work the practice. You buy it and the associates work it, right?
A That is correct.
Q So is the Scottsdale purchase a deviation from your business model?
A No, just felt like working. I would have to help out. That was part of what Tim Wildong wanted me to do. Tim Wildong wasn't in charge of my life in Ohio. And as the gentleman said, if you don't mind me, he said I had a good thing going.
Q Thank you.
A I know. Thank you. Sometimes I ramble. I apologize.
Q So was it your understanding, then, this plan to purchase a practice in Scottsdale, and you have what's in front of you is Exhibit 18 I believe. It's highlighted in yellow, that you'll be working four days a month, Dr. Foley, age 70 will be

working three days per week up until Dr. Wildong receives his license in June 2015.

A Yes, sir.

Q And Dr. Raiffe will work one-to-two days per week as needed, correct?

A Yes, sir.

Q So your business model was to not work the Ohio practices, but your plan was to work a couple days a week at the Scottsdale practice?

A The Scottsdale practice is about six and a half miles from my house. The Hamilton office was five miles.

Q Yes-or-no question.

A Yes, yes. I was going to hopefully work --

Q Thank you.

A -- two days a week.

Q Thank you. You answered my question. Now you previously testified that Mr. Vandiford was your business partner, correct?

A Yes, sir.

Q He found practices and you obtained financing for those practices, correct?

A Yes, sir, I would --

Q Thank you.

A I'm sorry.

Q In order to find practices that you wanted to purchase

would you agree that Mr. Vandiford needed to understand what your business model was so that he could find practices that would fit your model?

A No, he meant Opal would find practices. They both understood my model. So she would be --

Q Thank you, you answered my question. There's not a question pending.

A Sorry. I was just trying to be very elaborate.

MR. BRAILSFORD: Would you pull up Exhibit 44, please.

BY MR. BRAILSFORD:

Q We talked about this text yesterday and this is a text dated April 25th, 2016. It's allegedly between you and Mr. Vandiford, correct?

A I'm sorry, I must have -- yes, we saw this text yesterday, sir.

Q And this is Mr. Vandiford is mentioning, you know, too bad you're leaving. Do you remember that?

A Yes, sir.

Q And you recall testifying that he wanted you to work the Ohio practices? Do you remember that testimony?

A Well, he -- he would like me to work, but he knows that I wasn't going to if you look at the last part. I buy, the associates work it and we split the profits. That's the business model.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Q Thank you, Doctor.
A My pleasure.
MR. BRAILSFORD: Exhibit 21, please, at page 34.
BY MR. BRAILSFORD:
Q So if we look at line 13, and this is your testimony from October of last year. I asked you, why does Mr. Vandiford ask you why it's too bad and you answered that it's because he had the belief that he wanted you to work the Ohio practice.
MR. HAUF: Objection, Your Honor.
Q -- and teach associates how to work dentistry, right?
MR. HAUF: Objection, Your Honor. This has already been asked and answered in previous testimony.
THE COURT: We talked about the text. Frankly, I don't recall talking about this deposition testimony.
MR. HAUF: It was the same depo page we've used previously.
THE COURT: We'll play this out and --
MR. HAUF: Thank you, Your Honor.
THE COURT: -- and I'll overrule the objection for now.
BY MR. BRAILSFORD:
Q So it was your understanding that Mr. Vandiford was saying, too bad that you're leaving me because he wanted you to work the Ohio practices, right?
A He wanted me to if I -- right there where it says I would

have to teach the associates how to do better dentistry, like surgery. But that's why we didn't hire brand new associates or we'd hire experienced dentists. Unfortunately, sometimes they don't know how to do surgeries. I'm sorry, my screen went blank.

Q My fault.

A How to do better surgery, which is what I'm very good at. Most dentists don't choose to do their own surgery.

Q Thank you.

MR. BRAILSFORD: Could you pull that back up.

UNIDENTIFIED SPEAKER: I apologize. My fault. What exhibit?

MR. BRAILSFORD: 21. Thank you.

BY MR. BRAILSFORD:

Q So your answer back in October was that Mr. Vandiford wanted you to work Ohio practices. Do you see that line 16? Plural, correct?

A Yes.

Q Wanted you to teach associates how to do better dentistry, correct?

A Correct. I said that, yes, sir.

Q Now you heard Mr. Twyford's testimony yesterday where it was his understanding that you were also working the Ohio practices. Do you recall that?

A I recall also thinking that he's wrong. Yes, sir, his

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

I've --
Q Thank you.
A Like Dr. Jones had a misunderstanding of my business model.
Q Thank you. You answered my question. You also heard Mr. Street's testimony that the bank believed you were working your Ohio practices and that you would also be working the Hamilton practice. Did you hear that testimony?
A I heard it, yes, sir.
Q Okay.
A It's just as wrong as Spencer's was, sir.
Q Thank you. You answered my question.
A All right.
Q So if we count Mr. Vandiford, Mr. Twyford and Mr. Street, that's three people that understood or at least wanted you to be working the Ohio practices if that was part of your business model, correct?
MR. HAUF: Objection. Calls for speculation.
THE COURT: I understand where we've been. You don't need to summarize with him.
MR. HAUF: Thank you, Your Honor.
BY MR. BRAILSFORD:
Q So you just testified that your business model was to not work the practices but to let the associates work them, right?
A That's correct, sir.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Q You also testified that the Hamilton practice was the one practice that you purchased where the seller was not staying on, correct?
A Yes, sir. Yes, sir, that's correct.
Q And you wouldn't want to rely on graduate dentists or new dentists because they can't produce at the same level as an experienced dentist --
A That's correct.
Q -- like yourself?
A We didn't hire any newbies.
Q And the problem with associate dentists is that they're like a revolving door, right?
A It's hard for them to get what's called buy in. It's hard for them to put their heart and soul into it. I mean sometimes they're really good, especially the older dentists that we had purchased a practice from. Most dentists, one of the appeals that they had is that they would no longer be in charge of the stuff that dentists hate, which is dealing with staff and payroll and ordering and all the other stuff. So Opal would take that away from them. She would do that and they get to do their dentistry and go home.
Q Thank you.
A Okay.
Q Yes or no, you had to fire several associates, right, Dr. Raiffe?

A Yes, sir.
Q Yes or no, associates don't take the practice seriously, right?
A Some don't. That's correct, sir.
Q But your testimony has been that you don't work the Ohio practices, you just let the associates work the practices, correct?
A Well, let me -- well, the existing dentist who we bought it from would work it. Some had associates in addition to that. So yes, sir, it's all up to them.
Q Thank you. You testified yesterday that you would occasionally work a practice to help a dentist with surgery or wisdom tooth extraction, right?
A Yes, sir.
Q I want to talk to you about dentistry. Are you still practicing dentistry?
A Yes, sir.
Q Okay. You would agree that dentistry involves a lot more than just teeth extractions, correct?
A There are many phases of dentistry, yes, sir.
Q So --
A Surgery --
Q I'll ask the questions and you can just answer, okay?
A You got it.
Q Thank you. Dentistry includes drilling teeth, correct?

A Yes.
Q Does dentistry include fixing cavities?
A Yes.
Q Does it include crowns?
A Yes, sir.
Q Bridges?
A Yes, sir.
Q Veneers?
A Sometimes.
Q Root canals?
A Sometimes.
Q Treating gum disease?
A Sometimes.
Q So dentistry is a lot of stuff?
A There are multi facets of the profession, yes, sir.
Q You go to school for four years to learn all this stuff, right?
A Yes, sir.
Q It's not just wisdom teeth extraction, correct?
A That's correct.

MR. BRAILSFORD: Go to Exhibit 21, page 34. Thank you.

BY MR. BRAILSFORD:
Q So your testimony was you don't work your practices, but in October 24, 2019 your testimony was that Mr. Vandiford

expected you or wanted you to work the Ohio practices to teach associates how to do better dentistry.

A Yes, sir.

Q Sounds like he wanted you to do a lot more than just surgery?

A No. My experience has been that -- with that most dental schools give you a very good fundamental education, but unlike -- like even my school where they had specialties, you did not learn surgery. You had to do that after school, so most -- most general -- most general dentistry -- most general dentists do bread-and-butter dentistry. If they want to get involved in something like a full bony impactions, it's a little bit of an art and they don't know that. They do simple extractions. So trying to keep everything inhouse --

Q So when your testimony --

A I'm sorry, I wasn't -- I wasn't finished. I apologize. When you try to keep everything inhouse you would learn to instead of sending it out to the oral surgeon they would do full bonies in -- in house. That's what I teach them to do if they're interested. Yeah, there's a comfort level, also.

Q Are you finished, Dr. Raiffe?

A I am now. Thank you.

MR. BRAILSFORD: Can you pull up Exhibit 44.

BY MR. BRAILSFORD:

Q Now yesterday when you were asked about this text from

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Mr. Vandiford you testified that you couldn't buy another practice because you were leaving Ohio. Do you recall that testimony?

A Yes, sir.

Q Okay. So this text message in April of 2016 was that you, basically you couldn't buy a practice because you were leaving Ohio. You were moving to Arizona, right?

MR. HAUF: Objection, Your Honor. This is the same questioning we've had before on this exact same exhibit.

THE COURT: This is something that's been asked and answered.

BY MR. BRAILSFORD:

Q As of May 2016 you still owned the Warren Group practice, right?

A Yes, sir, I believe so.

MR. BRAILSFORD: Pull Exhibit 1, please, second page. Show the fax line.

BY MR. BRAILSFORD:

Q The date on that Exhibit 1 is May 17, 2016, right?

A 2016, yes, sir.

Q May 17, 2016 --

A Yes, sir.

Q -- fair? You still owned that practice at that time?

A Yes, sir.

Q In fact, you were still in Ohio at that time, right?

A Correct.
Q Because you didn't move to Arizona until the end of May, right?
A Yeah, it was the -- a week or so later.
Q So did you move at the end of --
A May, yes, sir.
Q And the Hamilton -- the Hamilton loan, that closed in July, right?
A July 20th, the end of July. Yes, sir.
Q Okay. But you had already moved to Arizona at that time?
A Correct.
Q So you still closed on a loan even knowing that you couldn't buy a practice if you weren't living in Ohio anymore?

MR. HAUF: Objection, speculation.

THE COURT: I don't understand that.

MR. HAUF: No one testified he couldn't buy a practice if he wasn't living in Ohio anymore.

MR. BRAILSFORD: We did, Your Honor.

THE COURT: We have Mr. Vandiford saying too bad you're leaving and you can't buy this practice near Cleveland. That's what I understood the text to represent.

MR. BRAILSFORD: Yes, Your Honor, and the witness just testified that it was his understanding he couldn't buy the practice because he was leaving Ohio.

THE COURT: What's the objection, then?

MR. HAUF: I was going more towards a loan perspective, so I withdraw the objection.

MR. BRAILSFORD: Thank you. And I believe he answered the question.

THE COURT: Okay, then we can move on.

MR. BRAILSFORD: Okay.

BY MR. BRAILSFORD:

Q Heard a lot of testimony about Opal Anderson. You testified that Opal Anderson had all your personal information, right?

A Yes, sir.

Q She paid all the bills for your businesses, right?

A Yes, sir.

Q She also paid your personal debts, correct?

A Correct.

Q She had access to your checking accounts, right?

A Yes, sir.

Q She paid your mortgage payment --

A Yes, sir.

Q -- right? Would that be the mortgage payment in Ohio?

A No, in -- no, the Arizona house. My wife paid hers and I need to send a check.

Q You testified that she paid your car payments --

A Yes, sir.

Q -- right?

A They were a business expense.
Q She made your credit card payments as well, right?
A Yes, sir.
Q All your personal bills she paid?
A Pretty much so.
Q You trusted her?
A Yeah, I'd like to think --
Q Did good work for you?
A Yeah, for the most part.
Q Was she sloppy?
A She's human.
Q I don't understand the answer. It was, was she sloppy or was she accurate?
A She's -- I'm sure she's made mistakes as we all have.
Q I'm not talking about making a simple mistake here. I'm asking you -- I mean this is a woman that you testified essentially you gave the keys to your kingdom to, right?
A You -- you're conflating trust with accuracy. I trusted her completely. I hoped that she was accurate.
Q Let me ask you this, Dr. Raiffe. Would you trust her if she was sloppy?
A No.
Q Would you trust her if she was missing your payments?
A I would trust her to do the right thing. I didn't have cause to suspect her of any malfeasance, I suppose.

Q Thank you. So you gave her total control of your finances, correct?
A Yes, sir.
Q But you didn't have any oversight over Ms. Anderson, did you?
A I'm sorry? I beg your pardon?
Q Didn't have any oversight over Ms. Anderson, did you?
A No. If I had a question I would -- she would certainly answer it. But I never saw need to question anything.
MR. BRAILSFORD: Now can you pull up Exhibit 1, please.
BY MR. BRAILSFORD:
Q There was some testimony --
MR. BRAILSFORD: Go to the first page.
BY MR. BRAILSFORD:
Q -- about the sloppiness of Exhibit 1, right?
A Yes, sir, I heard that from the -- the last gentleman.
Q A lot of these numbers, this looks sloppy. Would you agree?
A Listening to what the judge said also, there was some errors there, yes, sir.
Q Is that indicative of the type of work that Ms. Anderson did for you?
A No, I would have no idea that these numbers existed as you've fleshed it out several times. I've never seen this

document before, sir.

Q Would you agree that the sloppiness in the document marked Exhibit 1 is indicative of a person that filled this out that doesn't have the temperament to fill this type of document out?

MR. HAUF: Objection. Calls for speculation.

THE COURT: What's the objection?

MR. HAUF: Speculation.

THE COURT: Overruled.

MR. BRAILSFORD: Thank you.

BY MR. BRAILSFORD:

Q You can answer the question.

A Can you repeat it for me if you don't mind?

Q Would you agree that the sloppiness displayed in Exhibit 1 is indicative of a person that doesn't have the temperament to fill out this type of a document?

A No. No, sir. I don't think that's indicative of a bad temperament. If she's made mistakes that's unfortunate.

Q Now you did not take Ms. Anderson's deposition, correct?

A I did not take her?

Q Ms. Anderson hasn't testified in this case before, has she?

A I don't believe so.

Q And she's not being called as a witness here to testify, right?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

A I don't believe so.

Q So the one person that could confirm your explanation that Ms. Anderson filled out this document is not here to testify, correct?

A I don't see her. No, sir.

Q And Ms. Anderson is the one person that could confirm your explanation that a stamp was used on or may have been used on Exhibit 1. She's not here to confirm that, correct?

A No, I don't believe she's going to be here today, sir. I don't -- but I don't know how that works.

MR. BRAILSFORD: Can you go to that second page of that.

BY MR. BRAILSFORD:

Q And I just want to make sure I understood your testimony correctly yesterday. Your testimony was that the signature on the second page of Exhibit 1 could be a stamp, but you just don't remember signing it, correct?

A I testified, sir, I believe, that I've never seen this document before and it most likely was a signature stamp that I gave Opal to use like she did for everything else with my signature on it, sir.

Q So you don't remember signing this document, correct?

A That is correct.

Q One last thing to close this up. The signature on the second page of Exhibit 1, I just want to make sure that there

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

is no other explanation other than this being a signature stamp or simply you not remembering signing, correct?
A Since I've never seen this document before, sir, yes, that is correct.
Q So there's no other way that that signature could have gotten on there other than a signature stamp or you signing it, but you don't remember signing it, right?
A I don't believe -- I believe that was a signature stamp, sir, because I've never seen the document before. Yes, sir.
Q Okay. And you do recall your testimony back in May where your testimony was that you were just told to sign this document. You remember that testimony?
A No, I don't. Sorry. But like I said, it was most likely a signature stamp. I've never seen this document before.
MR. BRAILSFORD: If you go to page 106. You've got to pull up my notes. I'm sorry.
BY MR. BRAILSFORD:
Q So do you remember testifying that this document was filled out by Opal and they just told you to sign here? Do you remember that?
A Yes, sir.
Q Okay. And your testimony is that you did not sign that?
A No, I believe my testimony is I don't recall signing it and it was most likely a signature stamp.
Q Okay.

A    But it says here they said sign here.  Again.
Q    So if they told you to sign there, is it possible that you did sign there?
A    Possible, but it's most likely was a signature stamp.
Q    Thank you.
MR. BRAILSFORD:  I have no further questions.
THE COURT:  Mr. Hauf.  How long do you anticipate, Mr. Hauf?
MR. HAUF:  Not terribly long, Your Honor.  I only have a few questions.
THE COURT:  So we're 20 minutes before the noon hour. You think you'll be done before then?
MR. HAUF:  I should be, but if Your Honor would like we can break now and --
THE COURT:  Let's see how we do.
MR. HAUF:  Okay.  Thank you.

REDIRECT EXAMINATION

BY MR. HAUF:
Q    Dr. Raiffe, with regard to production, we've talked a lot about production and dentistry art.  Are there different licenses you have to possess as a dentist to engage in surgery versus general dentistry?
A    No, unless you opt to limit your practice to a particular specialty, such as oral surgery or periodontics.  As a general dentist you're licensed to do every aspect of dentistry.

Q Okay. So if I were to draw an analogy like attorneys can do bankruptcy work or other work, general dentists can engage in surgery if they have the proper training without having required -- without being required to get another license?

A Correct.

Q And so are you able to engage in surgery?

A Yes, sir.

Q And is it the type of surgery that would be above and beyond what a general practitioner would engage in?

A Depending on their training or their comfort level, yes, sir.

Q And so what happens if a general dentist encounters a situation where they have to perform surgery?

MR. BRAILSFORD: Objection, foundation, speculation.

MR. HAUF: I'll re-ask the question, Your Honor.

BY MR. HAUF:

Q So in the general practice if I have a patient that comes in and requires oral surgery what would typically happen?

A The first thing would be that the general dentist would assess the health. They would be candid about their ability to do that type of surgery. Some of it's easy. Sometimes you got to know when to send it out to a specialist.

Q Okay. And so if a general dentist doesn't feel comfortable performing a particular type of surgery, although they would be licensed to do so, they send it to someone else?

A Yes, sir.

Q Okay. And so going back to your previous testimony, would you train your associates in your Ohio practices how to perform these more complex surgery types?

A Yes, sir.

Q And so this was -- would that end up boosting profits then?

A Sure. Yeah, yes, sir.

Q Okay. And so when we talk about training, did you train the associates who didn't have that experience?

A If they wanted it. If they felt that's something they would like to do or in that particular practice there was a need of relatively younger patients coming in needing their wisdom teeth out. If not, they knew the bread and butter. They knew the -- they knew basic dentistry. There's nothing I could teach them.

Q Okay. So a wisdom tooth extraction would be one of those types of procedures that would be -- you need to have a little bit more training than a general dentist?

A Depending on the complexity of the individual case, yes, sir.

Q Okay. And so while you owned these Ohio practices and Hamilton, you didn't produce on a regular basis unless a doctor was missing; is that correct, or --

A Say again, sir.

Q So when you owned the Ohio practices you'd engage in a regular scheduled production basis?
A No, not --
MR. BRAILSFORD: Objection.
A -- at the other practices, no, sir.
MR. BRAILSFORD: Your Honor, I don't know that my objection was heard, but going forward can we make sure that counsel's not leading the witness.
THE COURT: Mr. Hauf, no leading questions, please.
MR. HAUF: Understood.
BY MR. HAUF:
Q You didn't maintain a regular -- did you maintain a regular schedule at any of those practices?
A No, sir.
Q And so when we say production, what does that typically mean?
A On a -- on a -- for a dental practice mode? What -- what -- I'm sorry. What --
Q If I were to draw a distinction, what does it mean when you say, well, I can engage in production?
A Oh, okay. If you're going to -- a patient comes in and they need four badly impacted wisdom teeth out plus using the nitrous oxide as sedation, I would -- that would take me a half an hour to do and generate $2500 in production. I hate seeing that walk out the door. If they started seeing this, the other

doctor indicated that they -- they -- a lot of dentists just don't do surgery. They send it out. I do my own. I would like to teach them how to do it and keep that production inhouse.

Q So when there was talk of next level, was that what was meant by next level?

A Yeah, I hate seeing surgery go out. That's just silly.

Q Can you have a profitable practice with only a general dentist?

MR. BRAILSFORD: Objection, calls for speculation.

THE COURT: Mr. Hauf?

MR. HAUF: Sure, I'll -- well, I'm just going towards the general idea of practice profitability. I'll re-ask the question.

BY MR. HAUF:

Q Were any of these practices that you did own in Ohio that were profitable, did they engage in only general dentistry?

A As opposed in addition to surgery? No. The real profitable ones also have that surgical production inhouse.

Q Okay. And did the dental practices that didn't have surgery, were they also profitable?

A Not as much, but yes, sir.

Q Okay. And during your deposition did you give counsel, opposing counsel, the address and phone number for Opal Anderson?

A I believe so. Yes, sir.

MR. HAUF: That's all I have, Your Honor.

THE COURT: Thank you. Are we at the conclusion, then?

MR. HAUF: Yes, Your Honor.

THE COURT: My understanding is the parties did not want to do closing argument today but rather wanted to submit briefs. Are we still of that mind?

MR. AUSTIN: For the Plaintiff, yes, Your Honor. And I believe the initial discussion was two weeks, if the parties decided to do one, with a week response. The only question would be, knowing how lawyers write, what the practical page limit for us so that we give you relevant information but don't simply drone on.

THE COURT: Before answering the question about page limitation let's first all establish that February 11 is when these briefs are due if they're going to be filed and that any response to the briefs filed will be due -- well, the 17th is a holiday, so instead of making it the 18th let's make it the 19th of the response date.

MR. AUSTIN: That works for the Plaintiffs, Your Honor.

THE COURT: Okay. And then let's talk a little bit about --

MR. HAUF: I'm sorry, Your Honor. Could I clarify?

The briefs are due, the original briefing would be 11th, correct?

THE COURT: February 11th.

MR. HAUF: Okay. And then the response 19th?

THE COURT: The 19th, correct.

MR. HAUF: Thank you, Your Honor. Sorry.

THE COURT: What I would find useful in that briefing, and you can certainly do whatever you want, but I am curious about what the parties' positions are regarding this use of the stamp and the use of Opal Anderson to prepare the document, is there going to be a question of agency ratification of her acts and the like. That strikes me as a key feature of what's going on in this case. So brief what you wish, but I'm curious as to what the parties' position is and what you think the law is regarding this.

I certainly got the impression that it's Dr. Raiffe's belief that if a stamp was used, he's not liable or he's not culpable in a materially inaccurate financial statement.

MR. AUSTIN: Understood, Your Honor. We will happily brief that and provide you relevant case law and apply the facts thereto. Happy to do that for Your Honor.

THE COURT: So in terms of number of pages you might need, what are you thinking on the brief and the response, Mr. Austin?

MR. AUSTIN: Your Honor, I think the local rules

provide a motion to be 14 pages, in that realm. I think that should be more than sufficient, especially if we're just really focusing on, you know, a wrap up of closing arguments now briefed with the addition of the agency issue and then walking through the elements of 523(a)(2).

I think we can do it in 14 pages. I think a response of no more than seven seems logical. I'd defer to Adam -- Mr. Hauf if that doesn't strike --

THE COURT: Mr. Hauf, I'm hearing 14 and seven.

MR. HAUF: Your Honor, originally our discussion was we may or may not file a brief and we may just do our response. I think seven pages is fine for a response.

THE COURT: Okay. And a brief, if you decide to file one, 14 is sufficient?

MR. HAUF: Yes, Your Honor. More than sufficient.

THE COURT: Okay. All right. Anything else that we need to be talking about while we're all together, Mr. Austin?

MR. AUSTIN: No, Your Honor. I think we officially rest our case with the conclusion of Mr. Raiffe's testimony. We submit it to Your Honor for a decision pending the briefing. We have nothing further to be scheduled. I think once the Court reads the briefs if there's further oral argument that's required we'll address it at that time and the Court can simply set a hearing and we'll happily come back and discuss it with Your Honor.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: All right. It's not clear to me that we're going to have oral argument if the briefing is concise, clear and I don't need any further discussion from counsel then I'll take it under advisement at that point. If we're going to set a hearing, I'll certainly let the parties know.

MR. HAUF: As a -- one thing that we were talking about was as far as the page limit on the response, if we don't file a reply would we be -- they wouldn't have an opportunity to reply to our response if it was longer, correct, on the briefing schedule? So if we --

THE COURT: You're asking whether there's going to be an opportunity for a reply to your response?

MR. HAUF: Correct.

MR. AUSTIN: Your Honor, that seems --

MR. HAUF: Well, my question was if we expand the response page to 14, would they need a reply?

THE COURT: I'll give the opportunity for reply.

MR. AUSTIN: Thank you, Your Honor. We'll keep it at the seven-page. I think seven-page for a reply if needed is fine. And we shouldn't be very long for that reply. We'd like to get a decision from Your Honor promptly, so --

MR. HAUF: My question was really around the seven-page limit, if I'd be able to expand that to 14 on my response.

THE COURT: You want 14 on a reply -- or a response?

MR. HAUF: Response, yeah. If we choose -- we may just file a brief to make things easier, though. Because originally we were going to do oral closing arguments.

MR. AUSTIN: What's good for the goose is good for the gander, Your Honor. If it's 14, 14 and seven for a -- 14 pages motion, 14 pages response, we'll do seven for reply. That's fine, Your Honor.

THE COURT: Okay. So any reply that's going to get filed needs to be filed by February 26. And here's the schedule again. February 11, briefs, 14-page max. February 19, any response to those briefs, 14-page max. February 26, reply to any responses, seven-page max.

MR. AUSTIN: And, Your Honor, just to be clear, the reply is only to address those items in the response, not to further expand what should have been included in the brief initially?

THE COURT: I see the brief and then the response. It sounds like Mr. Hauf wants to go beyond whatever is discussed in the opening brief. That's fine. But any reply has got to be limited to replying to what happened in that response.

MR. AUSTIN: Thank you, Your Honor. Just like that clarification. With that the Plaintiffs have nothing else, Your Honor, unless there's something the Court needs.

THE COURT: Okay. Mr. Hauf?

MR. HAUF: The Defense also would rest.

THE COURT: All right. Thank you. We're adjourned and this matter will be taken under advisement, if not on February 26th, then at the time of any oral argument that might follow that briefing schedule.

MR. AUSTIN: Thank you Your Honor.

MR. HAUF: Thank you.

MR. AUSTIN: Appreciate your time.

(Proceedings Concluded)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated: February 3, 2020

Harold Ferguson

eScribers, LLC
7227 N. 16th Street
Suite #207
Phoenix, AZ 85020